```
1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5    vs.                      )   CASE NO. 3:19-cr-00003-RRB
                              )
6    TRISTAN GRANT,           )
                              )
7          Defendant.         )
     _____)
8

9
               TRANSCRIPT OF TRIAL BY COURT, TRIAL DAY 1
10     BEFORE THE HONORABLE RALPH R. BEISTLINE, DISTRICT JUDGE
                    April 12, 2021; 8:46 a.m.
11                      Anchorage, Alaska

12

13   FOR THE GOVERNMENT:
            Office of the United States Attorney
14          BY:  KYLE F. REARDON and JENNIFER L. IVERS
            222 West 7th Avenue, #9
15          Anchorage, Alaska 99513
            (907) 271-5071
16

17   FOR THE DEFENDANT:
            Law Offices of James Alan Wendt
18          BY:  JAMES A. WENDT
            425 G Street, Suite 610
19          Anchorage, Alaska 99501
            (907) 258-9100
20

21

22   _____

23              SONJA L. REEVES, RMR-CRR
              Federal Official Court Reporter
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record
```

1                        I N D E X

2              April 12, 2021, Trial Day 1

3

4    Government's
     Witnesses:      Direct    Cross    Redirect    Recross
5
     Sharon Cooper     17       68        94          108
6
     Ajela Banks      115       --        --          --
7

8

9                  E X H I B I T   I N D E X

10   Exhibit                                            Page

11   3            Adultlook.com Ads                     170

12   12.2         Silky Nude Pic for Adultlook.com      181

13   12.3         Silky Face Pic for Adultlook.com      181

14   12.4         Photo Banks w/JS and KC               139

15   12.5         Photo Banks w/JS                      140

16   12.6         Video w/Contraband Image              222

17   12.7         Video w/Contraband Image              223

18   12.8         Video w/Contraband Image              236

19   12.10        Excerpt of Text Msgs Banks & Grant    175

20   12.12        Excerpt of Text Msgs Banks & Grant    184

21   12.13        Excerpt of Text Msgs Banks & Grant    204

22   12.14        Excerpt of Text Msgs Banks & Grant    208

23   12.15        Excerpt of Text Msgs Banks & Grant    216

24   12.16        Excerpt of Text Msgs Banks & Grant    154

25   13.4         Snapchat Video                        179

| | | | |
|---|---|---|---|
| 1 | 13.5 | Snapchat Video | 179 |
| 2 | 13.15 | Snapchat Video | 182 |
| 3 | 13.17 | Snapchat Video | 183 |
| 4 | 13.18 | Snapchat Video | 240 |
| 5 | 13.19 | Snapchat Video | 240 |
| 6 | 17 | Phone | -- |
| 7 | 19 | Grant's Camera | 180 |
| 8 | 19.4 | DVD Containing Contraband | 230 |
| 9 | 19.5 | DVD Containing Contraband | 230 |
| 10 | 19.6 | DVD Containing Contraband | 230 |
| 11 | 19.7 | DVD Containing Contraband | 230 |
| 12 | 19.8 | DVD Containing Contraband | 232 |
| 13 | 19.9 | DVD Containing Contraband | 232 |
| 14 | 19.10 | DVD Containing Contraband | 232 |
| 15 | 19.11 | DVD Containing Contraband | 233 |
| 16 | 19.12 | DVD Containing Contraband | 235 |
| 17 | 19.12.1 | Screen Capture | 235 |
| 18 | 19.13 | DVD Containing Contraband | 235 |
| 19 | 19.13.1 | Screen Capture | 235 |
| 20 | 19.14 | DVD Containing Contraband | 235 |
| 21 | 19.14.1 | Screen Capture | 235 |
| 22 | 19.15 | DVD Containing Contraband | 235 |
| 23 | 19.15.1 | Screen Capture | 235 |
| 24 | 19.16 | DVD Containing Contraband | 235 |
| 25 | 19.16.1 | Screen Capture | 235 |

| | | | |
|---|---|---|---|
| 1 | 19.17 | DVD Containing Contraband | 235 |
| 2 | 19.17.1 | Redacted Screen Grab | 235 |
| 3 | 19.18 | DVD Containing Contraband | 235 |
| 4 | 19.18.1 | Redacted Screen Grab | 235 |
| 5 | 19.19 | DVD Containing Contraband | 235 |
| 6 | 19.19.1 | Redacted Screen Grab | 235 |
| 7 | 20 | Homewood Suite Receipt | 225 |
| 8 | 20CERT | Certificate | 225 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to Order of the Court at 8:46 a.m.)

2          DEPUTY CLERK:  All rise.  His Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session, the Honorable Ralph R.

5    Beistline presiding.

6          Please be seated.

7          THE COURT:  Good morning.  Are we ready to go?

8    Everybody looks good.  Is the government ready?

9          MR. REARDON:  The United States is ready to

10   proceed, Your Honor.

11         THE COURT:  Is the defense ready?

12         MR. WENDT:  We are.

13         THE COURT:  We're going to have opening

14   statements briefly from the government.

15         MR. REARDON:  The United States --

16         DEPUTY CLERK:  Would you like me to call the

17   case?

18         THE COURT:  Go ahead and call the case.

19         DEPUTY CLERK:  We're on record in *United States*

20   *of America versus Tristan Grant*, Case Number

21   3:19-criminal-3-RRB.

22         Counsel, if you will please identify yourselves

23   for the record.

24         MR. REARDON:  Good morning, Your Honor.  Kyle

25   Reardon and Jennifer Ivers for the United States.

1          MR. WENDT:  James Wendt for Mr. Grant.

2          THE COURT:  And we have Mr. Grant.

3          MR. REARDON:  Your Honor, four things this

4   morning.  First, the government has elected not to give

5   an opening statement.  We filed a trial brief that was

6   fairly detailed and so we're not going to do an opening

7   statement.

8          One of the government's subpoenaed witnesses

9   was Julissa Carter.  The United States has elected not

10  to call her.  However, after speaking with Mr. Wendt on

11  Friday and then again this morning, we have kept her

12  under subpoena because she is a possible defense

13  witness.  We have excused her today and asked her to

14  come back tomorrow.

15         As it relates to Ms. Carter, when she arrived

16  this morning, she expressed some concern about needing

17  to speak with a lawyer.  She was previously involved in

18  a federal case that has since been dismissed.  She was

19  represented in that case by John Murtagh.  The advice we

20  gave her, again, with Mr. Wendt present, was to contact

21  Mr. Murtagh this morning if she has any concerns.  And

22  so we may be coming back to Your Honor with a request to

23  appoint Mr. Murtagh for purposes of advising her, but

24  we'll keep the Court advised as to that issue.

25         THE COURT:  I have no problem with appointing

1  Mr. Murtagh if he's willing, but my understanding is you

2  weren't going to call her anyhow.

3          MR. REARDON:  We were not, but it's a defense

4  witness.  I have provided to Mr. Wendt a copy of the

5  stipulations that were agreed to previously.  I have

6  signed them, and I'm asking Mr. Wendt and his client to

7  sign those.  And if they are agreeable and if they are

8  signed, then we will file them with the Court.

9          And then finally, I don't know if the Court saw

10 her not, Mr. Wendt filed his speedy trial motion

11 yesterday.  The United States has not obviously had a

12 chance to respond, and, again, it's our understanding,

13 consistent with the Court's prior order on this issue,

14 that we will be ordered to file a response, if

15 necessary, at the conclusion of the trial.

16          THE COURT:  Well, I would say just respond in

17 due course.  You should obviously respond to it in due

18 course.

19          MR. REARDON:  If the defendant is aquitted,

20 then it becomes moot.  We will respond in due course.

21 Those are the four issues that the United States had

22 prior to beginning the trial.

23          THE COURT:  Thank you.  Mr. Wendt?

24          MR. WENDT:  As far as opening statement, we

25 would like to reserve our opening statement until the

the conclusion of the government case at the beginning
of the defense case.

THE COURT:  Did you take care of those
stipulations?

MR. WENDT:  My client is reading the
stipulations now.  I received them some time ago.  I
remember talking to Mr. Reardon that there was no
problem with them.  I think they are relatively generic.

Candidly, I don't remember if I told my client
about them.  I thought I did, but it's possible he is
seeing them for the first time and he's looking them
over right now.

THE COURT:  Do you need some time?

THE DEFENDANT:  Yes, sir.

THE COURT:  How long do you need?

THE DEFENDANT:  Five minutes.

THE COURT:  Give him five minutes, and then the
government should be ready with your --

MR. REARDON:  Your Honor, if I could put on the
record what our witness order is expected to be.  The
first witness will be Dr. Sharon Cooper.  The second
witness will be Ajela Banks.  The third witness today
will be Officer Seth McMillan from APD.  The fourth
witness, if we get that far, is expected to be FBI
Special Agent Lisa Watson.

1          THE COURT:  Let's take a five-minute recess so

2     Mr. Grant can take a look at that stipulation, and when

3     you're ready, we'll come back.

4          DEPUTY CLERK:  All rise.  The court now stands

5     in a brief recess.

6          (Recessed from 8:50 a.m. to 8:59 a.m.)

7          DEPUTY CLERK:  His Honor, the Court, the United

8     States District Court is again in session.

9          Please be seated.

10          THE COURT:  Okay.  Where are we, Counsel?

11     Mr. Wendt?

12          MR. REARDON:  Your Honor, the stipulations have

13     been signed.  We're having copies made and we will get

14     those filed and a copy delivered to Your Honor.

15          That is all we have from the United States.  I

16     believe Mr. Wendt has an issue he would like to raise.

17          THE COURT:  Mr. Wendt?

18          MR. WENDT:  Yes, Your Honor.  We will be

19     presenting a mistake of age defense, and the government

20     is aware of that, there's not a problem with that.

21          Also, speaking with my client, he wants to ask

22     to continue this trial.

23          THE COURT:  Okay.

24          MR. WENDT:  There is a witness outside who has

25     flown from North Carolina, an expert witness, and we are

willing to have her testify today so she doesn't have to
come back. My understanding is she is here. The
expert, Dr. Cooper, is here. With an expert in kind of
sex trafficking to educate the Court on that, we have no
problem with her testifying today.

I believe all the other witnesses are local.
And my client feels he needs more time now to spend with
me and to go over some of the discovery. He hasn't seen
all of the discovery, but he's seen most -- the vast
majority of it, but he needs to go through all the
discovery.

And he has some witnesses that he would like to
discuss with me. So he's asked to have this continued,
I think, for approximately a month. Is that right?
Approximately one month.

THE COURT: Very well. Mr. Reardon?

MR. REARDON: Your Honor, the government is
opposed to a continuance. As Mr. Wendt says, we have
called a witness from North Carolina. She will testify
this morning. I understand he's going to accommodate
that, but she is not the only witness who is impacted by
this trial.

The government's first witness is a witness who
has a matter pending before Judge Gleason. Resolution
of that matter is dependent upon her testimony here

today.  There are also two victims who have been waiting
to testify.  Continuing the case would impact those
victims causing them further stress and anxiety as they
wait to testify against the man the government has
accused of being their the victimizer.

In addition, Your Honor, the Court is well
aware of the fact that for a substantial period of time,
as detailed in the defendant's motion filed last night,
he has been demanding to go to trial at the earliest
possible opportunity, and yet here we are and he wants a
continuance.

I would note for the record when it comes to
discovery, according to a letter that the government
obtained written by the defendant to Marika Alex, who
will be a witness in this trial as well, written on
November 24th of 2020, included in that letter was a
letter from Mr. Scott Dattan, who was the defendant's
original attorney, from June 27th of 2019.  This came
into the United States' possession because it was sent
by the defendant to Ms. Alex and Ms. Alex provided it to
to us.

At that point, he had six DVDs of discovery in
his possession.  In reviewing what had been produced on
June 27th of 2019, there was approximately 6500 pages of
discovery, to include statements from the defendant,

1   from Ms. Banks, from Ms. Carter, from the victims, not

2   the entirety of their statements, some of that material

3   was withheld for Jenks purposes and to protect their

4   identity, but he had 6500 pages of discovery at that

5   time.

6           According to DOC records, the defendant,

7   between February 25th of 2020 and January 10th of 2021,

8   he asked to review his discovery on seven occasions:

9   February 25th, February 29th of 2020, March 6th,

10  March 13th, August 22nd, December 20th and January 10th.

11          After that, there was a hearing in which the

12  defendant sought to be released from Ms. Carter.  The

13  defendant's release was denied, but Judge Scoble ordered

14  that he be granted up to four hours a day of discovery

15  review time.

16          After being -- after the marshals were ordered

17  to provide that, the records show that the defendant

18  reviewed his discovery between February 4th and

19  February 15th.  He reviewed it twice on February 4th,

20  and then on the 5th, 6th, 7th, 8th, 9th and 10th, he

21  refused, according to DOC notes.  He reviewed again on

22  February 11th, and then did not ask to see his discovery

23  on the 12th, 13th, 14th, 15th or 16th.

24          And then finally, Your Honor, as it relates to

25  the defendant's demand to see discovery or be prepared

because he hasn't seen discovery, this defendant was
then, after given the four hours by Judge Scoble, he was
then ordered released -- ordered to be released on day
passes for three days prior to the start of the last
trial.  The purpose of that was to allow him to meet
with his attorney and prepare.

      The defendant chose after the first day to
abscond, escape, run away, not return to the jail.  And
so his demands now on the day of trial that he has been
asking for for over a year appear to the government to
be nothing more than a game to attempt to delay the
inevitable.

      We would ask the Court to deny his motion to
continue.

      THE COURT:  Thank you.  The Court, and I think
the parties, have bent over backwards to try to attempt
to accommodate defendant's various requests.  He's had
three different defense counsel appointed.  He's had
many opportunities to review discovery.  He's been
released even on one occasion to meet with counsel and
he absconded on that occasion.

      It's the Court's view that defendant is
attempting to manipulate the system.  The Court is
concerned about the welfare and availability of
witnesses.  I think it would be abuse of discretion to

```
 1    continue this matter at this time, and certainly would
 2    not be in the interest of justice.
 3              THE DEFENDANT:  Can I speak?
 4              THE COURT:  No.  So --
 5              THE DEFENDANT:  It's my trial.
 6              THE COURT:  So I deny the motion.
 7              Are you ready for your first witness?
 8              MS. IVERS:  Yes, Your Honor.  We're ready.
 9              If I remember correctly, are we to stay seated?
10              THE COURT:  Yes, I think that's what the
11    protocol requires.
12              MS. IVERS:  If we're ready, the United States
13    would like to call Dr. Sharon Cooper.
14              THE COURT:  Okay.  Very well.
15              THE DEFENDANT:  Your Honor, can I speak?
16              THE COURT:  I'm going to let your attorney
17    speak on your behalf.
18              THE DEFENDANT:  I'm trying to speak on my
19    behalf.  This man just lied.
20              THE COURT:  That telephone is for you to speak
21    to your attorney with.  If you want to talk to your
22    attorney, you can speak to your attorney through
23    recesses and breaks, but we need to keep this matter
24    moving.
25              THE DEFENDANT:  I'm trying to speak about this
```

continuance.  My rights are being violated.  I haven't
seen none of my discovery.

       THE COURT:  I understand, sir, but I have
already ruled on that issue.

       THE DEFENDANT:  I ain't going through with this
trial, bro, for real.  You all ain't about to railroad
me like this without seeing none of my shit.  This is
not fair.  I have a Fifth Amendment right and a Sixth
Amendment right to have counsel, to see my counsel and
to go through my discovery, and I haven't seen none of
it.  I seen six fucking disks.  I ain't seen none of
this.

       THE COURT:  Good morning, ma'am.

       THE DEFENDANT:  What the fuck is --

       THE COURT:  Just one second.

       Sir, I understand that this is --

       THE DEFENDANT:  Come on.  When he wanted a
continuance, he got all of those continuance.  When I
want a continuance, it's a problem.  Yeah, I wanted to
go to trial, but I didn't want to go to trial and get
railroaded like this.  I have been asking to see my
discovery for two and a half years.

       He gave me this discovery the last time and
then give me a protective order.  Now I can't see it.
Come on, man.

1        THE COURT:  Here is the deal, if you want to

2   attend the trial, you're going to have to be quiet.

3   Otherwise, you're going to have to attend remotely.

4        THE DEFENDANT:  I don't have to attend.  I got

5   a right to ask for a continuance.  You denied me my

6   continuance.

7        You ain't even let me reserve my right to state

8   why this is a violation.  This is a Fifth Amendment and

9   Sixth Amendment violation.

10        THE COURT:  All right.  Can we swear the

11   witness in, please.

12        THE DEFENDANT:  Pussy-ass shit, man.

13        (Oath administered to the witness)

14        DEPUTY CLERK:  For the record, can you please

15   state and then spell your full name.

16        THE WITNESS:  My name is Sharon Cooper.

17        THE COURT:  Speak loud.

18        THE WITNESS:  My name is Sharon Cooper.

19        THE COURT:  You have a soft voice.

20        THE WITNESS:  S-h-a-r-o-n, C-o-o-p-e-r.

21        DEPUTY CLERK:  Thank you.

22        THE COURT:  Okay, Counsel.

23        MS. IVERS:  Yes, Your Honor.

24        SHARON COOPER, GOVERNMENT WITNESS, SWORN

25                  DIRECT EXAMINATION

BY MS. IVERS:

Q.   Dr. Cooper, welcome.

What is your occupation?

A.   I'm a developmental and forensic pediatrician.

Q.   Please explain those words.  "Developmental" and "forensic," what do those mean?

A.   A developmental pediatrician has extra training in the area of pediatrics for children and adolescents who have any type of developmental problems:  Learning disabilities, attention deficit hyperactivity disorder, autism, and who may therefore require medical management for those particular problems.

A forensic pediatrician is a pediatrician who works in the field of child maltreatment and all types of other versions of child maltreatment, such as sexual exploitation.

Q.   Within that area of forensic pediatrics, do you have a specific area of expertise?

A.   Yes, I do.

Q.   What is that area?

A.   I work specifically in the area of child sexual exploitation.

Q.   How long have you been studying child sexual exploitation?

A.   I began studying it in 1998 when I was approached

1  by the United States Postal Inspection Service asking me

2  to facilitate training for USPIS inspectors who were for

3  the first time starting to get digital images on the

4  internet and trying to have to ascertain the likely age

5  of the children that were in those images.

6        And from that particular time, as far as child

7  sexual exploitation is concerned, I have continued to

8  work nonstop to the present.

9        COURT REPORTER:  Your Honor, does the witness

10  have to wear the plastic shield?  I'm having difficulty

11  hearing.

12        THE COURT:  Are you comfortable wearing a

13  regular mask instead of that shield?

14        THE WITNESS:  I can, sir.

15        THE COURT:  Let's give it a try.

16        COURT REPORTER:  Thank you, Your Honor.

17        THE COURT:  I was just waiting for you to speak

18  up.

19        MS. IVERS:  Just for the record, Ms. Cooper has

20  switched from a face shield to a facemask --

21        THE COURT:  Yes.

22        MS. IVERS:  -- so that the court reporter can

23  hear her better.

24  BY MS. IVERS:

25    Q.  So we'll get back to your sort of history of

1    studying child sexual exploitation in a few minutes.

2          Can you please explain your educational

3    background, Dr. Cooper?

4      A.   Yes.  I got my bachelor's degree from Fisk

5    University, and I went to medical school at Meharry

6    Medical College in Nashville, Tennessee.

7          Then I volunteered and joined the Army, and did

8    my internship and residency at Tripler Army Medical

9    Center in Honolulu, Hawaii.  When I finished that

10   training, I began the rest of a military career.

11         But relevant to this issue, after I finished my

12   internship and residency, I was assigned to another

13   medical center in San Francisco, but most importantly

14   was given the tasking of becoming the child abuse

15   physician at that installation for the next three years.

16         And because of that initial training in child

17   maltreatment, the remainder of my 22-year career in the

18   military was always associated with seeing and caring

19   for child abuse cases at all of the subsequent

20   installations where I was assigned.

21         When I had finished my fellowship in

22   developmental pediatrics, which was between '84 and '86,

23   and I had become the chief of the developmental

24   pediatric service back again at Tripler in Hawaii for

25   the next five years, the Army Medical Education

Department approached me and talked to me about becoming
a trainer and an instructor for all branches of the
military with respect to child maltreatment.

In keeping with that particular component of my
duties, I was provided a significant amount of
particularly federal training by the FBI, the Department
of Justice, and other federal agencies, because all
military installations are federal jurisdictions, and so
we were not bound by state rules as much as we were
bound by federal rules.

I became a team member of a deployable team
worldwide for any type of significant child abuse,
sexual abuse, sexual exploitation involving multi
victims. So a coach on a military installation who had
sexually abused multiple children, may have taken
pictures, things of that nature were the kinds of cases
that I had to work in prior to my retirement from the
military.

In 1990, I was assigned to my last military
assignment, which was Fort Bragg, and I was the chief of
pediatrics at Fort Bragg, which has the largest
pediatric population in the Army; nearly 47,000 children
that we were responsible for.

And in that position, not only was I responsible
for all aspects of all pediatric care that was provided

1    for the next seven years at the installation, but I also

2    became more of a trainer for the Army, Navy, Air Force

3    and Marine Corps with respect to the issues of child

4    sexual abuse, child sexual exploitation.

5            I retired in 1997 and started my own corporation,

6    Developmental and Forensic Pediatrics, which is

7    incorporated in the state of North Carolina, and began

8    to see patients as a civilian, but also then began to

9    see patients outside of North Carolina.  I began to see

10   patients around the United States who were victims of

11   crime.

12           And because of that, the Department of Justice

13   sent me to Europe for a major training, a conference

14   that was held on child sexual exploitation involving

15   abusive images.  In those days, these were still called

16   child pornography images.

17           And I began to network with many agencies that

18   worked in that particular field.  And within that

19   relationship, was invited to the National Center for

20   Missing and Exploited Children.  That occurred in the

21   beginning of 2000.  And I was asked to provide training

22   on sexual maturation for images so that we could discern

23   whether these looked like children, teenagers, et

24   cetera.

25           And I began to -- they asked me to become an

1    instructor for them after I had taken all of their

2    courses.  They had 40-hour courses for prosecutors,

3    judges, investigators, victims advocates, et cetera.

4        And I made specific recommendations in two of

5    their courses.  One had to do with child abuse images or

6    the child pornography course, as it was called then.

7    And also the sex trafficking course, because in the sex

8    trafficking course, which was a 40-hour course, there

9    was very little information regarding victims.  The

10   majority of the course was focused on offender behavior,

11   investigations, trial strategy and things of that

12   nature.

13       So consequently, after I had become a trainer in

14   that area, we would have -- I taught about four times a

15   year specifically in sex trafficking victimization

16   starting around 2003, and taught until about 2017.  We

17   were teaching on the average of 80 to 90 students per

18   class, and there were usually three classes a year.

19       So I had the opportunity to teach and learn from

20   thousands actually of investigators who had worked

21   already in this particular area because most of the

22   attendees to this training were undercover vice agents.

23   They were individuals who had already been working in

24   trafficking circumstances and were now beginning to

25   understand some of the nature of victim impact.

1    I continued to train not only in the United

2  States, but I also trained for INTERPOL, international

3  police agency, in fact.  The North American Chapter of

4  INTERPOL asked me to write the chapter in their handbook

5  on child sexual exploitation, which I did.

6    I have also been the lead author of some books,

7  the most significant of which is a two-volume set of

8  books from 2005 and 2007 called The Medical, Legal and

9  Social Science Aspects of Child Sexual Exploitation,

10  which was seen as one of the most comprehensive

11  textbooks in the United States on this particular

12  subject.

13    Q.  You mentioned that you retired from the military.

14  What was your rank when you retired?

15    A.  I retired as a full Colonel.

16    Q.  And so you currently -- are you still working in

17  the private practice office that you established after

18  you retired?

19    A.  Yes, I do.

20    Q.  And are you currently affiliated with any

21  universities?

22    A.  Yes.  I am adjunct professor of pediatrics at the

23  University of North Carolina Chapel Hill.

24    Q.  Are you a board certified physician?

25    A.  Yes, I am, in pediatrics.  Yes.

1    Q.  Are you licensed to practice?

2    A.  Yes, I am, in the state of North Carolina.

3    Q.  Okay.  Are you a member of any professional

4    organizations?

5    A.  Yes, I am.  I am a board member of the Academy on

6    Violence and Abuse.  I'm a past board member of the

7    American Society on Prevention of Abuse to Children.  I

8    am a board member for the National Center for Missing

9    and Exploited Children.  And I am a board member for the

10   MACE Foundation, which is a foundation on maternal

11   adverse childhood experiences.

12   Q.  Have you received any awards in the course of

13   your work on child exploitation?

14   A.  I have been honored in several locations.  I

15   received the Outstanding Speaker and Contributor Award

16   in Los Angeles, California from the ICAN Organization,

17   which is its interstate organization on advocacy and

18   child maltreatment.

19       I received a Congressional award when I retired

20   from the Army.  It's called a Legion of Merit.  It

21   requires Congressional approval.  I've received some

22   other citations over the years for the work that I have

23   done.

24   Q.  You mentioned that you started becoming

25   interested in child sexual exploitation in around 1998.

1    Is that still your primary focus in your work?

2        A.   Yes, it is.

3        Q.   When you say "child exploitation," what kind of

4    categories are we talking about here?

5        A.   There is several different types of child sexual

6    exploitation.  Child abuse images or child sexual abuse

7    images.  Some systems refer to this as child sexual

8    abuse material, is what we used to called child

9    pornography.

10            We do not call it child pornography anymore

11   because the term pornography infers voluntary modeling

12   and consent, and we're talking about children.  So now

13   the term that the National Center for Missing and

14   Exploited Children and other agencies worldwide use are

15   either child sexual abuse material, CSAM, or child

16   sexual abuse images, CSAI.

17            A second type of child sexual exploitation

18   includes the sex trafficking of children.  That term is

19   probably the most universally used term, but it used to

20   be referred to as the commercial sexual exploitation of

21   children, CSEC, which was a term given to use by

22   Dr. Richard Estes from the University of Pennsylvania

23   School of Social Work.

24            And CSEC is an internally accepted term to this

25   moment.  I'm on a European organization, not board, but

staff with respect to training in 57 countries, and they refer to the sexual exploitation of children from trafficking internationally as CSEC crimes. So you will almost always see that terminology.

We also have the issue of ICT. A lot of alphabet soup in this, but ICT crimes against children means information and communication technology, ICT, information and communication technology crimes against children. This entails online grooming, something that we used to refer to as cyber enticement cases, but they are often online grooming and online marketing, which is the opposite of grooming, but facilitates a wider diaspora of buyers, for example, in children who are being marketed online.

There is also the intrafamilial trafficking of children, families who are selling their own children for many reasons. There is cyber extortion, and sextortion is what it's frequently referred to where you have blackmail of children into producing typically abusive images through the use of spyware, et cetera.

We also have cyber enticement, cyber harassment. And the other most recent type of child sexual exploitation is referred to as Pay Per View. This is live streaming sexual abuse of children often in foreign countries with individuals who would be called sex

tourists if they had traveled outside our country, but are now looked upon as sex tourists remotely because they are in the United States but paying money to traffickers outside the United States so that they can look at children performing sexual acts on demand.  So this is one of the most recent new types of child sexual exploitation.

Q.  Let's focus on commercial sexual exploitation, child sex trafficking.  Are those essentially synonyms?

A.  Yes, they are.

Q.  Have you reviewed research and literature written on child sex trafficking or on sex trafficking of adults as well?

A.  Yes, I have.  I repeat that kind of information every week, yes.

Q.  Please explain to us what kinds of literature and research is out there.

A.  The majority of research that I stay abreast of is health based because I'm a physician, and information regarding how to detect survivors who come into healthcare systems, that's one category.

But another important category is the category of assessment of survivors.  And probably one of the most commonly cited papers that I usually mention is an article called The Garden of Truth, which is research on

1   100 indigenous women in Minnesota, all of who were

2   trafficking victims, sex trafficking victims.  And the

3   reason that I tend to really refer to that article

4   frequently is because out of all the articles that I

5   have read, it has the most simplistic and clear

6   definition of the difference between prostitution and

7   sex trafficking.

8        That is a frequent point of confusion for

9   individuals.  It helps us to understand based upon their

10  evaluation of these more than 100 indigenous women and

11  the long-term outcomes.  And by the way, the researchers

12  of that documentary are very well-known and respected

13  researchers from the United States.

14       What they help us to understand is that

15  prostitution is the exchange of sex, typically for

16  money, influence, or other desired things between two

17  consenting adults.  They must be adults and it must be

18  consent, and, therefore, there is no force, fraud,

19  coercion, et cetera, then no longer considered

20  prostitution.

21       And trafficking, on the other hand, entails

22  third-party control.  So if you have a minor or an adult

23  who is exchanging sex for money, influence, drugs or

24  anything else, and they do not get to keep that money,

25  that money goes to a third-party, that is the definition

1    of trafficking, for the general population, as compared

2    to the federal definition, which, of course, always has

3    recruitment, enticement, obtaining, harboring, provision

4    of and transporting minors and/or adults for commercial

5    sexual acts, for which force, fraud and coercion are

6    required if they are an adult, but not so if they are

7    minors.

8        Q.  In addition to this literature and research

9    that's done by others that you keep up with, have you

10   also reviewed first-person narratives written by

11   traffickers themselves?

12       A.  Yes, I have.  Generally speaking, I try to keep

13   abreast of the literature.  There is popular literature

14   written by self-professed traffickers.  I have probably

15   12 or more books that have been written on how to be a

16   trafficker, how to exploit others, what to look for in

17   others in order to be able to be successful.

18           And some of these are self-published and some of

19   them are published by the publishers, by recognized

20   publishers, but this is not an uncommon topic that can

21   be found available.

22       Q.  You mentioned I think previously that you have

23   been both a trainer and received training in the area of

24   child exploitation.  Have you also received training

25   specifically with regard to trafficking of minors and

1   adults?

2       A.  Yes, very much so.  I have received training by

3   the FBI.  I have been -- I received training by

4   INTERPOL.  I have also received training through In

5   Hope.  In Hope is an international organizational of

6   hotlines where the national center is an example of one

7   of those hotlines.

8           And the National Center for Missing and Exploited

9   Children, which I'll just call NCMEC -- everybody calls

10  it that just to shorten that -- has these hotlines where

11  many people make reports of witnessing or seeing online

12  some indication of a minor that is being sold.  And so I

13  receive ongoing training from those kinds of

14  organizations as well as continue to stay abreast of new

15  changes with respect to victimization.

16      Q.  And how long have you been involved in the

17  trafficking part of child exploitation?

18      A.  It started about 2002 of this century.

19      Q.  I think you mentioned that you have personally

20  interviewed trafficking victims as part of your

21  practice?

22      A.  Yes, I have.  I have interviewed about 100, a

23  little bit more than 100 victims.

24      Q.  Does that include -- are we talking mostly minor

25  victims, all minor victims?

1     A.   No, they are not all minor victims, but I would

2   say 80 percent are minors, 20 percent are adults, but

3   the majority of even the adults were brought into

4   victimization when they were minors.

5     Q.   Okay.  Have you also reviewed clinical studies

6   about sex trafficking?

7     A.   Yes, I have.  There is quite a bit of information

8   now for physicians on how to understand the nature of

9   the medical problems that we see in sex trafficking

10  victims.  We now know that there are four categories of

11  medical problems we should be looking for.

12          One has to do with physical violence.  If the

13  victims are adults, this would fall under the incident

14  crimes of violence kinds of injuries that you often see.

15  If the victims are children, they are also injuries that

16  we would consider battering injuries.

17          The second category has to do with drug use and

18  misuse and the fact that many victims are either coerced

19  to use drugs or drugs are facilitated as far as being

20  available to victims in order to maintain control of the

21  victim.  And also sometimes victims will begin to seek

22  the use of drugs in order to cope with what they are

23  having to deal with, having multiple sexual encounters

24  and sometimes assaults daily.

25          The third category has to do with the physical

1  health impact from a genital/urinary perspective:

2  Sexually transmitted infections, lots of genital trauma,

3  internal trauma, anal trauma, et cetera.

4          And then the fourth category of medical problems

5  that we see in the trafficking population, sex

6  trafficking population is psychological.  And we know

7  that the three most common diagnoses will be anxiety,

8  depression and posttraumatic stress disorder, but recent

9  literature since 2016 has helped us to recognize that if

10 children were already abused and in foster care

11 settings, out-of-home care a lot during their younger

12 years before they were brought in as trafficking

13 victims, the kind of PTSD they are going to experience

14 is more likely to be called complex PTSD.

15         And the literature tells us that those kinds of

16 children have had something called polyvictimization.

17 They have been victims of sexual abuse, neglect,

18 physical abuse, exposure to violence.  They are

19 polyvictimization survivors.  And that term, which was

20 researched by David Finkelhor in his Crimes Against

21 Children Research Institute in New Hampshire, that term

22 which came into the literature around 2007, has now

23 helped us to understand that these victims who become

24 trafficking victims are much more likely to have complex

25 posttraumatic stress disorder.

1    Q.  Dr. Cooper, have you previously testified in

2   court?

3    A.  Yes, I have.

4    Q.  How many times have you been qualified as an

5   expert?

6    A.  About 300 times, because I testify in a lot of

7   juvenile and family court cases as well as routine state

8   cases, and then, of course, federal cases and

9   court-martial proceedings.

10    Q.  Do you know about how many federal cases you have

11   been qualified as an expert in?

12    A.  In federal cases, I would say over the years

13   certainly more than 50 to 75 federal cases.  Sex

14   trafficking cases would be close to about maybe 20 to

15   25 cases in sex trafficking.

16    Q.  Okay.  So 20 to 25 times you have been qualified

17   as an expert in sex trafficking?

18    A.  Yes, that's correct.

19    Q.  You get paid to testify when you come to court,

20   right?

21    A.  Yes, I do, for my time.

22    Q.  Have you been qualified previously as an expert

23   to express your opinions on the characteristics of sex

24   traffickers?

25    A.  Yes, I have.

1      Q.   And on the dynamics of sex trafficking?

2      A.   Yes, I have.

3      Q.   And that would include things like grooming,

4   control, force?

5      A.   Yes, that's correct.

6      Q.   Have you been qualified to express opinions on

7   victim vulnerabilities to trafficking and the mental and

8   emotional effects of that?

9      A.   Very much so, yes.

10     Q.   And as well as the medical, mental health and

11  substance abuse issues that relate to sex trafficking?

12     A.   Yes, I have.

13         MS. IVERS:   At this point, Your Honor, I move

14  to qualify Dr. Cooper as an expert on the dynamics and

15  mental health impacts of sex trafficking and the

16  commercial sexual exploitation of children and adults.

17         THE COURT:   Any questions, Mr. Wendt?

18         MR. WENDT:   No, Your Honor, no objections.

19         THE COURT:   Thank you.   She can be received.

20  Dr. Cooper can be received as an expert in the field so

21  requested.   Thank you.

22  BY MS. IVERS:

23     Q.   Dr. Cooper, the first kind of topic area I want

24  to talk to you about is how victims come into the

25  trafficking world.

1          Are there certain vulnerable characteristics that
2    victims might have that might make it easier for them to
3    be trafficked?
4       A.   Yes.  What we know about victims of commercial
5    sexual exploitation or sex trafficking victims is that
6    they have a significantly higher incidence of adverse
7    childhood experiences that includes the five different
8    types of child abuse; physical abuse, neglect, sexual
9    abuse, psychological maltreatment, emotional
10   maltreatment; and five types of family dynamics, which
11   would include exposure to intimate partner violence,
12   being in a home where a parent or caregiver had a drug
13   or alcohol addiction, being in a home where someone has
14   been incarcerated before, being in a home where there
15   has been separation of family members, and being in a
16   home where adequate provisions have not been made
17   available for the child.
18          These ten adversities we now know can be
19   tabulated, and the more adversities that you have, the
20   higher your risk to become a trafficking victim.  And
21   the reason for that is because the more adversities that
22   you have, the more likely you are to be removed from
23   your home, placed in foster care or congregate care
24   outside your home, the more likely you are to have
25   already been a victim of sexual abuse, which then

 1    increases your risk to become a runaway or homeless

 2    youth.  And if you've had a significant number of these

 3    adversities, you are also more likely to have what's

 4    referred to in the literature as neurodevelopmental

 5    disruption.

 6          So these survivors do not -- frequently have

 7    learning problems, speech and language delay problems,

 8    individualized educational plans in school, higher

 9    incidence of dropping out of school after eighth or

10    ninth grade, et cetera.

11          And because they are polyvictims and have

12    untreated trauma from all of the victimization in their

13    childhood, they tend to have uncontrolled behaviors that

14    send them on a trajectory to juvenile justice outcomes.

15    So therefore, you will also have a higher incidence of

16    victims in sex trafficking who have had some type of

17    interaction or intersection with the juvenile justice

18    system.

19    Q.  Can you explain how age could play into a

20    vulnerability to trafficking?

21    A.  Yes.  Since 1960, we have had an understanding of

22    sexual maturation of the human body.  What we have found

23    is that since 1960 to the present, for every decade,

24    children, especially girls, are entering into puberty at

25    a younger age.  For every decade, it's one year earlier

than the original ages that were given to us by
Dr. Tanner with the Tanner stages of sexual maturation,
now referred as SMR, sexual maturation ratings.

So the challenge for us today is that the average
age of onset of puberty, which is usually discerned in
the United States by breast development, but not in
every country is breast development that marker, in the
United States, the average age of breast development for
girls is eight to nine years of age, eight to nine
years.

It takes approximately five years from the onset
of breast development to complete sexual maturity. So
consequently, a child can be 13 or 14 years of age and
be completely sexually mature as far as their body
appears, but definitely not mentally mature, and not
from a brain development perspective.

That's the other unfortunate fact. We have these
children who are maturing earlier and earlier
physically, but since the year 2000, with the research
where serial MRIs were taken of otherwise normal
children starting at the age of five looking at brain
maturity, we now know that the brain matures from the
back of the brain forward, with the forward part of the
brain from the prefrontal cortex is located being the
last part of the brain to be completely mature.

1       Now that we know this, we also know that the

2  prefrontal cortex is not completely mature until almost

3  26 years of age.  So here you have this body that is

4  physically and sexually mature, but you have the

5  judgment capability that is far from mature.  It's very

6  easy therefore to dupe, convince, cajole a seemingly

7  physically mature person, especially a girl, into some

8  of the dynamics that we see in the grooming of sex

9  trafficking.

10     Q.  And so when we're talking about a teenager --

11  well, let me ask you this:  Based on your research, what

12  is the average age of a minor to enter the world of

13  trafficking?

14     A.  In the United States, the average age is between

15  11 and 12, generally speaking.  We can see victims as

16  old as 15 or 16 who have been brought into what's

17  referred to as "the life," but many times the reason

18  they are so young is because the first and most common

19  trafficker, the most frequent type of trafficker of

20  children are their own family members.

21     Q.  And so when we have got someone who is a younger

22  age, they're less mature, and then on top of that we can

23  layer these other things you discussed like

24  developmental problems, adverse childhood experiences?

25     A.  Yes, that's correct, especially the presence of

learning disabilities, because if you have a teenager

who has learning disabilities, as they move forward in

school, they see themselves in the classroom setting,

you know, as the bottom of the class.  It affects their

self-esteem, so they find school to be not a place that

they basically want to be, so you have a higher

incidence of school dropout.

Q.  And then as far as other vulnerabilities, does

someone who has previously been trafficked, do they

become more vulnerable to being trafficked again in the

future?

A.  Absolutely.  Sex trafficking victimization is

highly recidivistic, and the average number of times

that victims may be returned to the life under the guise

of getting a better life or being with someone who is

going to take care of them is anywhere from five to

seven times before they are able to actually completely

exit the life, and that just requires the kinds of

systems that are available state by state.

Q.  And then you also mentioned folks who were

involved in the juvenile justice system being

vulnerable.  Is there also a substance abuse aspect?  I

don't think you mentioned that yet, if there is a

substance abuse element to vulnerability to trafficking.

A.  Yes.  What we know about substance use or misuse

 1   is that it is a very common dynamic that contributes to
 2   victimization.  Either children are given drugs in order
 3   to intentionally addict them so they will keep coming
 4   back for drugs and do whatever is necessary to get
 5   drugs, or children will begin to find drugs and take
 6   drugs on their own to cope, because being sexually
 7   assaulted by eight to ten to twelve people a night,
 8   seven nights a week, is highly traumatizing, and it's
 9   very difficult.
10          So children and adults frequently will try to
11   find some type of chemical system that will help them
12   get through that degree of victimization.
13     Q.  Okay.  So let's talk about how traffickers might
14   see these vulnerabilities and bring someone into the
15   life of trafficking.
16          Have you heard the term "grooming"?
17     A.  Yes, I have.
18     Q.  Can you explain to the Court what that term
19   means?
20     A.  When an individual, potential victim is noted to
21   be down and out, I'll use that term, it's very easy to
22   groom them into believing that an individual can offer
23   them a better life.  They very often will do so under
24   the guise of romance and convince the victim that they
25   are in love with them and they want to take care of

them, but they also are clear that you have to be part

of this solution, not just the savior here, you have to

be part of this solution, and the role that you will

play is that you will help us to make money, and I will

take care of you and try to make sure no one hurts you

and the two of us will have money.  And the long-term

goal is life ever after, a permanent relationship.

Q.  And so it's common, in your experience, for a

trafficker to have other romantic or sexual relationship

with the victim at least at first?

A.  Very much so, yes.

Q.  And does that relationship change over time?

A.  Yes, it does.

Q.  How does that happen?

A.  After, sometimes not a very long time, the

trafficker begins to establish or make the victim

understand that there is actually power control dynamic

in this relationship.  The victim follows the rules and

the trafficker will be good to them, but if the victim

doesn't make enough money, becomes recalcitrant, is

using drugs too much and is not as marketable, then the

trafficker will begin to use much more power-based

consequences, usually physical, physical violence is

more common, but other types of circumstances, such as

threats to the victim.

1    Q.   Are traffickers always the ones that are out on

2    the streets talking to these potential victims, or do

3    they -- what strategies do they use to recruit victims

4    into the life?

5    A.   Typically what happens is that, depending upon

6    the size of the enterprise that a trafficker controls,

7    you will see that there is a recruiter in the

8    enterprise.  The recruiter may be another trafficked

9    victim very similar in age to the victim who is being

10   recruited, but the victim -- but the recruiter may be

11   something called a "bottom," a person who has a lot of

12   understanding of the rules and the requirements by the

13   trafficker.

14       The bottom may be a -- is usually a woman who has

15   had experience in knowing the trafficker and understands

16   how much money is to be made, how that money is to be

17   given to the trafficker, where the children and

18   adolescents are to be sold and all of the nuts and

19   bolts.

20       And the bottom is often the person who first

21   responds to lack of compliance by a victim and will try

22   to keep all of that under her control before it gets to

23   the level of the trafficker, because the trafficker

24   could be much more violent.

25   Q.   And I think you and I have both used a term "the

life." Can you just quickly define that so no one is confused?

A. Yes. One of the strategies that traffickers frequently use with victims is to help them understand that this is the life you have been in: Homeless, run away, juvenile detention, et cetera. I'm going to offer you a better life.

And that terminology "better life" is extremely common. It is referred to in books that are written by traffickers as selling a potential victim a dream, selling them a dream so that they will believe that it's worth doing whatever he tells me to do because eventually my life is going to be better.

"The life" though is not that life. "The life" is the life every day of having to go out to have sex with X number of people, to make X amount of money, to follow the rules, to not get drunk or drugged out so much that you can't be marketed, and then everything will be fine as long as you follow the rules of the organization.

Q. And you mentioned using a recruiter, potentially a bottom or another trafficking victim. Why would someone do that? Why would someone go out and recruit another trafficking victim?

A. Because typically they were recruited in the very

1  beginning.  And they also typically would do this

2  because a trafficker is not going to be hanging out on

3  the streets trying to flag down a minor victim.  That

4  would be very problematic.  They could easily be

5  arrested for some type of associated crime or reported

6  by a bystander.

7      So the trafficker elevates their position in the

8  organization by having other people under them to be the

9  individuals who recruit, educate, and eventually

10  introduce the victim to the actual trafficker

11  themselves, so there is this hierarchy that therefore

12  raises the importance of the trafficker in the whole

13  enterprise.

14  Q.  And what types of locations are common places

15  that a victim might be recruited into the trafficking

16  world?

17  A.  In the olden days, which was the eighties and the

18  nineties, it would usually be hubs of transportation,

19  bus stations where runaways could be found, places of

20  that nature.

21      But nowadays, because of the internet, youth can

22  be recruited almost anywhere.  They are often recruited

23  from Facebook and dating sites online.  They also though

24  are recruited by individuals who are in school systems.

25  They could be actually traffic victims themselves who

are still going to school. They absolutely are recruiting in foster care homes, in congregate care systems. And they are frequently recruited in juvenile detention centers and short-term incarceration settings.

Q. Speaking of sort of the role of the internet in the trafficking world, can you explain how internet has changed things, specifically with regard to not so much recruitment, but on the marketing side, how advertising is done through the internet?

A. Yes, I can. The internet first became recognized as a conduit for victimization in about 1996 or 1997. It warp speed sped us to the present, and it's almost hard to keep up with what new way are people being marketed online.

However, from a marketing perspective, the internet has changed sexual exploitation so much because the general public think that the term "prostitution" means driving down the street at night and seeing people walking up and down the street sort of looking for buyers in cars. That does consider, but that's not the common way anymore, and hasn't been for almost 20 years now.

Because victims are sold and shown in social networking sites, in online classified ads. Backpage.com was a huge vendor for a very long time

until only about 18 months ago when they were put out of
business in the United States, but that business has
been picked up by other online classified sites.

The deal is that the online use will make the
victim appear to be selling themselves, number one, that
it's all their idea about how they are out there, so to
speak.

And the marketing is in code. "I would like to
have a date with a nice man and I'd really like 150
roses," which means it's going to cost $150. And people
who are knowledgeable about online marketing know
exactly what those mean.

The other part of the use of the internet is that
from the time this victim leaves wherever they may be
housed, the internet is part of that process. The
internet can be how an Uber is hired in order to
transport that victim to a hotel.

The internet is how the victim will locate that
buyer. And the internet is how the victim will get paid
because the buyer will already know long before they got
there exactly how much it's going to cost and they have
to pay up front.

All of those, we call them technology-facilitated
crimes are the name of the game with respect to victims
of sex trafficking.

1    Q.  And just a couple more questions sort of on the

2    recruitment side of things.

3        Do traffickers employ strategies to sort of

4    separate victims from their prior life and keep them

5    engaged in the trafficking life?

6    A.  Yes, they do, in several ways.  But two of the

7    most common ways is to rename the victim so that they no

8    longer have their birth name and they are never referred

9    to by their birth name typically, so they see themselves

10   as that new person, often a name that is glamorous.

11   Many times geological, such as "Emerald" or "Diamond" or

12   things of that nature.

13       And then the second thing is that the trafficker

14   is able to convince the victim that they are a new

15   person because they don't even talk about whatever

16   happened to them in the past, except to say, "I have

17   rescued you from what has happened to you in the past

18   and so now you're in a new life."

19       So this being renamed and being given a new

20   location and a new vocation is how they are able to

21   convince victims that this is the life they are supposed

22   to lead.

23   Q.  You previously mentioned sort of physical

24   violence might be used to keep someone from leaving.  Is

25   verbal abuse also something that you see as a part of

1  that?

2  A.  Very much so.  And actually psychological

3  maltreatment in the literature is seen as more damaging

4  than physical maltreatment, because physical

5  maltreatment goes away, the trafficker often will remind

6  the victim it was their fault, that they had to get a

7  beating and that if they toe the line everything will be

8  fine.

9  But if you have an individual who psychologically

10  batters a person over and over again and tears down

11  their self-esteem and self-worth for long periods of

12  time, that is far more wounding and that lasts a lot

13  longer.

14  Q.  Dr. Cooper, do you have an opinion about whether

15  trafficking victims can appear to be doing this all

16  willingly?

17  A.  Yes, I do have an opinion on that.

18  Q.  Please share your opinion.

19  A.  That is the name of the game, which is another

20  term beside "the life."  Sometimes it's referred to as

21  "the game."  Absolutely victims are told and shown how

22  to make it appear that everything that's happening is

23  all their thought process, that they control everything.

24  They control the money that they receive from the

25  buyer and the buyer never knows that that money stays in

their hand for only a short period of time. Often it's given to the bottom. Or if they are a favored victim in the enterprise, they may actually get to give it to the trafficker themselves directly.

The key component of the game is to convince a victim that they have to play their role, and if they do, they will move up in the pecking order and maybe one day they will become a bottom. So there is this promotion dynamic, almost a business manner of keeping control over victims.

Q. Have you heard the term "compliant victim"?

A. Yes.

Q. Please explain what that means.

A. The term "compliant victim" was given to us by Ken Lanning from the Behavioral Science Division of the FBI in Quantico. In fact, Ken Lanning wrote a long chapter in our textbook on the compliant victim, because sexual exploitation is frequently associated with victim compliance.

And in his chapter that he wrote, he talked about the fact that people think that anybody who is a victim of a sexual assault or sexual abuse or in this case sexual exploitation will be your typical dragged away from a safe environment, screaming and hollering, mugged, drugged, et cetera, in order to be brought into

1    this new form of captivity.  But Ken Lanning is very

2    clear that, no, that's not often how it happens.  What

3    often happens is that someone grooms this child or adult

4    into believing that they can offer something better for

5    them in life, that they will have money when they have

6    always been broke, they will have a place to stay when

7    they have always been homeless or frequently been

8    homeless, they will be the antithesis of whatever is

9    happening in their life is offered to them by a

10   trafficker.

11         And this makes the victim therefore compliant

12   with what the trafficker asks them to do.  And that is

13   confusing to many people because they really want force,

14   fraud and coercion to be the reason that these victims

15   are in the situation that they are in, but many times

16   the fraud component of how "this is going to just be

17   your idea and I'm just going to be here to just make

18   things easier for you" is one of the ways in which these

19   individuals become compliant, and in fact protect the

20   identity and whereabouts, et cetera, of the trafficker.

21   Q.  And we have been talking a little bit about

22   bottoms and their role, potential role in an enterprise.

23   And you mentioned they sort of go up this hierarchy.

24         Is it common for a bottom to be older than some

25   of the other victims?  Is there an age dynamic there?

     A.   Very much so.   Typically, the bottom has had much
more experience with the trafficker and understands the
rules of the game and is the person who will enforce
those rules, sometimes with violence.   The bottom can be
quite violent towards girls who are under their control,
but they are absolutely part of that process.

     Q.   And it sounds like based on your testimony so far
that a bottom could be the one that's doing a lot of the
sort of on-the-ground work for the trafficking
enterprise?

     A.   Yes.

     Q.   So how does the trafficker play a role in that
compared to the bottom?

     A.   Typically, the trafficker calls the shots.   They
let them know how much money is to be made, they let
them know where they are going to -- what he wants the
victims to be dispersed at times.   If it's an online
situation, they want to make sure that the victim is
having sexual contact with a certain number of buyers a
night so that they get a certain amount of money.

          They have a quota.   Many times victims have a
quota of money that they have to make nightly, or daily.
It's not always at night.   And the bottom may be the
person who enforces that.   And the bottom may also be
the person who reminds the victim that if they are not

1  completely compliant, there will be significant

2  consequences.

3     Q.  In this type of scenario, is it possible for the

4  trafficker to be pretty hands off?

5     A.  Very often, that's the case.  It is a way of

6  being able to deny culpability and any kind of

7  relationship with respect to criminal acts.

8     Q.  And so we know a trafficker is probably

9  collecting some money potentially.  Is it necessarily

10 all of the money or part of the money?

11    A.  Most of the time, it's the majority of the money.

12 The bottom may get a small amount of money.  The victim

13 gets almost no money.

14    Q.  And is it -- are you aware of cases where a

15 trafficker might be getting gifts or other sort of

16 benefits in lieu of actual cash?

17    A.  Definitely.  Sometimes there is a barter system,

18 which you can easily see within the life of sex

19 trafficking.  Sometimes traffickers will get vehicles if

20 they have had a big party, et cetera, and provided a

21 bunch of girls for that purpose.  They can get paid in

22 drugs.  They can be paid in weapons.  They can be paid

23 in cash.

24         And they can be also paid in access.  For

25 example, high rollers at casinos will get paid by

 1    getting -- be given a topnotch room and entrance into

 2    those particular gambling areas so that their victims

 3    can be made available to potential buyers.

 4        Q.  In your experience interviewing past victims of

 5    trafficking, have they told you that they just gave the

 6    trafficker money voluntarily?

 7        A.  They initially, in my experience in talking to

 8    survivors, the majority of them at first would say,

 9    "This was my idea."  However, it doesn't take a long

10    time in talking to them to recognize that they're

11    homeless, they have no money, they have no access to

12    money.  Everything that they get has to come from the

13    trafficker, so, therefore, once you have established

14    rapport with them and they feel safe to be able to be

15    more candid, they are much more forthcoming with respect

16    to the fact that they have nothing but the clothes on

17    their back, generally speaking.

18        Q.  Let's dig into that a little bit about when

19    victims are talking about this how they might sort of

20    appear to people who are interviewing them.

21            What happens when victims have contact with law

22    enforcement?

23        A.  Victims will deny, first of all, that they are

24    victims.  That is the most common reaction as far as law

25    enforcement is concerned.  And then if law enforcement

1  convinces them that they have enough evidence, that they

2  actually have been exchanging sex for money, and if law

3  enforcement is enlightened enough to recognize that this

4  is a 13-, 14- or 15-year-old, they probably have

5  somebody that is getting that money and making them

6  available, they will pretty categorically deny that

7  there is anybody else as part of that enterprise.

8         So therefore, we know that in an investigative

9  interview victims will not be able to give you as much

10 information for a couple reasons.  One, because they

11 have may have been coerced to not tell the truth.  Even

12 if they are at a point of being ready to disclose

13 information, their disclosures are often not

14 chronological and sound as if they are not cohesive

15 because these victims, as compared to other types of

16 victims, have some of the highest level of posttraumatic

17 stress disorder.

18        Research on trafficking victims has revealed that

19 the PTSD incidence is higher than 87 percent, which is

20 higher than veterans who have been to war.  And so

21 because of this high degree of PTSD, an investigative

22 interview is very difficult for them to be able to

23 chronologically fill in the blanks.

24        What research has shown is that -- there is

25 another reason for that that I'll explain in just a

second.  What research has shown is that your best
information from a victim, chronologically speaking and
as far as details are concerned, comes from a
therapeutic relationship where a victim has been meeting
with the same therapist for a period of time and now is
able to recall in a less stressful environment
information because the investigative -- the
investigative interview is highly stressful so their
cortisone levels get very high and it causes the brain
to have most of its blood flow to the mid brain where
fear and flight and fight are located.  So they are very
unable to provide some of the important details that
they would otherwise.

     Q.  You are using the term "investigative interview."
Just quickly what do you mean by that?

     A.  That's typically a law enforcement interview as
compared to a therapist or psychologist or social worker
who is talking to the victim in a different way.

     Q.  Why might a trafficking victim have some
skepticism with law enforcement?

     A.  Because sometimes trafficking victims are
exploited by law enforcement.  We certainly have police
officers, and have read about this many, many times
where law enforcement will arrest a victim, maybe
sexually assault the victim and then let the victim go,

1    but not give them any money for that process.  Or a

2    trafficker may know of a certain part of town where they

3    -- the trafficker has paid law enforcement to look the

4    other way, so to speak, so that the kinds of sex crimes

5    that are going to take place in that particular part of

6    town will be less likely to be associated with an

7    arrest.

8       Q.  Would a trafficker also potentially coach a

9    victim on what to say if they have contact with law

10   enforcement?

11      A.  Very much so.  In one particular case that I

12   worked in in New York, a very long-term trafficker was

13   finally successfully arrested by law enforcement, and in

14   his home he had more than 50 DVDs of very young girls

15   repeating a different name.  "What is your name?"  They

16   would have to repeat in this video a new name that he

17   had given to them and a new Social Security number that

18   was linked to an adult, so, therefore, if they were ever

19   arrested, that Social Security number would not show

20   that this victim was a minor.

21       There were over 50 victims, videotapes of that

22   that the FBI sent to me to review because they were

23   trying to identify these particular victims.

24      Q.  Do you have an opinion about whether a victim

25   might minimize or even forget what has happened to them?

1      A.   Yes.  We know that PTSD causes a lot of

2    difficulty in ancillary details.  A victim will

3    typically remember what we refer to as core components

4    of victimization.  Did this person strangle you, Did

5    this person punch you out, et cetera, versus when did

6    this happen, what time of day, what day of the week,

7    what month, year, et cetera.

8          The more frequently a victim is victimized, it's

9    much harder for them to be able to say, "Oh, yeah."

10   They might be able to remember that there was a

11   Christmas tree on that street corner when he picked me

12   up as the clue as to the exact date of when something

13   may have happened to them.

14     Q.   And could a victim have trouble remembering how

15   many dates they went on, for instance?

16     A.   Oh, absolutely.  It would be very hard for them

17   to be able to give you that detail sometimes.

18     Q.   I just used the term "date."  I don't think we

19   have I defined that yet.  Could you explain what that

20   is?

21     A.   Sure.  In the olden days, which was, again, back

22   in the eighties and early nineties, the term used for

23   trafficking victimization was "tricks," you know, a

24   person was a "trick," and, "How many tricks did you have

25   tonight," used to be the question.

1      Once we started having online dating and dating

2   websites, the term "date" became much more acceptable,

3   because when, for example, Craigslist was one of the

4   first online sites to begin selling people and they

5   would talk about, "I would like to have a date and I

6   would like X number of roses," to mean how much the date

7   would cost.

8      So the term "date" or "escort" -- "escort" is a

9   more generalized term, but "date" is absolutely the most

10  commonly used term for when you're using terminology on

11  the internet.  So the person who is buying you is

12  usually referred to as a "date."

13  Q.  Would guilt -- in your experience, could guilt

14  and self-blame have an impact on a victim's ability to

15  share the full extent of what happened to them?

16  A.  Yes.  That research came from, again, the Crimes

17  Against Children Research Center in New Hampshire.

18  Dr. Kathleen Kindell-Tackett wrote a book called Child

19  Victimization.

20      In her section on what happens when victims are

21  trying to make a disclosure, she described in the

22  literature that the three most common deterrents and

23  prevalent problems are guilt, self-blame and shame.

24  These three dynamics, guilt, self-blame and shame, are

25  the most common dynamics that hinder a victim being able

to become completely honest with as many details that

they may know, because it's, unlike a robbery or some

other type of crime, this is a highly stigmatizing

scenario and it causes victims to have very great

difficulty laying themselves out to be judged by the

public.

Q.   So I want to go through a few more terms.

     THE COURT:  At some point we're going to have

to take our morning recess, so in the next few minutes,

whenever you feel comfortable.

     MS. IVERS:  I have sort of two fairly short

topic areas and then I'll be done.

BY MS. IVERS:

Q.   Have you heard the term "gorilla"?

A.   Yes, I have.

Q.   What does that refer to?

A.   So the term "gorilla" was a term used again about

maybe up until 2016 or so.  The original terminology,

finesse versus gorilla pimps.  These are definitions of

individuals who are traffickers, were given to us by Dr.

Cecilia Williamson out of Ohio in her research.

     And the term -- that term "gorilla" referred to a

very violent person versus a Romeo-type of individual.

In the more recent years, maybe in the last three years

or so, there has been movement from not characterizing

1  an individual in that manner, and so the terminology now

2  is vicious-violent offender, as compared to a finesse or

3  romance-type of offender.  One will use physical force.

4  The other will use psychological means in order to exert

5  control over trafficking victims.

6      Q.  Have you heard the terms "renegade" or

7  "independent"?

8      A.  Yes.

9      Q.  Please define those.

10      A.  There is a whole lexicon of terms in trafficking.

11  And a "renegade" is a victim who is becoming more and

12  more self-sufficient and independent and who is begining

13  to sort of buck the rules, regulations and all of the

14  things that have to be complied with as far as the

15  offender is concerned.

16          So one of the rules of the game, for example, is

17  if a girl is in a group of offenders who are talking,

18  and she is supposed to look subservient and keep her

19  eyes on the ground typically, but if she glances up at a

20  different offender in that group, that's referred to

21  oftentimes as choosing up, meaning that she prefers to

22  be with that individual than the person who is

23  trafficking her.

24          That means exchange of money.  She has to work

25  off money as if she is selling herself to this other

person.  She has to pay money to that first trafficker
in order -- because she has chosen that, but because she
appears to have chosen a different person, she is
running the risk of being labeled a "renegade," meaning
that eventually she may leave the life altogether as a
victim and she may in fact become a trafficker.

So "renegade" is a negative term used to describe
children and adults who are becoming more and more
self-sufficient.

Q.  So you mentioned the vicious, violent versus the
finesse.  Are those -- can a trafficker embody both of
those traits at different points?

A.  Yes, they can.  In fact, that's not an uncommon
dynamic if you have a single trafficker, in that they
will always, almost always remind the victim that once
they become violent with them, it was because of the
victim that they had to become violent.

If they really love them and they wanted to take
care of them, but they didn't make their quota, they
didn't follow all the rules, so then they have to be
taught a lesson.  So it is not unusual to see both of
those terms really for the same person.

Q.  With regard to a renegade, is that a person who
is just a prostitute of their own free will, or does
that also imply that there is still a trafficking

1    relationship?

2        A.   Yes, in a renegade situation, typically there is

3    a trafficking relationship specifically.   Simply because

4    in prostitution, there is consent, no one is keeping the

5    money, there is not third-party control in that

6    situation.

7            So in a renegade situation, when you are talking

8    about that, generally speaking, it's going to be in a

9    trafficking circumstance, although there will be

10   traffickers who have seen another trafficker who is a

11   woman who became a trafficker as she became a renegade

12   and she decided to become in charge rather than being

13   the victim.

14       Q.   And when we're talking about -- we talked

15   previously about who a bottom might be and they might

16   appear to be a renegade at some point.   Is that person

17   likely to get involved in the criminal justice system

18   and eventually charged with a crime?

19       A.   Yes.   Would a bottom be at risk of being charged

20   with a crime?   Not only is a bottom often at risk to

21   being charged with a crime, but many times it is a setup

22   so that the trafficker themselves will not be charged

23   with a crime.   The bottom can be the sacrificial lamb,

24   so to speak, so that the trafficker can bail them out

25   and do other things of that nature, but the goal is to

1    protect the trafficker from being arrested.

2        Q.  Have you heard the term "pimp"?

3        A.  Yes, I have.

4        Q.  Can you explain how that relates to this?

5        A.  The term "pimp" and "trafficker" are somewhat

6    interchangeable.  "Pimp" is more commonly sort of a

7    street term, and then it became a noun and a vowel -- a

8    noun, sorry, and a verb, because you would pimp people

9    out and the car was pimped out.

10        It just became a very popular term used

11   universally that had nothing to do so much with sex

12   trafficking.  But the correct terminology is trafficker

13   because we're talking about the act of sex trafficking.

14       Q.  Can pimp be abbreviated to just a letter P?

15       A.  Yes.  In fact, there have been individuals who

16   were music video performers and sometimes gang members

17   who would use just the initial P as part of their

18   moniker, if you will, so that you know that this person

19   is, oh, also, by the way, a pimp.

20        It is a common phrase for people who are working

21   to become a pimp, learning how to be a pimp, to be

22   referred to as a PIT, which stands for pimps in

23   training.  So the P letter has a lot of amazing

24   significance in this kind of crime.

25       Q.  Might a trafficker, instead of referring to

1    themselves as a pimp, use other words to describe their

2    trafficking enterprise?

3        A.  Yes.  They may call themselves a daddy.  They may

4    call themselves, you know -- they won't call themselves

5    a John because a John is a buyer, but they will call

6    themselves a king.  They have many different kinds of

7    street names that are often used for recognition of

8    their role as the trafficker.

9        Q.  Have you heard the terms "player" or "hustler"

10   being used to describe a pimp?

11       A.  Definitely.  In fact, still in the United States,

12   there are players balls, which are very well-known,

13   highly attended fashion show kind of things where pimps

14   will come with girls and women showing how grandiose

15   they can appear in that situation, and they often refer

16   to themselves as pimps.

17            And even movies are named after hustlers.  And

18   everyone understands that a hustler in the olden days

19   was somebody who was like a person who played cards and

20   knew how to cheat, but a hustler today is going to be a

21   trafficker.

22       Q.  Have you hear the term "snatch up"?

23       A.  Snatch up, yes.

24       Q.  What does that mean?

25       A.  Snatch up means that they are going to sort of

kind of grab you up and take control of what you're
doing.  I'm going to snatch up -- snatch you up so to
speak, but the word "you" is left out, because I have
control over you and you have to do what I tell you to
do.

    Q.  What about break in?

    A.  Breaking in is a strategy and actions that breaks
the will of a potential victim so that they are not
likely to try to run away or leave the offender.  It
entails many times sexual assault, and it could be
violent sexual assault.

        It also sometimes entails memorialization of that
sexual assault with videos, et cetera, but it also can
entail so-called running a train, that is multiple
people sexually assaulting a victim.  This is very
common in gang related sex trafficking and breaking in,
sometimes referred to as being "sexed in."

        But breaking in is to teach a victim that this is
what you're going to do for me and you are going to do
it as I tell you to do it.  It's not about I'm going to
pay you money to do it; it's about I have the power and
control to coerce you to do this.

    Q.  In your experience, have you heard of traffickers
viewing themselves as businessmen or entertainers?

    A.  I have testified in cases like that where the

trafficker was highly respected, but everyone knew that

he was going to be the person to provide women and girls

at high roller situations and casino gatherings or at

entertainers' parties, for example.

In one case that I testified in in California,

all of the women and girls that he had recruited were

from Oregon and were brought down to be the dates for

only people who were in the entertainment industry.

Q.  Might a trafficker have sort of other enterprises

that he's working on in addition to the trafficking

part?

A.  Sex trafficking might be part of it, but there

may also be weapons trafficking and there may also be

drug trafficking.  I definitely testified in cases where

the trafficker had more than one line of business and

they therefore had a significant amount of money.

Q.  What about pornography, can that be related to

trafficking?

A.  Very much so.  And adult pornography and

pornography of adolescents that are made to look like

adults is highly lucrative.  It's in fact seen as one of

the most lucrative internet businesses around the world.

And I have spoken at three Congressional briefings to

this point on that whole issue of pornography,

pornography addiction, the marketing of pornography and

1    it's a huge amount of money that is contributed to this

2    and how it normalizes sexual harm.

3        Q.  In a scenario where a trafficker might have sort

4    of multiple enterprises, would he in that case rely more

5    on the bottom to sort of run the trafficking day to day?

6        A.  Yes.  Typically, the trafficker will be front and

7    center in the most dangerous and the most lucrative of

8    his enterprises, if he has multiple enterprises, the

9    ones that he wants to keep his eye on the money the

10   most.

11       This is when he would designate other individuals

12   to be responsible for the lower hanging fruit, which

13   would often be the sex trafficking component.

14       Q.  In preparation -- you met with us to prepare for

15   your testimony today, right?

16       A.  Yes, I did.

17       Q.  During that preparation, did you meet with or

18   examine any of the victims in this case?

19       A.  No, I did not.

20       Q.  Were you told significant details about this

21   case?

22       A.  No, I did not.

23       Q.  So what is your testimony today based on?

24       A.  It's based upon my knowledge of the literature,

25   my experience in the field, and the fact that I continue

1  to work in this particular area.

2         MS. IVERS:  No further questions for Dr. Cooper

3  from the government, Your Honor.

4         THE COURT:  Okay.  Do you need an extensive

5  cross examination or what do you think?

6         MR. WENDT:  I have some questions.  I don't

7  know if it will be extensive.  It certainly won't go on

8  for 30 minutes or so.

9         THE COURT:  Will it go five minutes?

10        MR. WENDT:  Yes, it will go on for five.

11        THE COURT:  Let's take a 15-minute recess.

12  Thank you.

13        DEPUTY CLERK:  All rise.  This matter now

14  stands in recess for 15 minutes.

15        (Recessed from 10:22 a.m. to 10:40 a.m.)

16        DEPUTY CLERK:  His Honor, the Court, the United

17  States District Court is again in session.

18        Please be seated.

19        THE COURT:  Okay.  Welcome back.  Mr. Wendt?

20        MR. WENDT:  Thank you, Your Honor.

21                 CROSS EXAMINATION

22  BY MR. WENDT:

23    Q.  Good morning, Dr. Cooper.

24    A.  Good morning.

25    Q.  We're quite a ways away.  Can you hear me all

1  right?

2      A.  Yes, I can.  Thank you.

3      Q.  I have some questions for you, not too many, but

4  I have some.  I want to start off with something you

5  recently said that I just don't understand and I would

6  like to have you explain for me.

7          You said pornography is lucrative.

8      A.  Yes, it is.  It's a multibillion dollar

9  administration.

10     Q.  I can get on the internet and type in "sex

11 pictures" or "sex videos," and there is more to look at

12 than I could look at in ten years.

13     A.  That's correct.

14     Q.  How would people make money with pornography?

15     A.  The ads that are associated with the running of

16 those particular images are what makes so much money.

17 And it is thought to be one of the -- it is a huge

18 public health concern in the United States and other

19 countries as well.

20     Q.  Who pays for ads on pornography?  I don't think

21 Coca-Cola wants their soft drinks on pornography

22 websites.  Who puts ads on pornography websites?

23     A.  Well, there are quite a few that are associated

24 with sexually -- sexual things, such as Trojan for

25 condoms.  You have alcohol companies that frequently are

1    part of that process.  You also have dummy agencies so

2    that you don't know who the real vendor is that is

3    paying money for those images on the internet.

4         But I was part of a research presentation at

5    Princeton on this subject.  And a book came out of that

6    called The Social Cost of Pornography, and it was

7    stunning to understand how lucrative this industry is.

8    It is no longer so much in the United States because the

9    CDC called the pornography producers, the video

10   producers out on the fact that all of these images

11   depicted unsafe sex, no use of condoms or anything of

12   that nature.

13        So the majority of the studios that were making

14   adult pornography in the United States moved from

15   California to Germany.

16   Q.   Okay.  How does an amateur person who just wants

17   to -- thinks he or she can make money with pornography

18   and gets the camera equipment and gets the room, gets

19   the actors, or whatever you want to call them, how does

20   that person make money from pornography?

21   A.   Well, often what happens is that if the images

22   are of underage minors, they are frequently sold as if

23   the minor made the images themselves.  That's how they

24   are labeled, "Hot Teen, Want to Have Fun with Me," these

25   kinds of titles that infer that they are self-produced

images.  There are many 1-900 calls, et cetera, that
links the video, not necessarily at all with who is in
the video, but links the video with a telephone number
for the purpose of a sex trafficking encounter.

Q.  Okay.  So what would a person do if he or she
wanted to make money from pornography after getting all
the equipment and stuff together, I have got all the
stuff, I have got the models that are going to do the
sex acts, I got everything together and they take the
pictures, what actually do they actually have to do to
sell that pornography?

A.  They would interact with industries, all the
different industries for which pornography is part of
what they do, the entertainment industry, the gambling
industry, the industries that are associated with
casinos, industries that are associated with alcohol,
tobacco and firearms are sometimes also involved with
respect to the marketing of pornography because they are
seeing the role of pornography is to enforce male
dominance, a lot of those kinds of things.

The other thing is that pornography is on the
internet, is also part of what you see that is sold
through hotels that are now not referred to anymore as
clean hotels.  Clean hotels don't have internet
pornography available on the television sets, because

there are internet TVs in those hotels.  Clean hotels
are now, you can look up on the internet if you're going
to stay in a hotel and find out if a hotel is a clean
hotel or not, which means the entire hotel chain has
agreed, has signed papers that they will not show
pornography on their Pay Per View that they have on the
televisions in their various rooms.

But the market for pornography remains extremely,
extremely active, and the most -- the best resource that
you could get about this whole dynamic is a book written
by Dr. Gail Dines called Pornland, P-o-r-n-l-a-n-d, one
word.  Dr. Dines is a retired professor, social media
professor, who has spent 25 years studying pornography
and is the most, I would say, knowledgeable person in
our country that focuses on the money that is associated
with the production of adult pornography.

Of course, we know that child pornography also --
and, again, we don't call it child pornography anymore;
we call it child sexual abuse images -- that's also a
multibillion dollar industry, and it's, of course, under
the table, it's illicit contraband, people pay money in
order to have access to these kind of images.

And that paying of money started back when people
were just -- not just -- when people were purchasing
videos, VHS videos.  In fact, the biggest investigation

in the United States that started the whole process of
sale of, at that time referred to as child pornography,
was from the United States called Operation Avalanche
where individuals were making images, making them into
VHS tapes, selling them on the internet for $29.95 a
tape.  And there were so many buyers from around the
world that the owners of that particular business were
pulling in close to $3 million a month in money that
they were making from those types of images.

          There is a huge market for this particular kind
of content, and that's where the money comes from.

Q.  Okay.  So the people who are engaged or beginning
to get engaged in that business, so to speak, there
would be records, bank records, phone records of those
people who do those things; is that right?

A.  Well, I don't know if they are reporting their
income to tax individuals.  They may be undercover-type
of businesses that have a different name.  For example,
when I think about some of the Congressional briefings
that we have provided, we have had in those
Congressional briefings individuals who were in those
videos, in adult pornography videos, talking about the
labor law violations, the labor trafficking situations
that were very common in the production of these kinds
of videos, that the actors and actresses were paid very

little, but the producers were making millions of
dollars over the process of the diaspora of those kinds
of images that are available.

Every time you type in the word "porn" on Google,
and the entire first page comes up with all, remember
these will come up with all the adult pornography sites,
they will usually say 12,000 videos or 15,000 videos,
and they will talk to you, the viewer, and let you see
35 minutes or 45 minutes of a given video, but then if
there is another type of video for which they have a
trailer, then you have to use your credit card in order
to pay $29 in order to see this next type of video or
this next genre of video, which may be all gay, which
may be all lesbian.  It may be all definitely S&M type
of content.

And the more that you see of free videos, the
more you're going to be pulled in to pull out your
credit card to pay for Pay Per View videos, and this is
a major contributor to its immense amount of money
that's being spent on adult pornography.

Q.  Okay.  But the people who do receive that money,
if they are making as much -- if they are really
successful, there should be a record of that somehow?

A.  Oh, yes.  If they are really successful, that
would be true.  If they are receiving money on the

1   internet as compared to someone who sends a link or a
2   trailer from their own cell phone, you know, they are
3   not using the internet and marketing that way.  If they
4   have made on a video on their cell phone and now they
5   are getting ready to market for actual sexual contact,
6   hands-on sexual contact, they sometimes will send a
7   video clip of the victim that they are going to buy to
8   have sex with from their cell phone.

9          The money will never be recovered because that's
10  a hand-to-hand payment once that victim is delivered to
11  that hotel room or to that individual who was seeing the
12  video on their cell phone.  In fact, it was in 2003 that
13  the marketing of children in Japan rose 95 percent,
14  children for sex rose 95 percent, and the reason for
15  that was because in 2003, 3G technology came out so that
16  you could then take a picture of a girl and send it to
17  somebody else's phone and say, "Is this the one that you
18  want," and no one has seen that even on the internet per
19  se.  It's all 3G technology.

20         So that's why we refer to these crimes as
21  information, that would be internet; and communication,
22  that means 3G, 4G, 5G technology; technology, ICT crimes
23  against children.

24  Q.  Are most of these people who engage in this
25  technology savvy?

1     A.   Savvy enough to know how to make money, yes.

2     Q.   All right.  Savvy about technology though?

3     A.   It's not hard.  In fact, unfortunately,

4  six-year-old children can take pictures of themselves

5  and send to somebody that they met in a video game.  I

6  have had patients in my emergency room who have done

7  that.  It doesn't take a lot of technology knowledge to

8  do that.

9     Q.   When you started testifying, you were talking

10  about sexual abuse and you were talking about sexual

11  exploitation.

12     A.   Yes.

13     Q.   And do I have this right that child sexual

14  exploitation is a form of child abuse, but child abuse

15  has a wider net of which exploitation is one part?

16     A.   I would say it's the other way around.  Child

17  sexual abuse is a form of abuse.  Child sexual

18  exploitation almost always involves child sexual abuse

19  but may involve many, many additional forms of harm.

20          So a child is sexually abused in a home, let's

21  use that as an example.  The offender may be a parent.

22  In fact, parents are the most common offenders who make

23  child sexual abuse material or child sexual abuse

24  images.  They take those images that they've made of

25  themselves sexually abusing their child, they put them

on the internet to market their child for someone else
to come and have sex with their child to their home.
This is called intrafamilial trafficking.

And once that has happened, they may bring in one
person at a time to sexually abuse their child for
money, or they may bring in several people at a time,
so-called organized abuse, which is written about in
great depth in a document that you can access online
called The Survivors' Survey from the Canadian Center on
Child Protection that came out in 2017.

I was on their international working group. More
than 150 responded about how now-adults' images were
made of them as children and are now circulating out
there where people will download, trade and possess
those images. And now that these individuals are
adults, they are helping us to understand the nature of
organized abuse, much to our surprise.

We never thought that there would be multiple
offenders in one home sexually abusing the child, taking
turns sexually abusing a given child while the cameras
were rolling for the purpose of production of images.

So sexual abuse is the source. It's the core, if
you will, victimization. But sexual exploitation
frequently entails making that one sexually abusive act
become an act that can harm the victim from many, many,

1    many offenders, which is why when I teach on this

2    subject, I talk about child sexual abuse, that means

3    sexual abuse involving one offender, one victim.  Then

4    the more difficult type of case is the multi victim

5    case, a coach or a pediatrician who sexually abuses

6    multiple of his players and/or his patients.  That's a

7    multi victim case.

8         But the most difficult types of cases to

9    investigate and understand are the multi offender cases,

10   because multi offender cases are such that a victim

11   can't tell you who did this to me because there were

12   just too many people who did that.  That's what you see

13   in sex trafficking.  It's a multi offender case.

14   Q.  Okay.  And I think you testified that as young

15   people, children, get into the life or whatever, become

16   victims of sexual trafficking, as they move along and

17   get older, it's easier and easier, they become more

18   vulnerable to other traffickers; is that right?

19   A.  I don't know if I said it's easier and easier for

20   them to become more vulnerable to other traffickers.  If

21   a child is brought into sex trafficking victimization,

22   it is a life changing experience.  And there are some

23   articles that say that the expected life span of a sex

24   trafficking victim is about seven years.

25        They often have suicidality -- their leading

1   causes of death are suicide, homicide and HIV/AIDS.

2   Those are the three leading causes of death in sex

3   trafficking victimization.

4        And so I did not say it's easier and easier for

5   them, because it's not easier and easier.  But if they

6   have been broken in by one trafficker, to be sold to

7   another trafficker is not uncommon.  And so it's not

8   unusual for a victim to perhaps have run away from a

9   trafficker, but now they are homeless, they have no

10  skills and they are on the streets, and so another

11  person may recruit them or pick them up and bring them

12  back into another aspect of victimization.

13       So from that perspective, it is not unusual to

14  see a victim who is trafficked by multiple traffickers

15  over time.

16  Q.  You didn't say easier, but you did say more

17  vulnerable?

18  A.  Yes, they are.

19  Q.  Okay.  You talked about Tanner stages.  And when

20  were the Tanner stages first developed?

21  A.  In the 1960s by Dr. James Tanner in the UK.  He

22  made -- helped us to understand the progress of sexual

23  maturation, which for girls starts with breast

24  development, then pubic hair, then axillary hair, the

25  hair underneath the armpits, and finally the onset of

menses or having periods.  Those are the Tanner stages.

Around 1999 or so, Dr. Tanner and Dr. Arlan Rosenbloom from the University of Florida, also a pediatric endocrinologist -- both of these were pediatric endocrinologists -- wrote a letter to the editor of the Journal of Pediatrics saying, "You should not be using Tanner stages when you're talking about," in those days, "child pornography investigations."

Because what started happening is that Dr. Tanner and Dr. Rosenbloom and other endocrinologists in the country were being hammered by investigators to testify as an expert witness that this image is consistent with an underage child, a child who is not an adult.  Adult being defined as 18 years or older.

These endocrinologists did not want to spend their time looking at abusive images.  It's very vicariously traumatizing.  And Dr. Tanner and Dr. Rosenbloom wrote this one short letter to the editor that said, "Do not use Tanner stages when you are talking about child pornography investigations.  Tanner stages are for us to tell if the child has delayed puberty or getting them ready for sports physicals or things of that nature."

This stopped a lot of healthcare providers from even acting at all in investigations of child

pornography because we all were only trained on Tanner
stages.  It was about -- there was about a three-year
hiatus until the World Health Organization and other
international organizations changed that terminology to
SMR, sexual maturation rating.

SMR now is the terminology in all pediatric and
endocrinology books because the Tanner stages just
happen to be named after Dr. Tanner.  But there were
other people who studied sexual maturation, and so as to
not give it that moniker and make it more generic and
meaningful, the term sexual maturation rating is now
used fairly universally.

So when I see a patient in my clinic and I have
to discern and make a physical examination, I want to
make sure that I have documented what stage of pubertal
development they are in.  I no longer, and have not for
more than 15 years, used the term Tanner stage 2 or
Tanner stage 3.  I will refer to the patient as SMR.

And we use the SMR rating by body part, so breast
development would be from stage 1, which would be no
breast development, to stage 5, which would be
equivalent to an adult woman.

The other one would be genital development, pubic
hair is typically what we would get.  So pubic hair will
be totally absent in a stage 1 sexual maturation rating

normal, and very characteristic in a female triangular
shaped, very thick pubic hair in a stage 5.  So now
almost across the world, if we read an investigative
assessment that's been done by a healthcare provider and
they are talking about the sexual maturation of a child,
it will read something like, "This patient has B2 PH3,
for example.  Breast development is stage 2, pubic hair
distribution is stage 3, not stage 5, which is
completely adult.

     Q.  Okay.  That was a little more information than I
wanted to know, but it's very interesting.

          The reason I brought it up is you said something
extremely interesting.  When you were testifying you
didn't say when Tanner was, and that's why I asked when
those were.

          You had said, and correct me if I'm wrong, that
the maturation of children -- and I don't know if you
just meant females or all children.

     A.  All children.

     Q.  -- all children has happened one year earlier for
every decade since the Tanner stages began.

     A.  That is correct.

     Q.  And the Tanner stages began in the sixties.
We're up to at least five or six years --

     A.  Younger, that is correct.

1    Q.   -- that people are maturing younger?

2    A.   That is correct.  It used to be that the onset of

3    breast development for girls in the United States would

4    be 13, and now girls are starting to have breast

5    development at ages 8 and 9.

6         There are several reasons for this, but the

7    research from Dr. Steingraber -- I forgot her first

8    name, but her last name is Dr. Steingraber -- on the --

9    the title of the research is The Falling Age of Puberty

10   in U.S. Girls.  That's the name of research, which was

11   funded by the Breast Cancer Fund in fact.  Helped us to

12   understand many of the reasons for this younger and

13   younger age of onset puberty in girls in particular.

14        It's more rapid in girls than it is in boys, but

15   boys are also developing at a younger age as well.  The

16   primary reason that they believe children are entering

17   into puberty at younger ages are the chemicals that we

18   give to animals, the meat of which we eat.  The most

19   important one is recombinant growth hormone.

20        Recombinant growth hormone is a very common

21   hormone given to poultry.  It's also given to beef.  And

22   recombinant growth hormone is a hormone that then gets

23   into all of our systems.  It causes us to have more

24   hunger.  And because we become more hungry, we become

25   more overweight.

In girls, estrogen is stored in fat cells so the more overweight a child is, the younger they will enter into puberty because they will have more estrogen in their systems. So that's why there is movement in our country regarding foods that don't have these added hormones and don't have added chemicals that actually change the neuroendocrine function of our brains and cause us to have more endocrinological problems.

Q. So is it fair to say then that your average 13- or 14- or 15-year-old today looks like the 18- or 19-year-old of a few decades ago?

A. That is true. That is true.

Q. Talking about drug -- I'm sorry, not drug -- sex traffickers, it's true, isn't it, they are not always men; they can be women as well?

A. Absolutely, yes. You do have sex traffickers who are female, yes.

Q. And you mentioned about the exchange of money or goods, and correct me if I'm misstating you again, but these are just my notes. I think what you said was when that exchange happens from a customer to a victim, it goes on up the chain eventually and the trafficker gets most of it, the bottom gets some, and the victim gets a very little bit?

A. If any. If any.

1    Q.  If any?

2    A.  Yes.  And I didn't use the term "up the chain."

3    Q.  No, you didn't, that was me.

4    A.  I didn't use that terminology, but generally

5    speaking, when you have this kind of crime against

6    persons, the key thing is that money is given to the

7    victim at the time of the beginning of the sexual act or

8    you have now arrived at a hotel room or wherever you are

9    going to be, and you announce that you are Diamond or

10   whoever and it's going to cost this.

11       Money is usually obtained first before any sexual

12   acts take places, usually.  If the victim is very

13   trustworthy, the victim may be able to keep the money

14   during the sexual act and leave with the money and

15   return back to wherever she has to go in order to

16   relinquish the money.  But for young victims and new

17   victims, it is not uncommon for the bottom to come into

18   that hotel room with the victim, and when the offender

19   pays the money, he may give it to the victim and the

20   victim must turn and give it to the bottom, so that the

21   money is never really in the victim's hand for a long

22   period of time before they have to perform the sexual

23   acts that the buyer has paid for.

24   Q.  And in turn, the bottom gives the majority of the

25   money to the sex trafficker?

1    A.    That's correct, yes.

2    Q.    You had -- I think you testified that the victims

3    may minimize or forget what they have been through for

4    whatever reason; is that right?

5    A.    I didn't say that they would forget.  What I said

6    was that if a victim has been a victim of

7    polyvictimization before they were ever brought into the

8    life, they will already have complex posttraumatic

9    stress disorder.

10         Therefore, once they begin to be revictimized,

11   sexually assaulted, as would be seen in a sex

12   trafficking circumstance, their ability to

13   chronologically recall every single thing that has

14   happened over time will be impaired for two reasons.

15         One, their brain from the polyvictimization has

16   already experienced what's referred to in the literature

17   as neurodevelopmental disruption.  So they are already

18   children who have poor memories, have difficulty with

19   cognition, have learning disabilities, long before they

20   were ever brought into a life of sexual exploitation.

21         They already are wounded and injured children in

22   that sense from a learning perspective.  Then if they

23   come under the control, the power and control of a

24   trafficker and are now being presented or provided to

25   buyers for sexual acts, many traffickers, if there is no

bottom that is monitoring them, many traffickers require that these girls and boys write down in a little notebook every single encounter that they have and how much money they were to have received or did receive, almost like a receipt book.  They don't give a receipt, but they have to write it down.  Otherwise, the trafficker will not know for sure how much money did you really make, are you cheating me, et cetera.

But they have to do it because they for sure would not be able to add it all up so well because they are already learning disabled young people to start out with.  Then to be sold multiple times a day for sexual acts worsens their degree of posttraumatic stress, and they become really functionally disabled adults.

Q.  Okay.  Is that similar in a sense -- that sounds similar to a drug trafficker who has a type of ledger about the drugs he sold and who owes him money, and this is frankly used in court to prove that the person is indeed a drug trafficker, not just a drug user?

A.  The difference is that for a drug trafficker, the drug trafficker is not using the drugs.  For a sex trafficking victim, the sex trafficking victim has to succumb to being sexually assaulted multiple times.

I have testified in court cases where the little Hello Kitty spiral bound books were there showing the

1  number of sexual encounters by day. I have definitely

2  testified in cases like that, and that's part of the

3  contraband that was part of the investigation. But the

4  difference is that in a drug trafficker situation, a

5  drug trafficker is not using those drugs, so it's not

6  impairing their ability to tell you about what has

7  happened. It only affirms how many different deals were

8  made on a given day, et cetera.

9      Q.  No, but it's still a business record that they're

10  keeping?

11     A.  It a business record.

12     Q.  Similar to the business record that a sex

13  trafficker is having their victims keep?

14     A.  Yes, if the sex trafficker keeps that ledger.

15  Many times the victims show that ledger to the sex

16  trafficker, but they have to keep it for the next night,

17  the next time they have to write down encounters.

18     Q.  I wanted to ask you, we did speak about the

19  victim minimizing. And I know that something I heard of

20  that's been around for a long time with victims of

21  kidnappings. I think it was called the Stockholm

22  effect. Have you heard of that?

23     A.  The Stockholm syndrome.

24     Q.  The Stockholm syndrome, that's right, where the

25  victim actually likes the kidnapper and speaks favorably

1  of them and the thought is, I believe, if I'm not

2  mistaken, after you get them away from the kidnapper,

3  eventually they will come back to normal and see what

4  happened.

5      A.   Yes.  What you're describing is trauma bonding,

6  more so than Stockholm syndrome.  Stockholm syndrome was

7  specifically devised to describe how the victim would

8  become an offender.

9          In Stockholm syndrome, they get abducted, for

10  example, and they begin to identify with the abductor.

11  And then they begin to be willing to commit the same

12  kind of crimes that the abductor committed, so they

13  become a partner in crime, if you will.

14          They are brainwashed to believe that this is what

15  they are supposed to do and this is the way it's going

16  to be.

17          Trauma bonding, on the other hand, is a situation

18  that's frequently described in sex trafficking

19  victimization where an individual is absconded, if you

20  will, by the trafficker.  They are given the rules.

21  They are expected to follow those rules.  They are

22  punished if they do not follow those rules.  And they

23  will go on to become compliant.  They become a compliant

24  victim in that interim.

25          A Stockholm person would become the bottom, so

the Stockholm syndrome would be a person who is the
bottom because they now are the enforcer. They are
acting like the trafficker. They are giving the
punishments or letting the victims know how much trouble
they are in and that they are going to rat them out or
tell the trafficker that they didn't make all the money
they were supposed to make, so they begin to act like
the trafficker.

On the other hand, when you have a victim who is
bonded psychologically to the trafficker, what happens
is that they will not tell the police who it is who is
controlling them, they will continue the script that it
was my idea, I was the one -- nobody is controlling me,
I get to keep all of this money, et cetera, although
that's not true.

And there is nothing to show you they have kept
all this money because they have nothing to show for it.
They have no place to live except with the trafficker.
They have nothing, no jewelry, nothing that would
indicate that they are selling themselves and keeping
all the money.

Instead the trauma bonding is that they have come
to psychologically believe that what is happening to
them by the offender is in their best interest. And so,
therefore, they don't try to run away, they don't try to

1  tell the police or anybody else this is what has

2  happened to me.  In fact, they will deny that if they

3  ever get questioned by authorities.

4      Q.  But as time goes by, do they reverse, so to

5  speak?

6      A.  If they are rescued.  If they are rescued and

7  they are able to appreciate that the things that they

8  were doing were not their choice, because they have been

9  told this is your choice, it's your life, you made this

10  decision.  And so as a developing prefrontal cortex as a

11  child adolescent who doesn't have that judgment yet in

12  the front part of their brain, they will believe that.

13      Q.  So it would be unusual for a person who is

14  rescued from sex trafficking to immediately point the

15  finger at the trafficker and say, "He's beaten me," he

16  did this, he did that, and then as time goes on actually

17  soften?  That would be the reverse of what you would

18  expect to see?

19      A.  That is -- let me restate what you just said so

20  that it's clear for me.

21          Typically victims who are rescued do not tell you

22  up front that they are being trafficked.  They have been

23  told time and time again they are not to say that, that

24  it was all their idea, because if they're minors, the

25  consequences will be far less, the trafficker will not

1   get into trouble, but the trafficker will be there for

2   them.  It's usually the trafficker posing as a parent

3   who will come and bail them out of juvenile detention,

4   for example.  That's a very common scenario when you

5   have minors who are arrested for what is seen as

6   malingering or sometimes seen as soliciting and some of

7   other minor charges that we bring against individuals

8   who might be exchanging sex for money or drugs.

9       Q.   All right.  In the cases you are involved in,

10  have the victims ever had a psychological or psychiatric

11  evaluation and treatment as a result of the trafficking?

12      A.   Yes, I have.  Yes, definitely.

13      Q.   Is that frequently done?

14      A.   I would say I have seen psychological assessments

15  in less than 50 percent of the victims, for several

16  reasons.  One is that sometimes these victims are very

17  unstable.  They don't have a stable home.  Many times

18  their parents have rejected them or they were out of

19  their home anyway starting out because they were already

20  in foster care and situations like that, so they didn't

21  have a concerned caregiver for them.

22          And because of that reason, it's very hard for

23  them to even have the capability of making healthcare

24  decisions, agreeing to have any therapy.  If a victim is

25  rescued in our country, they need to be placed in some

type of residential treatment facility that will be safe
for them and where they can receive appropriate mental
healthcare services. We as yet in our country do not
have the capacity to be able to provide that 100 percent
of the time. We don't even have yet the capacity to
provide that 50 percent of the time, but it is a goal on
the part of our country.

Q. You spoke a bit about a renegade/independent.
Are those two terms equivalent, or is there a difference
between a renegade and an independent?

A. I would say they are not the same. They are not
the same. A renegade is a person who may choose to not
go along with the rules and regulations eventually of a
trafficker and may run away from that individual or may
actually be ousted by that individual because they are
not obedient enough.

But they do not necessarily become a trafficker
themselves. They may be picked up by another trafficker
who will sell them but treat them differently.

Q. Okay. I misunderstood. I thought a renegade was
someone who was, for instance, a bottom, who then went
into business for him or herself away from the main
trafficker.

A. They can be, but not always. They can be that
kind of person but they have to have the capability of

being able to be smart enough to do that.  And so
sometimes, you know, they have had brain injuries from
strangulations and blunt force trauma to the head, et
cetera, and many times they are unable to do that.

        If they are capable of establishing their own
enterprise and grooming and bringing in other girls to
sell, then that would be one of the outcomes that you
could see for a renegade, but not every victim who is
referred to as a renegade will have that kind of
cognitive capability.

    Q.  Can a sex trafficker or a renegade, whether it's
a renegade or just a common sex trafficker, can they
have a social life of their own apart from the sex
trafficking?

    A.  Yes, absolutely.

    Q.  Can they have a significant other that's not
involved in sex trafficking?

    A.  Yes, they can.

        MR. WENDT:  Thank you very much.  Those are all
the questions I have.

        THE COURT:  Redirect?

        MS. IVERS:  Yes, Your Honor.

                   REDIRECT EXAMINATION
BY MS. IVERS:

    Q.  Dr. Cooper, just going back to the porn thing,

1  one quick question on that.  So are you familiar with

2  amateur porn websites?

3      A.  Yes, I am.

4      Q.  Can you just explain what those are?

5      A.  Amateur pornography websites are also on the

6  internet, and they are made by people who are not

7  professional videographers, who don't have studios, and

8  many times they are homemade images.

9          And the nature of those images, the purpose of

10  having those images are, A, to make money for the person

11  who is selling those images online, or, B, those images

12  may be used to sell the person of which those images are

13  made online, so it's like a teaser.  "Look at this,

14  she's available to you, it will cost you whatever," or

15  "Get in touch with me," may not mention how much it will

16  cost to actually have sex with this person.  But it is a

17  marketing tool that's used sometimes.

18      Q.  Okay.  And kind of in that realm, you were asked

19  a lot of questions about making money as a pornographer,

20  and also even making money as a pimp, you referred to

21  very successful pimps or traffickers.

22          Are traffickers necessarily rich or high rollers?

23  Are there traffickers who make not a ton of money

24  through their businesses?

25      A.  Right.  I think we see all different kinds.  I

 1   have testified in court cases where a particular

 2   trafficker in Connecticut was a millionaire and had a

 3   lot of money.  He was a diversified trafficker, not just

 4   a sex trafficker, but also a weapons trafficker.

 5         On the other hand though, the majority of the

 6   traffickers that I have -- whose cases I have testified

 7   in are not wealthy people.  They are not living hand to

 8   mouth, but they are not well to do.  And they will --

 9   and they do not spend a lot of money on the girls that

10   they are trafficking either.

11         So it's common, for example, to find a trafficker

12   renting a Motel 6, two or three rooms for a couple of

13   weeks and have everybody between these two or three

14   rooms, and they will only provide sexual acts as

15   callouts, where the victim goes to where the person

16   online says I want them to come to my hotel room or to

17   my house or whatever.

18         So no, they are not always well to do at all.  I

19   think most of the ones that I have testified in -- cases

20   I have testified in have not been wealthy people.

21   Q.   Is there a reason that they might want people to

22   think that they have a lot of money?

23   A.   Yes, because if it looks like you have a lot of

24   money, groupies or people will want to gravitate toward

25   you because you look successful.  That both enhances

 1  your ability to recruit women and girls because you look

 2  successful, and also it facilitates your being able to

 3  arrange sexual dates because buyers will feel that this

 4  looks like a pretty successful person, so I can probably

 5  trust them, not only to provide safe sex for me, but

 6  also discretion.

 7      Q.  And you also were asked a couple questions about

 8  repeated victims of trafficking.  Have you seen

 9  instances where a victim runs away and then comes back

10  to the same trafficker?

11      A.  Yes, I have.

12      Q.  What's the dynamic there?

13      A.  It is very similar to the dynamic that we see in

14  intimate partner violence where a wife or a girlfriend

15  leaves, but after she's gone, if that individual is in

16  touch with her, they often promise this will never

17  happen again, I just lost control, all of those kinds of

18  things and it's very common for them to return.

19          So the dynamics of the violence in the

20  relationship are probably the most compelling to bring

21  that victim back into that relationship.

22      Q.  Moving on to sort of the sexual maturity

23  discussion that you just had.  So you said -- I think

24  you said like a 13- or 14-year-old would look like an

25  18- or 19-year-old from the sixties.  Am I understanding

1  that correctly?

2      A.  Right.  A 13-year-old today and a 14-year-old can

3  be completely sexually mature; whereas in the sixties,

4  that person would have been 16 or 17 years of age as far

5  as sexual maturation was concerned.

6      Q.  But that was like, what, 60 years ago?

7      A.  Right, it has been that long.

8      Q.  And so you -- so we're talking about physical

9  maturity.  How do you tell that -- can you tell that

10 someone is 14 or 15 and not 18 or 19?

11     A.  I sure can.  All I have to do is talk to them,

12 because even though there is sexual maturation, there is

13 not brain maturation.  And, if anything, the brain is

14 less mature than we thought from before.

15         And so these victims who are 12 or 13 years of

16 age who may have a perfectly mature body will be very --

17 they will either come across as highly naive or very

18 immature, or you will talk to them and it will be very

19 clear that you can suggest pretty much anything to them

20 and they will buy into it, because they are not -- they

21 don't have the brain maturation to be able to discern

22 what is in their best interest and what is not.

23         I have spoken to many 13-, 14- and 15-year-olds

24 who were trafficking victims, that's how I came to be

25 speaking to them, and they would talk to me for 10 or

15 minutes, and then they would stop and say, "Do you

know what really has happened to me," and I would say,

"Yes, you're in the life, right?"  And they would

breathe a sigh of relief and then be able to continue

their conversation.

　　　　Which a person who is cognitively the 18-, 19- or

20-year age is going to be a totally different kind of

person.  They are going to have a lot more, not just

sophistication, but they will have more cognitive

capabilities, unless they are so disabled and drugged

out or have been brain injured because of closed head

injuries, et cetera.

　　Q.  And you're a doctor, you work with these patients

all the time.  Can someone who is a layperson -- is it

your opinion that someone who is a layperson would also

be able to pick up on these cues as far as cognitive

development?

　　A.  Yes.  It is my opinion that they would.  For one

reason, teachers can tell this, coaches can tell this,

scout masters can tell this.  People who interact with

children can tell pretty quickly if you have a child who

is not at their age level.

　　　　It's very -- it's much more apparent when

children get into their teens as it is in the five-,

six-, seven-year-old child.

1    Q.  On the topic of forgetting, so you seem to

2    distinguish between things that a victim actually

3    remembers and that he or she is able to explain to

4    someone else.

5        So is it your experience that someone might

6    remember and say that they forget what happened to them?

7    A.  What I have seen and what the literature says is

8    that victims often can recall the core elements of what

9    has happened to them, especially life-threatening

10   circumstances, because that's very front and center in

11   their thought process.

12       However, chronologically, they are unable to

13   consecutively say this happened first and then this

14   happened next, and then it was in 2011 that such and

15   such happened, and so on and so forth.

16       It is their chronological thinking that becomes

17   significantly impaired.  And so consequently when they

18   bring up new issues that have happened to them to a

19   therapist or an interviewer, the interviewer will think

20   this person is all over the place, they are just

21   mentioning all of these different things, I don't know

22   what's true and what's not true.

23       That is the nature of complex PTSD, which is why

24   it's called complex PTSD as compared to traditional

25   PTSD.  Because remember, especially in trafficking

victims, the most common preceding life experiences has
been polyvictimization. One other thing that is
relevant to that is that research has shown if you have
been abused the same, like sexual abuse, pretty much all
of your life, your prognosis is much better than if
you've had four or five different kinds of abuses often
during your life.

It leaves your brain in a state of poor
regulation. That's the term that's used in the
literature, poor regulation. Because if you're always
sexually abused, your brain -- you can accommodate to
that. You anticipate it. You understand what's going
to happen. It's the same person. You can dissociate
yourself from it, if you're able to do that. But it's
not going to be you're also going to get beaten, you're
also going to be tied up, you're not going to get to eat
food for three days. You're not going to have all that
other stuff.

Those are the kinds of additional forms of
assault to your psyche, have much more outcomes. And I
would say that the person who has written a lot about
this, the two people who have written a lot about that
started with Dr. Bruce Perry. Dr. Bruce Perry from the
Trauma Academy, both in the United States, he's at
Baylor, and also has a site in Canada.

1       And then Dr. Julian Ford from the University of

2    Connecticut has been the second really renowned writer

3    in this particular area.

4       Q.  How might drugs have an effect on a trafficking

5    victim's ability to remember what happened?

6       A.  It would have a huge effect.  It depends -- and

7    it does depend also on what kind of drugs the victim has

8    been provided.  Marijuana is not so difficult, but once

9    you start having heroin and Ecstasy and many of those

10   kinds of drugs, it's harder for a victim to be able to

11   be, again, chronological or even recall all the details

12   at all.

13      Q.  So you mentioned -- you said that it's certainly

14   possible for a woman to be a sex trafficker, and you

15   also mentioned -- we have also been talking a lot about

16   bottoms.  Can a bottom be mistaken for a trafficker?

17      A.  Yes, because a bottom is -- if you have a bottom

18   who's very experienced, she may be willing to be the

19   face of the trafficker to protect the trafficker,

20   especially if the trafficker is a high-level person.

21      And so you may very well not know that a person

22   is a sex trafficker at all because this is the front for

23   them.  This person is the front for them.

24      Q.  And why would she be willing to be the front?

25      A.  Because she has bought into her devotion to that

individual.  Usually there is a close relationship that
started out, remember, as a sex trafficking victim
relationship.  And the fact that she has remained with
that individual over a period of time lets you know that
psychologically she is bonded to that individual and
also she sees benefits for herself in that process.

Many bottoms will say they couldn't imagine any
other work that they would be suited for because they
know so much about the life and how to market girls
and/or boys and how to deal in the system, so this is
why they are so devoted and remain in that situation.

Q.  And they know how this works, they have
experience in this.  What barriers are there to prevent
someone like a bottom or someone who has got a lot of
experience from just becoming a trafficker with no one
else above them?

A.  Well, one of the barriers is how she feels about
that trafficker.  I forgot to mention that many bottoms
see themselves as in love with the trafficker, and many
times they see themselves as common law wives to the
trafficker as well.  I forgot to mention that component.

So could you repeat your question again?  I
apologize.

Q.  So what barriers stand in the way of a bottom
becoming just her own trafficker with no one else above

1   her?

2      A.   A bottom may be a believer in the tradition of

3   sex trafficking and sees the male trafficker, if that's

4   who the individual is, as the father, boyfriend,

5   spiritual leader in the whole culture of pimping.  That

6   is a dynamic that was not well understood until we

7   started to really research what is the role of the

8   trafficker in the family so to speak.

9         They play three roles.  One is the father.

10  That's why it's often referred to as the daddy, but he's

11  the person who provides shelter and sometimes food for

12  the women and girls who he is trafficking.  He is an

13  incestuous father, because he also sexually assaults

14  these women and girls at will, et cetera.

15        He is also the husband/boyfriend in the culture

16  of pimping.  In fact, terminology in sex trafficking of

17  women and girls is that everyone is married to that

18  trafficker, and they refer to each other as

19  "wife-in-laws."  That's the terminology that is used.

20        And the reason that that's important is because

21  when I get ready to interview a survivor, it's important

22  for me to know what she sees her relationship to be with

23  that person.  Because if she says, "Well, that's my

24  husband," even though there is no legal marriage that

25  has ever taken place, it's a common law marriage type of

1    perception on the part of that victim, then I am going

2    to have to be careful about how I ask questions because

3    she's going to not want to provide information that way.

4         And then from a spiritual perspective, spiritual

5    wounding is written about quite a bit from the Office of

6    Victims of Crime and other agencies and in lots of child

7    victimization research.

8         Spiritual wounding is when an individual reminds

9    a victim many times over, "God put me in your life, you

10   better thank God, I was the one who rescued you from

11   that foster care facility or from that homeless

12   shelter," et cetera.  They not only will attribute their

13   position in the life of the victim as something that was

14   meant to be theologically, they also will carry that a

15   step further and often even read holy books every day to

16   the victims in a given family, reminding them that we

17   are -- I'm in charge because this is the way God would

18   have it to be, et cetera.

19        It doesn't have to be God.  It can be Allah.  It

20   can be whomever they are lifting up, but for the

21   victims, once they are rescued and have had therapy,

22   they often become -- they often have a loss of faith

23   after such a circumstance, which is referred to in the

24   literature as spiritual wounding.

25   Q.  You mentioned this husband/boyfriend dynamic.  Is

it common for a trafficker and one or multiple victims
to have children together?

A.   Yes.   What is interesting is that you never know
that it's the trafficker's child.   The trafficker almost
always claims paternity, but because the victim is
having sex with 8 to 10 to 12 people a night, I have not
-- I have testified in court cases where the trafficker
claimed paternity.   I have never seen a paternity test
to prove that fact in any of the cases I have ever
testified in.

Q.   How might having a child together influence the
victim either to not leave or to not go into business on
her own?

A.   It has a huge impact, especially if the victim is
an adolescent, because once the trafficker claims
paternity of a pregnancy that a victim now has
developed, the victim is very bonded then to the
trafficker.

In some of the rap music that you hear, they will
talk about that's my baby's daddy, and what that means
is I'm never turning on that person because they are the
father of our children or my child, et cetera.   So that
is a very highly successful manipulative ploy on the
part of traffickers who have women and girls they are
controlling become pregnant.

 1      They have frequently immediately said, "That's my

 2   baby and so we're going to take care of that baby," but

 3   they don't.  Usually the child is given up to social

 4   services or sent to some extended family member to be

 5   raised, not usually within the household of the

 6   trafficker and the victims.

 7   Q.  So we talked about, just kind of on this topic of

 8   renegades or bottoms and going into business on their

 9   own.  What do you look for to distinguish between

10   someone who is a bottom, who is kind of running the

11   business, and someone who is a true trafficker like

12   potentially a female trafficker?

13   A.  For one thing, a bottom tends to verbally protect

14   the trafficker and is pretty adamant that he is just a

15   friend, he just drives the cars for us, I'm the one who

16   is responsible for all of the negotiations.  They kind

17   of voluntarily take ownership.

18      Wherein the true trafficker doesn't ever

19   voluntarily take ownership for what is going on, so that

20   would be one of the first components that one would want

21   to consider.

22      And then the second point would be what evidence

23   of finances exist for the bottom.  A trafficker

24   typically has money.  They tend to make a lot of money,

25   for which they never pay taxes, so they have -- if they

1   are investigated, many times you will find money.  It

2   may be -- it's not in banks very often, but it's in

3   places where you can see there is a significant amount

4   of cash money.

5           Whereas the bottom does not usually have access

6   to that kind of money.  She may have a certain amount

7   for bail money that has been set aside specifically for

8   that purpose, but she does not have the equity or the

9   wealth that the trafficker would usually have.

10          MS. IVERS:  No further questions, Your Honor.

11          THE COURT:  Recross?

12          MR. WENDT:  Hold on just a second.

13          (Pause.)

14                  RECROSS EXAMINATION

15  BY MR. WENDT:

16    Q.  If someone was just around for a week or two, a

17  victim, is it true that they are less likely to minimize

18  or forget what had occurred to them?

19    A.  I want to make sure I understand the question.

20  If someone was around a victim for a week or two?

21    Q.  No, if the victim herself was only in the life

22  for a week or two, for a brief period of time, would

23  they be less likely to suffer these effects that you

24  discussed, some of which is minimizing or forgetting

25  what happened to them?

1    A.    It would depend upon what the victim has

2  experienced in that week or two.  It is not unusual, for

3  example, for a victim to be brought in with a train,

4  with multiple individuals sexually assaulting the victim

5  the very first night that they have come under the

6  control of a trafficker.

7        And that in and of itself is highly traumatizing

8  for a victim, so they very often will not be unscathed

9  and they would have difficulties.  On the other hand, if

10  a victim has been in and out of home care, has been

11  sexually assaulted on numerous occasions and now they

12  are, for two weeks, as you described, under the power

13  and control of the specific individual, the trafficker,

14  for a short period of time, is your question will they

15  be less affected?  Is that your question?

16    Q.    Basically, yes.

17    A.    I would certainly say that there is a definite

18  relationship between the longer time -- longer period of

19  time an individual is under the power and control of a

20  trafficker and all of those sexual exposures that they

21  experience from that process, to include use of drugs

22  and infections and medical complications, yes, the

23  longer, the worse the outcome will usually be.

24    Q.    One other thing you just mentioned is that

25  sometimes these victims, they have no place else to

turn, they have no place else to go.  What if a victim,
a young woman or girl, did have someplace else to go,
she actually had a decent home to go to.  Would that
person be less affected than the person who didn't have
a place to go?

A.   It would all depend upon why the victim is not in
that home that has resources to support her.  Often
children who have homes like that are not in their home
because they have been thrown away from the home because
they have been using drugs or have not been following
the rules and the parents see the presence of that child
as a risk for other children in the household or safety
in the household, so they may have been thrown out.
These are called throwaway children.

Or they may have been a victim in that home that
for all other reasons appears to be a stable, reasonable
home, but this victim may have been a child sexual abuse
victim in that home for a period of time, so for them
running away from that home or leaving that home to
them, to the victim, is their way out.

So in answer to your question, having been out of
a home for not a long time, and having been brought into
the life, does not necessarily mean that they are going
to have the major impacts that I have been describing if
in fact there is a safe, secure and nurturing

environment for them to be in and they are in that kind
of environment, even if it's a best friend's house or
something like that.

Q.  Okay.  And then my last question is:  If they did
come from a good home, if they were never abused in the
home and if they were only away for one or two weeks,
typically that person would not forget what happened to
them during those two weeks; is that true?

A.  I think that would be true.  They might not
forget -- it's unlikely they would forget, but that
doesn't necessarily mean that they would disclose what
has happened to them, because there may be guilt, shame
and self-blame.

Q.  I just wanted to understand what you had
testified to on redirect.  Correct me if I'm wrong, but
you said when apprehended -- I don't know if you used
the terms apprehended -- but when caught, the bottom
will protect the trafficker and the trafficker never
takes ownership, the trafficker never admits to it, but
the bottom will protect the trafficker?

A.  I think what I said was that the bottom will
typically protect the trafficker.  I very rarely use
terms like "never," but it is unlikely that the
trafficker would just choose to confess out of love and
support for the bottom.  I have not seen that occur

typically, but I have seen bottoms certainly protect the trafficker under the belief that the trafficker will come to their rescue at some point either by paying for a lawyer or paying for bail or some other means.

Q.  All right.  And I believe you also testified, I don't know if this is typical or not, but the victim would have 8 to 10 to 12 experiences a night.  I don't know if they are called tricks or dates or whatever they are, but that 8 to 10 to 12 number seems likes a lot to me.  Is that typical that they are that active?

A.  Yes, that is very typical.  It is very common for victims to have one hour, typically an encounter for one hour or so, and that usually starts sometimes at 3:00 in the afternoon and goes until 6:00 the next morning.

Q.  Geez.  Okay.

All right.  If a bottom is involved in drug trafficking and has a social life or a significant other, that person is only around for a short time -- I meant sex trafficking.  I apologize.  Sex trafficking.

A.  Could you start again?

Q.  If someone thought to be a bottom has a lot of experience in sex trafficking, and that person has a social life, a significant other or boyfriend who does not know about what the bottom, or what in this case the trafficker is doing who is thought to be a bottom, would

1  that person still have loyalty to their boyfriend or

2  would they perhaps turn on him?

3      A.   I'm not sure that I have seen that particular

4  scenario, and so I would hate to opine having not seen

5  that particular scenario.

6          What I do know -- I know and continue to

7  communicate with former bottoms, and what I believe is

8  that if they were involved with a trafficker and they

9  also had a romantic relationship with someone else, and

10  if I'm correct with what you opined, what your

11  hypothetical was, and the real boyfriend did not know

12  about the presence of the trafficker, if that's the

13  original hypothetical that you presented --

14      Q.   Or if the bottom is actually the trafficker.

15      A.   Those are two different things altogether.  So if

16  the bottom is still working for a trafficker, has a

17  boyfriend, would she still be devoted to the trafficker;

18  is that your question?

19      Q.   What loyalty does she have to her boyfriend?

20      A.   She may -- I don't know.  It would depend upon

21  the relationship with the boyfriend.  If the boyfriend

22  is the kind of boyfriend that accepts pretty much

23  everything, she could remain loyal to that boyfriend.

24  On the other hand, if she has a relationship with a

25  trafficker and has a boyfriend, the boyfriend may be her

cover so that she appears to have a legitimate

relationship with somebody so that the trafficker would

not be seen as that person.

MR. WENDT:  Thank you very much.  Those are the

only questions I have.

THE COURT:  Okay.  Looks like we're done.

Thank you very much, Doctor.  You're excused.

(Witness excused)

THE COURT:  Do you want to start a new witness

now, or do you want to come back in an hour with the

next witness?

MR. REARDON:  Your Honor, given the next

witness needs to come from downstairs, it's going to

take five or so minutes to get her up here.

THE COURT:  Start at ten until 1:00 p.m.

MR. REARDON:  We're prepared to go earlier than

that if need be, Your Honor.

THE COURT:  I'm prepared to go whenever you

are.

MR. REARDON:  I think there is other people who

need an hour.

THE COURT:  Let's start at ten until 1:00 p.m.

DEPUTY CLERK:  All rise.  This matter now

stands in recess until 12:50 p.m.

(Recessed from 11:51 a.m. to 12:42 p.m.)

                DEPUTY CLERK:  His Honor, the Court, the United

States District Court is again in session.

                Please be seated.

                THE COURT:  Okay.  We're back.  Good afternoon,

ma'am.  If you could stand just for a second, she's

going to swear you in and we'll get going.

                MR. REARDON:  Your Honor, the United States

calls Ajela Banks to testify.

                THE COURT:  Very well.

                (Oath administered to the witness)

                DEPUTY CLERK:  For the record, can you please

state your full name and then spell your full name.

                THE WITNESS:  Middle name too?

                DEPUTY CLERK:  Full name.

                THE WITNESS:  Ajela Akesi Iyakarmeya Banks,

A-j-e-l-a, A-k-e-s-i, I-y-a-k-a-r-m-e-y-a, and Banks,

B-a-n-k-s.

                AJELA BANKS, GOVERNMENT WITNESS, SWORN

                       DIRECT EXAMINATION

BY MR. REARDON:

    Q.   Thank you, Your Honor.

         Ms. Banks, just to remind you that everything is

being recorded and the court reporter in front of you

needs to be able to hear everything that you say, so we

need you to speak into the microphone and try to speak

1  as slowly and clearly as you can.  I know it's difficult

2  because of the mask.  Do you understand?

3      A.  (Witness nods head.)

4      Q.  Do you know Tristan Grant?

5      A.  Yes.

6      Q.  Do you see him in the courtroom today?

7      A.  Yes.

8      Q.  Can you identify him in the courtroom?

9      A.  Sitting to my left.

10     Q.  Item of clothing that he might be wearing or a

11 hairstyle or anything that distinguishes him?

12     A.  He's in oranges.

13         MR. REARDON:  Your Honor, let the record

14 reflect that the witness has identified Mr. Grant.

15         THE COURT:  Yes, so noted.

16 BY MR. REARDON:

17     Q.  How do you know Mr. Grant?

18     A.  We were like involved.  We have a child together.

19     Q.  And when was that child born?

20     A.  July 24, 2019.

21     Q.  When you say "involved," what do you mean beyond

22 having a child together?

23     A.  Like we had a relationship.

24     Q.  Do you recall when that relationship began?

25     A.  I believe we started talking like late June,

1    July-ish on social media basically.

2        Q.  Okay.  And late June or July-ish of what year?

3        A.  2018.

4        Q.  Before we get into the details of that

5    conversation, let me ask a couple of questions.

6            You are currently in jail, correct?

7        A.  Yes.

8        Q.  Why are you in jail?

9        A.  You mean state my charge?

10       Q.  Yes.

11       A.  Conspiracy sex trafficking of minors.

12       Q.  And did you plead guilty to that charge?

13       A.  Yes.

14       Q.  And you're testifying here today as part of a

15   cooperation agreement, correct?

16       A.  Yes.

17       Q.  What do you understand the terms of that

18   agreement to be?

19       A.  To tell the truth, if I'm asked to tell the

20   truth.

21       Q.  And are you expecting to receive a benefit as a

22   result of your cooperation?

23       A.  That's not my understanding.

24       Q.  Okay.  So getting back to your relationship with

25   Mr. Grant, you said you started to talk to him, was it

1   social media you said?

2      A.   Yes.

3      Q.   In July of 2018 or June of 2018?

4      A.   Yes.

5      Q.   Do you remember what social media platform you

6   used to communicate with him initially?

7      A.   Facebook.

8      Q.   And who was it that initiated the communications,

9   do you recall?

10     A.   I think it was like him.  He sent me a friend

11  request, and then I think I responded with like a wave

12  or a quote.

13     Q.   And what was the nature of that initial

14  communication on Facebook?

15     A.   It was just like formal greeting, getting to know

16  each other, asked some questions about, like, our

17  lifestyles because they like kind of had some stuff in

18  common where I had the escorting and then him saying

19  that he's a business kind of guy, could like get me into

20  like other aspects of like entertainment and modeling

21  and stuff.

22     Q.   You said a couple of things there that I want to

23  go back and get into more detail on.

24          Stuff in common.  What sort of stuff in common

25  did you have?

      A.   Like I was like escorting and he like pretty much
knew like how to take girls and like work with them,
because he's familiar working with other females like
that, so that's what I mean when I say in common.  And
then both was like just making money.

      Q.   Escort means to be in the sex trade?

      A.   Yeah, prostituting.

      Q.   When you said he had experience working in that
area, what was it about your communications that led you
to believe that he had that experience?

      A.   He was sending me pictures of, like, other women
and like lingerie and like all of this money, and then
saying that he could elevate me and like introduce me
like to other kind of platforms and stuff, just like
what I was doing.

      Q.   When you say "other kind of platforms," what do
you mean by other kind of platforms?

      A.   Like he was working on adult entertainment thing
he called HU$H, lingerie thing, and like I could go to
that.

      Q.   You said "Hush."  That's H-U-S-H?

      A.   Uh-huh.

      Q.   Did you ever learn from Mr. Grant or anyone else
what HUSH stood for?

      A.   Yeah, Have You Seen Her.

1    Q.  So Have You Seen Her, the acronym is HUSH?

2    A.  Yeah.

3    Q.  Did you ever see a logo for HUSH?

4    A.  No.  It was like, I think he was still like going

5    through what he wanted to use, like sometimes like a

6    pair of like women's lips or something.  It wasn't

7    really like a set logo made for it yet.

8    Q.  Any other businesses or enterprises that he told

9    you he was involved with during these initial

10   communications?

11   A.  No, not at that stage.

12   Q.  Was your conversation at this time only on

13   Facebook or did you use any other social media

14   platforms?

15   A.  We used Snapchat.

16   Q.  Explain for the Court what Snapchat is.

17   A.  It's another social media app, like more

18   fast-paced, like -- yeah.

19   Q.  It's a way to exchange messages and pictures and

20   videos, correct?

21   A.  Yeah.

22   Q.  Both Facebook and Snapchat are apps that were on

23   your phone or computer?

24   A.  Yeah.

25   Q.  And they are accessible through the internet?

 1     A.   Yeah.   You can get on Snapchat on the internet,

 2   but like you can't go on Snapchat on like your computer.

 3   It's only smartphones.

 4     Q.   It's only on your phone?

 5     A.   Yeah.

 6     Q.   You said earlier that during this time you were

 7   an escort or in the business.   When did you first start

 8   working as an escort?

 9     A.   When I was 15.

10     Q.   How old are you now?

11     A.   21.

12     Q.   Do you recall where it was when you first started

13   to work as an escort?

14     A.   Foster care in Alaska.

15     Q.   I'm sorry.   What was that?

16     A.   Foster care in Alaska.

17     Q.   And between the ages of 15 and -- let's clear

18   this up a little bit.   So you're 21 now, correct?

19     A.   Yes.

20     Q.   When you met the defendant in July of 2018, how

21   old were you?

22     A.   18.

23     Q.   So between the ages of 15 and 18 when you met the

24   defendant, where had you worked as an escort?

25     A.   I was like pretty much like just, I don't know, I

met older people through like my foster parents and they would like just set up ads on Backpage.  And then like I would go to the trailer court in Muldoon.

And then I found myself like stranded in Los Angeles due to some stuff with my mom, and then I was just like escorting from Los Angeles, Colorado, Arizona and Vegas.

Q.  During that three-year period that we're talking about, between 15 and 18, were there times when you had a pimp or somebody who managed your sex trade business?

A.  Yes.

Q.  Do you recall how many times you had a pimp during that time?

A.  It was like eight or ten times.

Q.  In your communications with the defendant online through Facebook and Snap in the summer of 2018, was there anything that he said or did that gave you an indication that he might be involved in the game or the lifestyle or be a pimp?

A.  At first, like no.  I just thought he was just like kind of like a rapper, some kind of like gang banger thingy.  I mean my friends were making like subtle comments about, oh, you're green, he's going to do this to you.  And I just was like ignoring it.

And so we continued to talk.  And then like he

actually got here and like we elevated to like Snapchat

and Facetime, and then was like more focused about like

questions of like, oh, how much money am I making and

just like back to the escorting thing.

Because I said I was in escorting, but I wasn't

doing it like as heavy as I normally was.  I was like

maybe one or two guys like every other week, but I was

working a regular job.

Q.   So is it fair to say that your relationship with

the defendant changed from when you initially met him

until the time that you were eventually separated from

him?

A.   Yeah.

Q.   And you mentioned him getting here.  We're going

to get to that in a minute, but I want to clarify a

couple of things that I said and ask you to define them.

I used the term "the game" and being in "the

life."  What do those two terms mean to you?

A.   Wait, what?

Q.   If I say to you "the game" or "being in the game"

or "being in the life," do those terms mean anything to

you?

A.   Yeah, that's like -- that's like, you know,

prostitution, pimping, like anything that's like drug

dealing or like gang banging, like that kind of stuff.

1     Q.   Okay.  The videos and the pictures that he sent

2   to you while you were talking on Facebook and Snap, what

3   generally did those show, do you recall?

4     A.   Huh?

5     Q.   The pictures and videos that he sent to you when

6   you were talking on Facebook Messenger -- or Facebook

7   and Snap, do you recall what those showed?

8     A.   Yeah.  It was, of course, like explicit nude

9   photos of him and then like photos of like a few, I

10  think it was like two or three different females

11  counting money, taking pictures with money, like posing

12  with him or just like nude photos that he took of them

13  like of professional kind of matter.

14    Q.   So at some point, did this online relationship

15  transition into an in-person relationship?

16    A.   Yeah.

17    Q.   Do you recall where the defendant was when you

18  were talking to him online?  Did he ever tell you?

19    A.   I think he told me he was in like Virginia, but

20  when he eventually got here, my mom went snooping and

21  she told me like she looked at the tag or something on

22  his bag and it said like Michigan or something.  I just

23  cast it off when he said he came from Virginia.

24    Q.   You mentioned him coming here with his bag.  Do

25  you remember when it was that he got here?

1    A.   Early September.

2    Q.   Again, that's September 2018?

3    A.   Yeah.

4    Q.   Do you know how he got the money to travel from

5   wherever he was, Virginia or Michigan, to Alaska?

6    A.   Yeah.  He told me he had a little bit, but then

7   he needed some, so I ended up like sending him some

8   money through a money order.

9    Q.   Do you remember how much money you sent him?

10    A.   I think it was like $100 or $150.

11    Q.   And what was the purpose of that $100 or $150?

12    A.   So he could pair it with what he had and get a

13   plane ticket to Alaska.

14    Q.   In early September, like you said, he made his

15   way to Alaska?

16    A.   Yeah.

17    Q.   Was that came to Anchorage?

18    A.   Yeah.

19    Q.   Where were you living at the time when the

20   defendant arrived in Anchorage?

21    A.   On 12th and Cordova.

22    Q.   That's 12th and Cordova in downtown?

23    A.   Downtown Anchorage, yeah.

24    Q.   So had you and the defendant spoken about what

25   your relationship was going to be like when he came back

1   to Anchorage?

2       A.   No.   I would call it like we were still pretty

3   much like at the honeymoon stage.  Everything was kind

4   of nice, yeah.

5       Q.   Prior to him arriving, would you have considered

6   him to be a boyfriend or somebody that you wanted to be

7   romantic with?

8       A.   Yeah.

9       Q.   At some point after his arrival, did he become

10  your boyfriend?

11      A.   I thought so.

12      Q.   You thought so?

13      A.   Yeah.

14      Q.   Okay.  When he came back to Anchorage in early

15  September of 2018, do you recall the first night that he

16  came back?

17      A.   Yeah.

18      Q.   Anything significant happen on that first night?

19      A.   He came and I introduced him to my mom and stored

20  his luggage in my room, and then we talked a little bit

21  and then we smoked a blunt and then I went to sleep.

22  And then I woke up and he was having sex with me.

23          And I got mad, and he said something about like I

24  liked it, and I didn't talk about it anymore.  And he

25  just said he was going to go to the rec center, and he

left.  And I went and got in the tub because I thought
like he had something and I didn't want to be a part of
it.

Q.  A blunt is a marijuana cigarette?

A.  Yeah.  Not a cigarette, but --

Q.  Somewhere between a cigar and a cigarette?

A.  Yeah.

Q.  And after smoking that -- did you smoke it with
him?

A.  Yeah.

Q.  After smoking that, did you then fall asleep?

A.  Yeah.

Q.  You said you woke up with the defendant having
sex with you.  Had you wanted to have sex with him?

A.  No, because I didn't want to like, I don't know,
I guess put out on like the first date kind of thing.  I
was kind of picky.  Even though like we had
conversations about it through like text messages prior
to his arrival, I just didn't want to start off just
like that.

Q.  Then you mentioned an argument and he went off to
the rec center.  What rec center are you talking about,
do you know?

A.  He didn't tell me.  At the time, he made it seem
like he had never been to Anchorage, but it was kind of

weird because my friends were saying he was from here,

but when I talked to him, he didn't make it seem as if

he was like from here.  So when he said, "I'm going to

the rec center," I didn't even care.  I was like, okay,

maybe he seen one passing by, but it was like really

late at night, so I'm pretty sure there was no rec

center open.

Q.  After he left your apartment, what was the next

thing that you heard about him or heard from him on that

first day that he's back in Anchorage?

A.  Well, I went to sleep, and I woke up and he

wasn't here yet.  It was like getting pretty late.  So I

started sending him text messages, starting to store his

property because I thought he just pulled a fast one on

me.  And then I called Marquita, who he introduced to

me, and she told me he got shot and was in the hospital.

Q.  Who is Marquita?

A.  His friend.

Q.  And we'll talk about that in a minute.  So

Marquita told you what about what happened to the

defendant?

A.  He got shot in Mountain View and he was in the

hospital, but they didn't know which hospital.

Q.  What did you do when you found out this news?

A.  I started panicking, told my mom, and then

1  Marquita came and picked me up and we went to

2  Providence. And they weren't telling us where he was.

3  I guess it was kind of secret kind of thing. So we

4  snuck into like ICU and got kicked out. And we started

5  snooping on like the nurses' like clipboards and stuff,

6  and we found his room number. And I went and seen him

7  in his room.

8     Q. When you got to his room, did he ask you anything

9  or want you to do anything?

10     A. No. He just told me like pretty much in vague

11  words that he got shot, and then he thanked Marquita for

12  bringing me. And then he was having me do errands, like

13  run back, get him some clothes. And then I brought my

14  gun, because he told me that some people that he

15  believed was associated with the shooting had came to

16  the hospital and pretty much intimidating or

17  threatening, so he had me leave it with him and I left

18  it with him.

19     Q. So you had a gun that you owned at this time?

20     A. Well, I guess you can say I owned it, yeah.

21     Q. It was in your possession?

22     A. Yeah.

23     Q. And the defendant asked you to leave that gun

24  with him in the hospital?

25     A. Yeah.

1    Q.  Did you do that?

2    A.  Yeah.

3    Q.  Do you remember whatever happened to that gun?

4    A.  It was seized when I got shot.

5    Q.  We'll talk about that in a minute.  But in terms

6    of anything happening at the hospital, do you recall

7    anything happening with that gun?

8    A.  Yeah, he made a video and posted it on Snapchat

9    of him like waving it around, telling the guys like,

10   "Aha, guys think you got me," or something like those

11   words, and he posted it.

12          Somebody called the hospital and told on him.

13   And I just happened to be walking into the hospital at

14   the time that the security searched the room for the

15   gun.  And I heard him telling them that if there was a

16   gun here, that it belonged to me and it was my fault.

17   So I walked in there and that's when the security guard

18   was telling me that he would give me a minute to take

19   whatever out of the room that doesn't belong there, and

20   I just took it and ran home.

21   Q.  You said the defendant posted something.  Do you

22   know what or where he posted that?

23   A.  Snapchat.

24   Q.  Snapchat.  Do you know the defendant's screen

25   name or user name on Snapchat?

1    A.   Gingerbreadman.

2    Q.   "Gingerbreadman," all one word?

3    A.   Yeah.

4    Q.   Did you ever talk to him about how he got that

5    nickname or why he used that name?

6    A.   Because he said nobody can catch him.

7    Q.   How long was the defendant in the hospital, do

8    you know?

9    A.   Honestly, at the most, like five days.

10   Q.   And do you know where he went to live after he

11   got out of the hospital?

12   A.   He was placed in a hotel by Applebee's, in that

13   area.

14   Q.   Do you know how long he stayed at the hotel?

15   A.   Not too long.  Less than five days, I would say.

16   Q.   And after he left the hotel, do you know where he

17   went to live?

18   A.   He was on and off again at my house and at his

19   baby mom's house.  He would stay back and forth.

20   Q.   So on/off again at your house.  Which house again

21   was that?

22   A.   Off of Cordova.

23   Q.   And then you said his baby mama house.  Who was

24   that?  Do you know who the mother of his child was?

25   A.   Marika Alex.

1    Q.  Marika Alex?

2    A.  Yeah.

3    Q.  And on/off again means what to you?  Is it every

4  other night?  Is it once a week?  What is on/off?

5    A.  I mean like every other two days or like every

6  other three days.  It just like really depends on if he

7  gets in an argument with one of us.

8    Q.  Now, during this time, when he's staying on/off

9  with you and you getting shot -- and let's just provide

10  context for the Court as to when that was.

11       When did you get shot?

12    A.  December 12, 2018.

13    Q.  And who shot you?

14    A.  Tristan.

15    Q.  Tristan, meaning the defendant?

16    A.  Yeah.

17    Q.  So between when he gets released from the

18  hospital and leaves the hotel, and December 12th of

19  2018, what was your relationship like with the

20  defendant?

21    A.  Wait.  Wait.  I forgot the timeline.  What?

22    Q.  So between him arriving in Anchorage and getting

23  shot and going to the hotel, and then coming to stay on

24  and off with you, so mid September until when you get

25  shot in December of 2018, during that three-month

1  period, what was your relationship like?

2     A.   Well, I thought it was like a relationship, like

3  boyfriend/girlfriend, that we was having regular

4  arguments and fights, but no, it was more like -- it was

5  -- kind of like Ike and Tina Turner at the end of their

6  good days, like fighting and then Tina trying to get

7  away, kind of like that.

8          It became very like violent and like demanding.

9  It was just always fights and just drama.

10     Q.   Did any of those fights ever involve weapons?

11     A.   Yeah.

12     Q.   How so?

13     A.   Like what do you mean?

14     Q.   Were there ever guns drawn?  Were there ever --

15  up until you getting shot, were there ever any other

16  instances in which triggers were pulled?

17     A.   Not from him to me, but guns were pulled on each

18  other, like slides were racked at each other.  Then like

19  I was chased down with his truck.  Well, besides his

20  hands.

21     Q.   That was going to be my next question.  Was there

22  ever physical violence in any of these fights?

23     A.   Yeah.

24     Q.   Did you hit him?

25     A.   Of course.

1    Q.   Did he hit you?

2    A.   Yeah.

3    Q.   During this time, were you continuing to escort?

4    A.   Yeah, but I guess I wasn't really making it a

5    priority that I should have.

6    Q.   You said you were not making it the priority you

7    should have?

8    A.   Uh-huh.

9    Q.   What do you mean by that?

10   A.   Like I really didn't like want to really engage

11   in it anymore.  Like my mom was living there.  I was

12   hiding it from her like what I was doing.  And then like

13   I was trying to get a regular job.

14        And then he talked me into going to SinRock, a

15   strip club, so I was over there.  So I thought I could

16   focus on dancing, but there still needed to be more

17   money.  Plus, I had like three or two guys and that

18   would be enough to like make enough money like I was

19   supposed to and it was supposed to be that.

20   Q.   So let's talk about the money that you made.  So

21   you would have dates with two or three guys.  What would

22   you do with that money?

23   A.   I would give it to Tristan, put some to the side,

24   pay for rent.  Yeah, like household things that I need

25   or just like give him money when he asked for like

outfits or stuff that he needs.  At first I just seen it
as like what you're supposed to do in a relationship,
but then it just became, "Oh, I need $500.  I need
$1,000."  It wasn't like, "I need it for something."  It
was like, "You're supposed to pay me.  You just pissed
me off, so you got to pay a fee," stuff like that.  It
just reminded me of like being trafficked in California.
It was the same stuff.

Q.  Was Tristan doing the things that other pimps had
done to you?

A.  Yeah, but it was different.  Other pimps in
California, stuff like that, they didn't use romance or
anything like that or say, "I'm your boyfriend."  It was
pretty much straightforward, "I'm your pimp," and da,
da, da.  He was kind of more like acting as if he cared,
and that's what made it like really toxic.

Q.  So the money that you made from dates, you would
give him some of the cash, correct?

A.  Uh-huh.

Q.  In terms of paying rent, was the defendant
contributing to paying the rent at the house or the
apartment at all?

A.  Absolutely not.

Q.  What about paying for food?

A.  No.

1    Q.   Would he eat food when he was there?

2    A.   Yeah.  I always cooked for him.  But like he let

3    my mom use his car like one time, and we didn't use it

4    ever again because it was just like a constant reminder

5    of using the car, so she kind of just felt like

6    indebted, so never again.

7    Q.   Any of the other utilities, the electric bill,

8    the gas bill, did he ever contribute anything towards

9    that?

10   A.   No.

11   Q.   And money that you were making escorting was

12   being used to pay for some of those expenses, correct?

13   A.   Yes.

14   Q.   Did Tristan ever give you a quota or ever tell

15   you how much money he wanted you to earn as an escort?

16   A.   He said $500 a day.  It was a mathematical

17   equation that went with it to like -- he would say like

18   $500 a day for like 30 days.  It would have made a

19   really big amount, but I don't remember like the whole

20   thing how it went.

21        But I know it was 500, so that's where it

22   started.  And then it just became, oh, you got more and

23   stuff like that.

24   Q.   And how were you supposed to earn that $500?

25   A.   Escorting, posting ads.

1    Q.  Posting ads.  What do you mean by posting ads?

2    A.  Posting escort ads like -- there's no Backpage,

3  so like Skip the Games, AdultLook.

4    Q.  Are Skip the Games and AdultLook sites that you

5  have used in the past to post ads for your escort

6  services?

7    A.  Yeah.

8    Q.  So this $500 for 30 days, what was the purpose of

9  that quota?

10   A.  So like he could use it like for whatever he

11  needed.  There was like elevate to something there,

12  trying to get like rich or wealthy.  Yeah.  I think

13  that's what it was, yeah.

14   Q.  If you missed the quota, would anything happen to

15  you?

16   A.  It was just like verbal abuse, just like, "Oh,

17  you're lazy," and just talking down to me and stuff like

18  that or like embarrassing me in front of his friends,

19  making degrading comments in front of my mom.

20   Q.  You have mentioned your mother living at the

21  apartment with you.  Was anyone else, between mid

22  September and when you got shot on December 12th, did

23  anyone else live or stay at your apartment for any

24  period of time?

25   A.  Yeah.

1     Q.   Who were those people?

2     A.   My friend JS and then her friend KC.  And then my

3   friend Jolena.  And sometimes my friends Mariah and

4   Elliott.

5     Q.   Did KC go by any other names?

6     A.   Silky.

7     Q.   S-i-l-k-y?

8     A.   Yeah.

9     Q.   Ms. Lotz, if we could bring up Exhibit No. 12.4.

10         Do you have a binder there in front of you of

11   exhibits, Ms. Banks?  You obviously are going to see

12   these on the screen.  If I -- just by way of

13   articulating what we're seeing on the screen is an image

14   that has had faces redacted.

15         There is an unredacted image in your binder if

16   you're not sure who these people are.  Do you recognize

17   you on the picture?

18     A.   Yeah.

19     Q.   And that's you in the center?

20     A.   Yeah.

21     Q.   Do you recognize who is on either side of you?

22     A.   Yeah.  On the left is Silky and on the right is

23   JS.

24         MR. REARDON:  Your Honor, we're using minor

25   victims' names.  I'm going to ask that -- try not to use

1  the name, and I'm going to ask that the record be

2  redacted to just use the initials "JS" whenever the name

3  (name redacted) is mentioned.

4          THE COURT:  Very well.

5  BY MR. REARDON:

6      Q.  Ms. Banks, if I could ask you to do the same.

7  When we speak about the girl on the right of the screen,

8  the one over your left shoulder, we'll refer to her as

9  "J" or "JS."

10      A.  Okay.

11          MR. REARDON:  Your Honor, the government moves

12  to admit Exhibit No. 12.4.

13          MR. WENDT:  No objection.

14          THE COURT:  It will be received without

15  objection.

16          (Exhibit No. 12.4 admitted.)

17  BY MR. REARDON:

18      Q.  Can we show Exhibit 12.5, please.

19          Do you recognize the two individuals in this

20  picture?

21      A.  Yeah.

22      Q.  And is that you on the bottom left or the lower

23  left?

24      A.  Yeah.

25      Q.  Who is in the upper right?

```
1    A.   JS.

2    Q.   Thank you.

3         MR. REARDON:   The government moves to admit

4  Exhibit 12.4.

5         MR. WENDT:   No objection.

6         THE COURT:   It will be received.

7         DEPUTY CLERK:   I'm sorry, 12.5?

8         MR. REARDON:   12.5.   Thank you, Camille.

9         (Exhibit No. 12.5 admitted.)

10 BY MR. REARDON:

11   Q.   Now, as it concerns Silky or JS, who came to live

12 first at your apartment in the fall of 2018?

13   A.   JS.

14   Q.   And do you remember when she came to live with

15 you?

16   A.   Late -- mid to late September.

17   Q.   And did you know anything about what was going on

18 in JS's life that required her to come live with you?

19   A.   I know she just told me she was on the run until

20 she turned 18.

21   Q.   So she was not 18 when she came to live with you?

22   A.   No.

23   Q.   Do you know how old she was?

24   A.   17.

25   Q.   Had you met JS before?
```

    A.   Yeah, treatment and foster home, and we went to
Whaley.

    Q.   I'm sorry.  What was that last one?

    A.   Whaley School.

    Q.   So she had been someone in the foster system that
you had come across?

    A.   Yeah.

    Q.   And had you ever been in any sort of juvenile
detention facility?

    A.   Yeah, McLaughlin.

    Q.   When JS came to live you with, did she bring
anything, do you recall?

    A.   I know she brought like a little bag of like a
few of her clothes, yeah.

    Q.   And do you know if the defendant was ever present
in your apartment when JS was there?

    A.   Yeah.

    Q.   Do you know if JS ever told the defendant that
she was 17?

         MR. WENDT:  Objection; calls for hearsay.

         THE COURT:  The question was "do you know."
That's a yes or no answer.

    A.   No.

    Q.   Do you know if you had ever discussed in front of
the defendant the fact that you and JS had been together

1  at McLaughlin?

2     A.  Yes.

3     Q.  What about being in the foster system together,

4  did you ever discuss that in front of the defendant?

5     A.  Yes.

6     Q.  What about being at Whaley, was that ever

7  discussed?

8     A.  No.

9     Q.  What about being in treatment?

10    A.  Yeah.

11    Q.  Do you know if JS was enrolled in school at this

12  point in time?

13    A.  No, she was on the run.

14    Q.  Was the fact that she was on the run ever

15  discussed in front of the defendant?

16    A.  Yeah.  We couldn't go certain places because I

17  would say, "She's on the run and there is cops."

18    Q.  What sorts of places?

19    A.  Like LED Club or like sometimes we would go to

20  like Costco parking lot, and then if something happened

21  and like the cops were coming, I'll be the same, "We got

22  to go because the cops are coming and she's on the run."

23    Q.  How long did JS stay with you after she showed up

24  in -- when was it again?  When did you say she came?

25    A.  Mid, late September.  I would say like she stayed

1  like a week and a half.  Then she left again.  Somewhere

2  we got in a fight.  And then she came back again like

3  early-ish October.  That's when she brought Silky.

4  Q.  And this was during the same time period that the

5  defendant was staying at your apartment for two or three

6  days at a time?

7  A.  Yes.

8  Q.  Do you know if -- without telling us what anybody

9  told you, but do you know if the defendant and JS ever

10  had any sort of sexual relationship?

11  A.  Before she came to live with me or after?

12  Q.  After she came to live with you.

13  A.  Yes.

14  Q.  Did the defendant ever tell you that they had had

15  a sexual relationship?

16  A.  Besides the time when I was there, no.  But then

17  I did look through his phone and see that he was talking

18  to her about prior sexual relationship that they were

19  having at his friend Julissa's house, yes.

20  Q.  Did you catch them in a sex act at your house

21  during this time?

22  A.  No, I never caught that.

23  Q.  Were there later instances in which you were

24  present when the defendant and JS were engaged in sexual

25  acts?

 1    A.   Yes.

 2    Q.   What sex acts did you observe being performed?

 3    A.   Well, there is the one where we're at a

 4  drive-thru and she was giving him oral sex.  And then

 5  there is this threesome video that we all did at a

 6  hotel.

 7        And then there is just like mini clips that were

 8  made where me and him were engaged in a sexual moment

 9  and JS must have come into the room and tried to join in

10  and I had gotten mad at her.

11    Q.   The drive-thru incident, the hotel incident, you

12  mentioned one of them being videoed.  Were they both

13  videoed?

14    A.   Yeah.

15    Q.   Who took the drive-thru video?

16    A.   I did.

17    Q.   What device did you use to take that video?

18    A.   My iPhone 6.

19    Q.   Do you know what device was used to take the

20  hotel video?

21    A.   His camcorder and then iPhones.

22    Q.   Do you remember what the camcorder looked like?

23    A.   A big black camera.  I don't know if it was a

24  Sony or like a Panasonic.  It was expensive.

25    Q.   At some point when JS was living with you, do you

1   know if she ever started escorting?

2       A.   Yes.

3       Q.   And how do you know that?

4       A.   She kept asking me at first, and I was just like

5   no because she's like -- because like the escorting that

6   I learned how to do in California is way more severe,

7   and so I was thinking like escorting in Alaska would be

8   more severe.  And it took me a long time to understand

9   that it's dangerous in California, like you can get

10  yourself killed if you're not alert.

11          And I didn't feel like teaching JS all of that,

12  but she asked and asked, and so then eventually I had a

13  friend who I went to do a date with and she tagged along

14  with me, and she ended up wanting to do a date with him,

15  so he paid her.

16      Q.   So you were present when JS was was introduced

17  into the game or into the business?

18      A.   Yes.

19      Q.   Do you know if JS ever started doing dates with

20  the defendant?

21      A.   Yes.

22      Q.   And how do you know that?

23      A.   Because she came back and told me.  We would be

24  telling each other a lot, and she had came back --

25              MR. WENDT:  I object to this testimony.  This

1   is hearsay.

2           THE COURT:  Sustained.

3   BY MR. REARDON:

4       Q.  Did you ever do dates with JS where money from

5   those dates went to the defendant?

6       A.  Yes.

7       Q.  How would those dates get set up?

8       A.  Through online, AdultLook, Skip the Games.

9       Q.  When money was earned on those dates, what would

10  happen to that money?

11      A.  We would give it to Tristan.

12      Q.  Do you recall how much you gave to him?

13      A.  I know she had -- she did a date for $1,000.  She

14  managed to keep like $500 of it, and then she gave $500

15  to him.

16          MR. WENDT:  I would object to foundation, Your

17  Honor.  I don't know where she's getting this

18  information from.

19          THE WITNESS:  I was there.

20          THE COURT:  Sustained.  Go ahead and clear it

21  up.

22  BY MR. REARDON:

23      Q.  The date that you were present at --

24      A.  The date that I was present?

25      Q.  Was that just once or were there multiple dates

1    where you were present?

2        A.   There was multiple dates where I wasn't present.

3    I was present with her for two dates.

4        Q.   On those two dates, what happened to the money?

5        A.   On the first date, it was with a military guy,

6    and she got $1,000.  And she kept $500 to herself and

7    then she gave $500 to Tristan, because it happened in my

8    living room and I was sitting on the couch.

9            Then she left with Tristan, went to his friend's

10   house, and the rest of the money disappeared to one of

11   his friends.  The second date was $800, and she went

12   shopping with us and just brought him a bunch of stuff

13   from Footlocker, like track suits and Jordans.

14       Q.   Who were those track suits and Jordans for?

15       A.   Tristan.

16       Q.   How would you describe the relationship between

17   JS as an escort and Tristan?

18       A.   JS as an escort and Tristan?  I think JS was only

19   doing it like because she thought it was like what would

20   get her attention from him.

21            MR. WENDT:  Objection; speculation, Your Honor.

22            THE COURT:  Well --

23            MR. REARDON:  I'll withdraw the question, Your

24   Honor.

25   BY MR. REARDON:

1    Q.   Do you recall if the defendant ever tried to get

2    a fake ID for JS?

3    A.   Yes.

4    Q.   What do you recall about that?

5    A.   He was trying to have her take pictures in my

6    kitchen like up against the wall, but like the lighting

7    was off, so he kept trying to get her picture, text it

8    to his connections that he had in another state and have

9    them make her a debit card or credit card to go with it.

10        But JS ended up leaving during the course of

11   that, so Silky became the next one.

12   Q.   Did the defendant ever make any comments to you

13   about JS's ability to make money as an escort compared

14   to your ability to make money as an escort?

15   A.   Yeah.

16   Q.   What did he say to you?

17   A.   He would just say like she can make more money

18   because she is white, so she's like -- it's a term we

19   use.  I can't remember it right now, but he just said

20   that because she was a white girl, she would be able to

21   make more money than me.

22   Q.   Did he ever say anything to you about posting her

23   online so that she would get more dates?

24   A.   Yeah.

25   Q.   What did he say?

1    A.  He told me that she -- he didn't understand why I
2  was like pretty much -- what's that word he used?  When
3  a person is like beating around the bush.  He would ask
4  me why I didn't post her yet, I was jealous because
5  she's a different kind of money, but I still never
6  posted her.

7    Q.  Why were you beating around the bush?  Why were
8  you not posting her like he asked?

9    A.  Because I felt like no.  At the time, there was
10  pressure but the pressure wasn't really intense.  And I
11  was just still like -- I was confident that JS would
12  eventually leave and she just like wouldn't come back
13  around as much as she used to, like she would find
14  another place to go to.

15    And because I felt like if something happened to
16  her, like she gets like raped or stuff that I went
17  through, I didn't want to have her blood on my hands.  I
18  just didn't want to do that.  And I was just like, "No,
19  JS."  For years of being her friend, I was just like
20  stuff that she will not pick up.  It would be just too
21  dangerous.  I was just like no.

22    Q.  Why were you concerned about JS in particular?
23  What was it about JS that caused you to be concerned?

24    A.  Well, like I know like ever since we like hung
25  around and was around stuff growing up, she just always

been like just innocent, just oblivious to like danger
that's right in front of her.  Like she can't pick up on
stuff like that.  She usually is at the last minute
before she realizes she's in danger.

And plenty of times I have had to intervene.  And
one of those things like, no.  Like yeah, she knows
stuff, but she's not like at the time was not like
mentally that advanced.

Q.  During the time that the defendant was living
with you on and off, would you communicate via text
message?

A.  Yes.

Q.  In any of those messages, do you recall
discussing JS?

A.  Yeah.

Q.  In any of those messages, do you recall
discussing dates?

A.  Yeah, but I can't like remember exact details of
what I said, but if I was to see like what I said, I
would remember.

Q.  Do you remember your phone number at that time?

A.  Yeah.  907-312-4914.

Q.  Do you recall what the defendant's phone number
was?

A.  It was 907-406 -- I want to say like the last

1   four digits had like a 2 or something in it.  Something.

2       Q.   Do you recall what kind of phone he had during

3   that time?

4       A.   iPhone 4.

5       Q.   At the time that you were texting with him in the

6   fall of 2018, did you know his phone number?

7       A.   Yeah.

8       Q.   Is there anything that would refresh your

9   recollection as to what that phone number was?

10      A.   Well, if I was to be given my phone.

11      Q.   Can't get into your phone.  If I could ask you to

12  turn to Exhibit No. 12 in front of you.

13      A.   In this thing right here?

14      Q.   There is two binders.  Specifically, Exhibit

15  No. 12.9.  One binder has just Exhibit No. 12 and one

16  binder has everything but Exhibit No. 12.

17      A.   Is it supposed to be a picture?

18      Q.   No, it's a printout of a blue color field on the

19  top and an exhibit sticker on the bottom.

20      A.   I don't know how to use this thing.  I don't know

21  how to use this.

22      Q.   12.9 is what I'm asking you.  Do you see the tabs

23  on the right-hand side?

24      A.   Not in this one.

25      Q.   Let me ask you to look in the other binder.

1    A.   I think I see it.

2    Q.   Before you tell me anything, has your memory been

3    refreshed as to what his phone number was?

4    A.   Yeah.

5         DEPUTY CLERK:   Can you please pull the

6    microphone in front of you.

7         THE WITNESS:   Yeah.

8    BY MR. REARDON:

9    Q.   Close the binder and tell us what Mr. Grant's

10   phone number was.

11   A.   907-406-4531.

12   Q.   I'm going to ask you to open that binder again

13   and turn it to 12.16.

14        Can you put 12.16 up, please?  I'm asking

15   Ms. Lotz to put 12.16 on the screen so you'll have it in

16   front of you as well as in the binder.

17   A.   Okay.

18   Q.   Looking at 12.16, do you see your phone number

19   listed on that report?

20   A.   Yeah.

21   Q.   That's the 4914 number?

22   A.   Yeah.

23   Q.   Do you see Mr. Grant's phone number on that

24   report?

25   A.   Yeah.

1    Q.  That's the 4531 number, correct?

2    A.  Yeah.

3    Q.  Now, the first message there, if you look into

4 the table and you will see a number of columns and rows.

5 I want you to focus on row number one.

6        Can you highlight that, please, Ms. Lotz?

7        Do you see your phone number listed, 4914?

8    A.  Yeah.

9    Q.  And you see a direction?

10   A.  Yeah.

11   Q.  And what does the direction say?

12   A.  Outgoing.

13   Q.  Do you see a body?

14   A.  Yeah.

15   Q.  Is there something written under the body?

16   A.  Yeah, "Wys."

17   Q.  Does that mean anything to you?

18   A.  It was a typo for the "S," but it is supposed to

19 be "what you doing" or "where you at."

20   Q.  WYA or WYD?

21   A.  Yeah.

22   Q.  If we bring that down, please, Ms. Lotz, and go

23 to line three.

24       So your phone number again there in the second

25 column; is that correct?

1     A.   Yeah.

2     Q.   And whose number there is in the next column

3  over, 4531?

4     A.   Tristan's.

5     Q.   Do you see direction again?

6     A.   Incoming.

7     Q.   And what does the body say?

8     A.   "Yo."

9     Q.   What is the date on these messages?  Do you see

10 the timestamp there?

11    A.   October 21, 2018.

12         MR. REARDON:  Your Honor, the government moves

13 to admit Exhibit No. 12.16 into evidence.

14         MR. WENDT:  We don't object to that, Your

15 Honor.

16         THE COURT:  You have no objection, is that what

17 you said?

18         MR. WENDT:  Yes.

19         THE COURT:  Very well.  It will be received.

20         (Exhibit No. 12.16 admitted.)

21 BY MR. REARDON:

22    Q.   So just by way of explanation, Ms. Banks, you

23 will see the first page of 12.16 again in front of you

24 or on the screen has a number one, first page.  If you

25 go to the next page, you will see that it's skipped

1    ahead to 104.  Is that what you have there in your

2    binder?

3        A.  Turn the page?

4        Q.  You can turn the page from 12.16 to the next page

5    in the binder.

6        A.  Okay.

7        Q.  Are you there on page 104?

8        A.  Yeah.

9        Q.  It should be a column or a line that's 438 if you

10   look to the far left.

11       A.  Yeah.

12       Q.  Okay.  Can I ask you just to read that message.

13   You don't have to read it out loud, just read it to

14   yourself.

15           (Pause.)

16       A.  Yeah.

17       Q.  That is an incoming message.  What's the number

18   that that is incoming from, do you know?

19       A.  Want me to say it or who it is?

20       Q.  Who is that message from?

21       A.  Tristan.

22       Q.  And when you read that message, what is Tristan

23   telling you in that message?

24       A.  That I ain't shit and that it looks like -- he's

25   saying I accused him of stealing some cocaine and that

1   he sent somebody to my house to get something.  And he

2   listed his time and he's threatening with his homies.

3       Q.  So I want to skip ahead to line 452, so that

4   would be page 107.  Now, that message that you just

5   read, he's angry at you and accusing you of something.

6           As you sit here now and as you think about that

7   message, do you know what you were fighting about or why

8   he was angry?

9       A.  Because I was working at a strip club, and when I

10  came back, I left like some cocaine on the counter.

11  When I came back, like my friend Jolena said it was

12  gone, so I just like called him and asked him why he

13  came to my house and stole the cocaine and called him a

14  crack head, and he started like cussing me out.

15      Q.  Were drugs something that were present in your

16  apartment during the time the defendant would stay on

17  and off with you?

18      A.  Yeah.  It was a little before.  When he first got

19  there, it was just like just marijuana.

20      Q.  Were there other drugs then that were later

21  brought into the apartment?

22      A.  Yeah, cocaine and Xanny bars.

23      Q.  Xanny bars, what are those?

24      A.  Xanax.

25      Q.  Do you know if any of those drugs were ever

1  shared or given to any of the people who you described
2  having stayed at your apartment during this time?
3      A.  Yeah.
4      Q.  What was given to whom?
5      A.  Well, I know like Jolena, Silky, they were doing
6  cocaine, and Silky kept getting Xanax from Tristan.
7      Q.  So let's look at line 452.  I have put it up on
8  the screen, and I just want to walk through this a piece
9  at a time.
10          The message says, "Next week I'll be another
11 state.  Bandz up.  You gone be out here if I let you
12 live.  Still talking shit."
13          "Bandz up," what does that mean?
14     A.  Like he's going to have a lot of money.
15     Q.  And this is, again, an incoming message from the
16 4531 number, correct?
17     A.  Yeah.
18     Q.  That was the number you knew to be Tristan?
19     A.  Yeah.
20     Q.  The next line says, "Bout Goo.  Man, you think
21 you're the first goofy I win off instead of being a
22 smart bitch and waited till I won and got me or got up.
23 U leave with nothing.  No game, no nothing, bitch.
24 Can't even make five a day.  What I need you for."
25          "Bout Goo," what does "Goo" mean to you?

1    A.   It's a typo.  I think he was trying to say about
2  good.  He's about good, like done.
3    Q.   Did the defendant have a nickname that he used at
4  this time?
5    A.   Yeah, his name was Goo.
6    Q.   He used the nickname Goo?
7    A.   Yeah.
8    Q.   So that section I just read to you, as the
9  recipient of this message, what did that mean to you?
10   A.   Like he's in the game.  You would call it like
11  firing you, that he's going to go find another bitch and
12  leave you.
13   Q.   Meaning he's going to go find another escort to
14  work for him?
15   A.   Yeah.
16   Q.   "No game, no nothing," what does that say to you?
17   A.   He's downplaying the way that I make money.
18   Q.   I'm sorry.  What was that?
19   A.   He's downplaying the way that I make money, how I
20  go about getting money.
21   Q.   Downplaying is what you're saying?
22   A.   Yeah.  Saying I don't make enough or that I'm not
23  dedicated to seeing him and me come up or just him come
24  up.
25   Q.   Can we say "come up," what do you mean come up?

1    A.  Like become like rich or wealthy, like that.

2  Like have a lot of money and be able to get whatever you

3  want.

4    Q.  So if we read on, "I rather do it on my own.  You

5  can't help me.  Can't even help yaself.  I was just at

6  no bread the other day.  I got 1100 in my pockets for

7  nothing."

8        So "bread," what does bread mean?

9    A.  Money.

10   Q.  And then when we continue on, "I get bread every

11  day.  Even ya lil white home girl JS broke bread today,

12  200 on some two second shit."

13       What does that segment or section mean to you?

14   A.  Saying that she did a date that took two seconds,

15  it was so quick, and she gave him the $200.

16   Q.  During this time, what was the quota that the

17  defendant was asking you to make for him?

18   A.  $500 a day.

19   Q.  "A lil white home girl, J," is that a reference

20  to JS, the one we have been talking about that came to

21  live with you?

22   A.  Yes.

23   Q.  And then he goes on, "LOL.  You got no real

24  bitch.  You a game thief that's gone forever scramble.

25  Dnt let me see you nowhere before I leave and that weak

1  azz club job you ain't going to have that for long.

2  Trust."

3         What does that last section mean?

4     A.   Just telling me that I'm not a real prostitute

5  and that pretty much I have to go into hiding until he

6  leaves the state or I'm going to get shot or something

7  or hurt, and that he's going to sabotage my job with the

8  strip club.

9     Q.   Were you worried about getting hurt?

10    A.   Yeah.

11    Q.   Why was that?

12    A.   Because I didn't want to die.

13    Q.   Were you worried about being hurt by the

14  defendant?

15    A.   Yeah.

16    Q.   And why was that?

17    A.   Wait.  What?

18    Q.   So what caused you to be concerned for your

19  safety as it concerned the defendant?

20    A.   Because like he's done stuff.  Like he's hit me.

21  Like he's bust out my window with his gun and just like

22  tried to run me over in like daylight and stuff.  And

23  just -- and I really felt -- and he was sending text

24  messages saying like he was going to kill me.

25         And then I was with him as he's like looking to

1    kill other people.  So --

2        Q.  The date of this message is what there, looking

3    at the timestamp?

4        A.  November 9, 2018.

5        Q.  If we look down -- if we bring that down, please,

6    Ms. Lotz.

7            You responded in the --

8            We should be on page 108, please, Ms. Lotz.  I'm

9    sorry.  I apologize.  We're still on 107.

10           If you look down, he then sends another incoming

11   message, "LOL.  Do you."  Correct?

12       A.  Yeah.

13       Q.  If we go to the next page, please.  And this

14   message actually starts on the prior page.  This is an

15   outgoing message.  What is your response?

16       A.  I said, "Awww.  Good for you.  Enough for the

17   cops to know you are pimping and pandering minors."

18       Q.  Now, in looking at the messages there in front of

19   you both on the screen and in the Exhibit No. 12.16, did

20   the defendant ever respond to your statement about

21   pimping and pandering minors?

22           Well, before we ask that, let me withdraw that

23   question and ask another question.

24           What did you mean when you wrote "pimping and

25   pandering minors"?

1        A.   Like taking money from them, having them do sex

2   for money, like what happened to me.

3        Q.   Who were the minors you were referring to?

4        A.   JS -- J and V.

5        Q.   If we go down to line 456.  Is this the next

6   incoming message after your comment about pimping and

7   pandering?

8        A.   Yeah.

9        Q.   And what is the defendant's response to your

10  threat to go to the cops about him pimping and pandering

11  minors?

12       A.   Read it?

13       Q.   Read it, and then if you can just tell us what it

14  says.

15       A.   Read it out loud or just to myself?

16       Q.   Read it to yourself, and then --

17       A.   He's just telling me that by the time I tell the

18  police, he's going to already be in another state,

19  accomplished his goal as far as getting money and

20  whatever it takes to leave.  And that he's going to take

21  my friends with him and use his IDs, because they are

22  legit and they can work.

23            And then he's trying to get me to regret my

24  decision, or trying to get a response from me of begging

25  to stay with him and not be fired.

1     Q.   And so the mention of the IDs, were those the

2   same IDs that you were describing earlier?

3     A.   Yes.

4     Q.   If we could go to page 111, please, line 469 to

5   470.

6          Looking at page 111 at 1216, it's the last page

7   of this exhibit.  You sent an outgoing message in which

8   you mentioned minors as well, correct?

9     A.   Yeah.

10    Q.   And, again, in the defendant's response, did he

11  address that accusation about minors?

12    A.   Yeah, it looks like it.

13    Q.   What does he say in his response when you tell

14  him to, "Run ya game on minors real women kno," and then

15  you use the "P" word?

16    A.   He just responds laugh out loud, and is acting

17  like he's not offended by the fact I call him a pussy

18  and telling me I'm stupid.

19    Q.   Okay.  But says nothing about the fact that you

20  had said he was running his game on minors?

21    A.   Yeah.  He didn't deny it.

22    Q.   When you say "run ya game," what does that mean?

23    A.   Like pimp them instead of pimping me.

24    Q.   "Pimp them," who are the "them"?

25    A.   My friends, JS and Silky.

```
 1      Q.  Let's talk about Silky.  Again, we're going to
 2   use the nickname, but you had said her name earlier.
 3           Her real name is the initials KC; is that
 4   correct?
 5      A.  Yes.
 6      Q.  Silky was someone who lived at your apartment
 7   during the time the defendant was there?
 8      A.  Yes.
 9      Q.  Do you recall when Silky came to stay with you?
10      A.  Mid October.
11      Q.  Do you remember how it was that Silky ended up
12   staying with you?
13      A.  Yeah.  JS was over at my house.  She was spending
14   the night.  And she -- I was getting ready to cook.  I
15   was cleaning.  And Tristan was in the bathroom.
16           And JS came to me and said that her friend needed
17   somewhere to go because she had a problem with her dad,
18   and she wanted to see if she can come to my house.
19           So I asked how old she was, and she said she's
20   15.  I was like, "Okay, sure, she can come," and just
21   tell her that she'll be safe here, because I didn't want
22   her to feel uncomfortable like when I was in that
23   predicament trying to go live at strangers' houses.
24           So she came over and she came with a backpack and
25   a PlayStation, and with promises to bring a laptop.  And
```

was like just begging to stay, saying like she'll give
us her PlayStation, she'll give us a laptop.  I just
felt really bad.  I just told her, "Keep your
PlayStation and your laptop.  You will be fine here."

I just told her, "I pretty much pay all the bills
here, so you will be fine.  We won't kick you out.
We'll give you -- everything is fine.  Relax, I'm
cooking."

And JS and her started sitting on the couch
relaxing.  Tristan came out of the bathroom.  He
overheard the conversation, and came out and like
snatched the PlayStation and all the games from her and
was like, "We're not in the" -- and started laughing and
tucked the PlayStation in his backpack.

I could see automatically that Silky got scared,
so I started watching her.  And Tristan left that night.
And that's when I just talked to her and was like,
"Don't let people talk to you like that and don't let
them see you're scared."

Q.  So the first night that Silky came to stay at
your apartment, the defendant was staying there?  That's
one of the nights he was on as opposed to off?

A.  Yes.

Q.  And the conversation that you had with JS about
Silky staying there and if she could come and stay with

1   you, was that a conversation that was had the day that

2   Silky arrived or was it something that was had maybe the

3   day before or several days before?

4     A.  The day, like mere hours before she arrived.

5     Q.  Do you know if the defendant was present during

6   that conversation?

7     A.  He was sitting on the couch on his phone.

8     Q.  And it was during that conversation that you

9   asked how old Silky was?

10     A.  Yes.

11     Q.  And JS told you how old she was?

12     A.  15.

13     Q.  When Silky arrived, did JS end up staying that

14   night?

15     A.  No, she left.

16     Q.  Do you know why she left?

17     A.  She wanted to go somewhere and do something.  She

18   was texting people on her Instagram.  I didn't pay

19   attention.

20     Q.  Just to be clear, JS is there, invites Silky

21   over, you allow her to stay, and then that night JS

22   leaves, and so it's just you, the defendant, and Silky

23   at the apartment?

24     A.  Yes.

25     Q.  Again, your apartment?

1    A.   Yes.

2    Q.   Do you know if at any point Silky ever did any

3    dates or worked as an escort?

4    A.   Yes.

5    Q.   How do you know that?

6    A.   I posted an app for her, and then she did -- she

7    tried to do a date at my house, at the apartment, but it

8    was just like a scam.

9         And then the second time, me, Silky and JS, we

10   all went on the date together, just sitting in a car,

11   making sure nothing happened to her.

12        And there was a third time where just me and

13   Silky and some military guys.

14   Q.   Let's talk about the first date.  You said you

15   created the ad for her to post online?

16   A.   Yes.

17   Q.   Was the defendant involved in the creation of

18   that ad at all?

19   A.   Yes.

20   Q.   What role did he play?

21   A.   He was the voice that -- he was the one saying to

22   post her, because right away, I think like the second

23   day JS reappeared back at the apartment and was trying

24   to tell Silky about escorting, like, "Oh, you could get

25   yourself a phone, you could get yourself nails," and

stuff like this, encouraging things to glamify being an
escort. She's like, "Tell Ajela you want to do it." So
I told her no at first. I was just, "No."

And so Tristan overheard it, and he came to me
and he was like, "Don't invite anybody to be living here
for free. That white girl need to be making some money.
Why is she here?"

I put it off for so long, and then that's when
the pressure picked up. It became like fights and just
like arguments and just violence, and it was all because
I was showing resistance against like not wanting to put
her an ad. So I said, "Fine, all I'm going to do is
write the body, the words to say, and I'm not using real
pictures, but you have to go get an Apple card or Amazon
card." He went and bought the card, and that's when I
used it and posted her ad.

Q. So the defendant told you that you should post
Silky because she shouldn't be able to stay there for
free; is that correct?

A. Yes.

Q. Do you know if Silky made any money from any of
her dates?

A. Yes.

Q. What happened to that money?

A. I know some of it she like spent on whatever she

1  wanted, just like when we would all go shopping she
2  would buy like stuff she wanted.  Then she would give
3  some to Tristan, just pass him some.  She tried to give
4  me some like as a courtesy because she was staying
5  there, but I told her no.  So she kept that money, but
6  any time she would leave with Tristan and JS, she would
7  just come back empty handed.
8        So I was like, "Leave your money at the house.
9  Don't go anywhere with your money."  So she was able to
10 keep like $600 at the house.
11 Q.  There were times that you saw Silky leave with
12 money and the defendant, but then come back without any
13 money?
14 A.  Yeah.
15 Q.  In addition to making the ad, were there any
16 other steps you had to take to get Silky posted online?
17 A.  No.  We just used -- took a picture.  She already
18 was like taking selfies on my phone because she didn't
19 have a phone.  So we just took a picture, and then
20 Googled a fake picture from Google and just used that.
21       And then we set up an email account because she
22 didn't have a cell phone and we couldn't use my number
23 because I already had an account.
24 Q.  If I could direct your attention to Exhibit
25 No. 3.  Do you have it there in front of you?

1    A.   Yeah.

2    Q.   The redacted copy has been put on the screen.

3 You have an unredacted copy in the binder if you need to

4 refer to that.

5         Take a moment and look at Exhibit No. 3 and then

6 tell me if you recognize Exhibit No. 3.

7    A.   Is it in the same binder or the other one?

8    Q.   It's a different binder.

9    A.   All right.  What did you want me to do?

10   Q.   This is two pages, two-page exhibit.  Just take a

11 look at it and then tell me if you recognize what is

12 shown in Exhibit No. 3.

13   A.   Yeah.

14   Q.   How do you recognize it?

15   A.   It's the ad that I made.

16   Q.   The ad that you made for whom?

17   A.   For Silky.

18        MR. REARDON:  Your Honor, the government moves

19 to admit Exhibit No. 3 into evidence.

20        MR. WENDT:  No objection.

21        THE COURT:  It will be received.

22        (Exhibit No. 3 admitted.)

23 BY MR. REARDON:

24   Q.   If we look on the second page, if we could

25 publish that, please.  Pull up the bottom screen shot,

Ms. Lotz.

On the left side there are two pictures that have been redacted, one is black and white and one is color.

Where did those pictures come from?

A.   The picture on the left is Silky.  She took it on my phone just like on Snapchat.  And then the picture on the right is from Google.

Q.   The picture on the right is not an image of anybody that you know?

A.   No.

Q.   So why did you go to Google to get an image?

A.   Because like I didn't want to like -- I don't know.  It just felt weird like having her post a nude like that.  I didn't want to be the one to go in there and take that kind of picture, so I said we'll just use this from Google.

Q.   Okay.  In the binder in front of you, you have got Exhibits 12.2 and 12.3.  Let's leave those down and not display those, please.

A.   12 point what?

Q.   12.2 and 12.3.

A.   Is that in the other binder?

Q.   Yeah.  You got to go back to the other one.

A.   What did you say it was?

THE COURT:  12.2.

1    A.   Okay.

2    Q.   Do you recognize both of those exhibits?

3    A.   Yeah.

4    Q.   What are they?

5    A.   They are pictures of Silky.  This first picture

6    is from Google.  And the second picture is of Silky.

7    Q.   These are the pictures that were used in the ad

8    we just saw?

9    A.   Yes.

10   Q.   Can we bring up Exhibit 3 again on the screen?

11        You don't have to open it in front of you.  I'm

12   going to put it on the screen for you, Ms. Banks.

13        And if we go to the -- highlight the bottom of

14   the first page, Ms. Lotz.

15        So this is an ad for an escort, correct?

16   A.   Yes.

17   Q.   What gets posted in that ad?  Can you read the

18   description?

19   A.   "Hey guys.  Silky lady here in town.  Ready to

20   deliver you a very sensational time.  So don't waste

21   time.  Text or call now.  Ready when you are."

22   Q.   And did you provide a contact number or way for

23   people to respond to that ad?

24   A.   Email address.

25   Q.   Do you know how that email was created?

1    A.   Gmail.

2    Q.   Was this something that Silky had already?

3    A.   No.  We created that as a point of contact

4  because she didn't have a cell phone and we couldn't use

5  my number because I already had a registered account.

6    Q.   Was the defendant present when you were making

7  this ad?

8    A.   He was walking around throughout the apartment.

9  When it was done, I showed it to him.

10   Q.   And what did he say when you showed it to him?

11   A.   He just said it was good, and I finalized it.

12   Q.   Do you recall how long Silky stayed with you?

13   A.   She got there like mid October and it was

14  early-ish November she was gone.

15   Q.   Is it fair to say roughly two weeks?

16   A.   Yeah.

17   Q.   Were there any times you were present when Silky

18  told her age to the defendant?

19   A.   Yes.

20   Q.   How old did Silky say she was?

21   A.   15.

22   Q.   And did the defendant have any reaction or

23  comment to that fact?

24   A.   No.

25   Q.   Do you know why Silky was on the run?

1     A.   No.   She just told me that she kept having

2   problems with her dad.

3     Q.   When she came to live you with, do you know if

4   she had any sort of ID?

5     A.   She had her high school ID from East High School.

6     Q.   You had mentioned an ID for JS.   Were there ever

7   any plans or attempts to make an ID for Silky?

8     A.   Yes.

9     Q.   Describe those.

10    A.   Well, he was trying to take pictures of me, and

11  then I guess the person he sent it to didn't like the

12  way the picture came out.   And then he responded by

13  going off on me saying I was too dark.

14       So then he told Silky to come over, and he took

15  the picture of Silky and sent it and was telling her how

16  good it would feel to just like make all of this money

17  going through banks in different states.   And then he

18  sent the picture to his person and he got an ID and

19  credit card.

20    Q.   I'm going to ask you to open up Exhibit No. 12

21  again and turn to 12.10.   Do you have that there in

22  front of you?

23    A.   Yeah.

24    Q.   Again, just to establish, who are the phone

25  numbers involved in this series of text messages?

 1    A.  Me and Tristan.

 2    Q.  And the -- if we turn to page two, the date of

 3  these messages, date range?

 4    A.  October 21, 2018.

 5    Q.  Okay.

 6        MR. REARDON:  Your Honor, the government moves

 7  to admit Exhibit No. 12.10 into evidence.

 8        MR. WENDT:  No objection.

 9        THE COURT:  It will be received.

10        (Exhibit No. 12.10 admitted.)

11  BY MR. REARDON:

12    Q.  If I can direct your attention to the third page.

13  Let's not put it on the screen, Ms. Lotz.

14        There is a series of pictures down there.  Are

15  you familiar with those pictures?

16    A.  Yeah.

17    Q.  What are those?

18    A.  Those are the attempts to get head shots to send

19  to make the fake IDs.

20    Q.  If we go to page four there is another head shot?

21    A.  Yeah.

22    Q.  So what did you say had happened when you took

23  pictures of yourself and Silky and then had to take ones

24  of just Silky?

25    A.  He told me I was too dark, nobody would trust me,

1  an African-looking ass.

2      Q.  And so asked for just a picture of Silky?

3      A.  Yes.

4          MR. REARDON:  Your Honor, at this point, I

5  think it's a good time to take a break.

6          THE COURT:  Very good.  Take a 15-minute

7  recess.  Thank you.

8          DEPUTY CLERK:  All rise.  This matter now

9  stands in recess for 15 minutes.

10         (Recessed from 2:28 p.m. to 2:46 p.m.)

11         DEPUTY CLERK:  His Honor, the Court, the United

12  States District Court is again in session.

13         Please be seated.

14         THE COURT:  Okay.  Mr. Reardon.

15         MR. REARDON:  Thank you, Your Honor.

16         Your Honor, we have a physical exhibit we would

17  like to show the witness.  May I approach?

18         THE COURT:  Very well.

19         MR. REARDON:  Exhibit No. 12.

20         (Mr. Reardon approaches the witness.)

21  BY MR. REARDON:

22      Q.  Ms. Banks, I handed you what's been marked as

23  Government Exhibit No. 12.  Do you recognize Government

24  Exhibit No. 12?

25      A.  Yeah.

1    Q.  What does it appear to you to be?

2    A.  An iPhone 6-Plus.

3    Q.  Is that the same kind of phone that you had?

4    A.  Yeah.  I don't know if this one is mine or not.

5  Mine had a case on it.

6    Q.  But that's an iPhone 6-Plus, and you had an

7  iPhone 6-Plus?

8    A.  Yeah, we both did.

9       MR. REARDON:  I'm retrieving Exhibit No. 12

10  from the witness.

11       (Mr. Reardon approaches the witness.)

12  BY MR. REARDON:

13    Q.  Just to clean up a couple of things from your

14  testimony before the break.

15       You had mentioned in your initial communications

16  with the defendant when he was not in Alaska that you

17  had seen videos and other things that he had sent you.

18       What again were the nature of those videos?  What

19  were those videos?

20    A.  Women counting stacks of money, like a girl

21  laying down on her belly, kind of like a nude shot kind

22  of of her buttocks.  And then like another girl in a

23  bathtub, like just kind of progressional kind of shoots.

24  And then the majority of it was like just little sex

25  little clips like that.

1     Q.  Did the defendant ever send you any pictures of

2  himself with money?

3     A.  Yeah.

4     Q.  If we could play 13.4.  I'm going to ask you to

5  take a look at 13.4, and then I'll ask you some

6  questions.  It's a short 10-second video.

7            (Exhibit No. 13.4 playing in open court.)

8  BY MR. REARDON:

9     Q.  Do you recognize the person in that video?

10    A.  Yes.

11    Q.  Who was that?

12    A.  Tristan.

13    Q.  Do you recognize the location of that video,

14  where it was filmed?

15    A.  No, I wasn't there.

16    Q.  Okay.  The couch or the floor didn't look

17  familiar to you?

18    A.  No.

19    Q.  Can we play 13.5, please.

20            (Exhibit No. 13.5 playing in open court.)

21  BY MR. REARDON:

22    Q.  Who was the person in that video?

23    A.  Tristan.

24            MR. REARDON:  Your Honor, government moves to

25  admit Exhibit No. 13.4 and 13.5 into evidence.

           1          MR. WENDT:  I object to relevancy, Your Honor.

2    I don't see the relevancy of this.  This is video from

3    California.

4          THE COURT:  How is it relevant?

5          MR. REARDON:  Your Honor, the videos are

6    consistent with ones that the witness described being

7    sent to her as part of her, in the government's view,

8    recruitment of the defendant with stacks of cash.

9          THE COURT:  Okay.  It will be admitted.

10          (Exhibit Nos. 13.4 and 13.5 admitted.)

11          MR. WENDT:  Are you waiting on me?

12          THE COURT:  No, I admitted it.  We're ready for

13    the next question.

14          MR. WENDT:  All right.  Thank you.

15          MR. REARDON:  I'm going to approach the witness

16    with another exhibit.

17          THE COURT:  Very well.

18          (Mr. Reardon approaches the witness.)

19    BY MR. REARDON:

20     Q.  Ms. Banks, I'm showing you what's been marked as

21    Government's Exhibit 19.  Do you recognize Government's

22    Exhibit 19?  I can bring it closer if you need to see it

23    closer.

24     A.  That was like all the attachments on it?

25     Q.  Let me bring it closer and just ask if you

1   recognize it.

2       A.   Oh, yeah.  Yeah.

3       Q.   What is Government Exhibit 19?

4       A.   Tristan's camera.

5       Q.   And you said "Tristan's camera."  The defendant's

6   camera?

7       A.   Yeah.

8            MR. REARDON:  Your Honor, the government moves

9   to admit Exhibit 19 into evidence.

10           MR. WENDT:  No objection.

11           THE COURT:  It will be received.

12           (Exhibit No. 19 admitted.)

13  BY MR. REARDON:

14      Q.   You had spoken earlier about some videos, one

15  that you had produced with your phone, one that had been

16  produced with a camera provided by the defendant.

17           Is that the camera that was used in one of those

18  instances to produce videos that you described earlier?

19      A.   I want to say yes.

20      Q.   Okay.  But you're not sure as you sit here now?

21      A.   Because there was more -- there was that camera

22  and then there was another one, but that one looks like

23  the most -- I believe that's the one that was there.  I

24  just didn't see it with that long thing in it.

25           MR. REARDON:  And then, Your Honor, the

government had previously offered Exhibits 12.2 and
12.3. We would ask that those be admitted into
evidence.

   MR. WENDT: I have no objection.

   THE COURT: They will be admitted without
objection.

   (Exhibit Nos. 12.2 and 12.3 admitted.)

BY MR. REARDON:

 Q. Now, in terms of Silky, do you recall instances
in which you and her were videotaped with a lot of
money?

 A. Yeah.

 Q. And what do you remember about that instance or
that incident?

 A. We had just got done doing some coke, and my
friend Jolena was there and Tristan was there, and we
were just like in the hallway kind of by my bedroom.
Tristan was recording like me, Jolena, Silky were all
just like twerking and like throwing money on each
other.

 Q. And where did that money come from?

 A. Like from our escorting.

 Q. Can we please play Exhibit No. 13.15?

   (Exhibit No. 13.15 playing in open court.)

BY MR. REARDON:

1     Q.   You're in that video, correct?

2     A.   Yeah.

3     Q.   Who was the other person that is having money

4   dropped on them in that video?

5     A.   Silky.

6     Q.   You heard a voice at the end.  Do you recognize

7   that voice?

8     A.   Tristan.

9          MR. REARDON:  Your Honor, the government moves

10  to admit 13.15 into evidence.

11         MR. WENDT:  Exhibit No. 13 and 15?

12         MR. REARDON:  13.15.

13         MR. WENDT:  No objection.

14         THE COURT:  It will be received.

15         (Exhibit No. 13.15 admitted.)

16  BY MR. REARDON:

17    Q.   Can we play 13.17, please.

18         (Exhibit No. 13.17 playing in open court.)

19  BY MR. REARDON:

20    Q.   Who is present in that video in 13.17?

21    A.   Me, Silky and Tristan.

22    Q.   Tristan, the defendant, you heard his voice?

23    A.   Yes.

24    Q.   Where was -- what location was that video made

25  in?

1    A.   My apartment, in the kitchen.

2    Q.   And the money that is in those videos -- I'm

3    sorry.

4         MR. REARDON:   The government moves to admit

5    Exhibit No. 13.17 into evidence.

6         MR. WENDT:   No objection.

7         THE COURT:   It will be received.

8         (Exhibit No. 13.17 admitted.)

9    BY MR. REARDON:

10   Q.   The money that's in 13.15 and 13.17, where did

11   that money come from?

12   A.   Our escorting.

13   Q.   To whom did some of that money go to?

14   A.   Tristan.

15   Q.   I want to go back to the text messages that we

16   looked at before, so if you could get Exhibit No. 12

17   out, the binder.

18   A.   Just plain old 12?

19   Q.   We're going to start with Exhibit No. 12.12.  Do

20   you have it there open in front of you?

21   A.   Yeah.

22   Q.   Who are the two numbers that are referenced in

23   this report, the phone numbers that are texting in this

24   report?

25   A.   Me and Tristan.

1    Q.   And if we turn to page 2 of Exhibit No. 12.12,

2  the starting date or the date timestamp for these

3  messages?

4    A.   October 29, 2018.

5          MR. REARDON:   Your Honor, the government moves

6  to admit Exhibit No. 12.12 into evidence.

7          MR. WENDT:   No objection.

8          THE COURT:   It will be received.

9          (Exhibit No. 12.12 admitted.)

10 BY MR. REARDON:

11   Q.   We don't have to bring it up, Ms. Lotz.

12         But, Ms. Banks, I would ask you to look at the

13 messages in the back and forth on page 15, the second

14 page of Exhibit No. 12.12, and see if you can recall

15 this conversation.

16         So having looked at the first few messages in

17 Exhibit No. 12.12, do you recall, or are you aware of

18 what's going on in these messages?

19   A.   Yeah.   I believe this is the day where I called

20 him accusing him of having sex with V's sister, and he

21 was trying to get me and my friend Jolena to come pick

22 him up.

23   Q.   Come pick him up from where?

24   A.   At that time, he was at Marika Alex's house.

25   Q.   So you were angry at him because you had heard he

1    had had sex with another woman?

2        A.   Yeah.

3        Q.   If we go to page 16, page 3 of the exhibit, there

4    is back and forth about that allegation, correct?

5        A.   Yeah.

6        Q.   And then again on page 17, the argument

7    continues.  And I want to highlight line 71.

8            Can we highlight that, please?

9            So on line 71, there is a mention of Silky,

10   correct?

11       A.   Yeah.

12       Q.   And this is the same Silky we have been talking

13   about for the last hour?

14       A.   Yeah.

15       Q.   That message says, "Shit ask Silky what just

16   happened.  You always believing bitches and not asking

17   me.  I have nothing to hide.  Only thing I've ever done

18   was let V give me head.  I never fucked her or her

19   sister."  Is that what the message says?

20       A.   Yeah.

21       Q.   "Head" means oral sex?

22       A.   Yeah.

23       Q.   But in this message, oral sex is different from

24   fucking or having vaginal sex; is that correct?

25       A.   Yeah.

1    Q.  Okay.  If we go to the next page, specifically

2  line 73.  This is an incoming message from the

3  defendant's phone, correct?

4    A.  Yeah.

5    Q.  And there is another mention of Silky?

6    A.  Yeah.

7    Q.  I want you to read this message and then tell me

8  if you can recall what's going on at this point in time,

9  what the back and forth is about Silky and the other

10  people mentioned.

11    A.  Read it to myself?

12    Q.  Yes, please.

13    A.  We are arguing.  Just prior to this message, we

14  were at a lingerie store to buy me an outfit to go to

15  the club.  And I had run into V and she told me that

16  Tristan needs to be her pimp and that they made a video

17  together.

18      So I got upset.  And she was following him

19  throughout the store calling him daddy, and like he

20  wasn't like telling her to stop or anything, like wasn't

21  denying anything she pretty much told me.  So I called a

22  cab when I was done and just went home.  And Jolena

23  dropped Silky, V, and Tristan off at his homeboy's

24  house.

25      And she came over to my house, and just were

having dinner, just going to ignore them and just talking. And Tristan Facetimed me and was asking why I was tripping and stuff. And I told him like why are you fucking V, and that's when he grabbed her, but she was like smiling, and like he put a gun to her face and was like, "Tell her that you lied," and she was smiling saying, "Oh, I was just kidding," blah, blah, blah, but I could just tell it was just all fake.

So I just hung up and said, "I'm not coming to get you guys." He was asking Jolena, me, to come pick them up, and I said no. So then he sent this message to use Silky, and I kind of felt bad because we did just leave Silky over there like she had no parts in it.

So he said V is trying to steal Silky from him, but us, like he made it look like a joint thing, steal Silky from me and him to give to his homeboy Crazy for pimping, and if I let that happen and I don't come pick him up and he has to take Silky and V to a hotel room for the night, then the only way he's ever going to fuck with me again on any kind of relationship level is if I pay him a fee, which means like normally $1,500.

Q. Let's go through a couple terms. Silky is the person that we have been talking about, correct?

A. Yes.

Q. "Snatch Silky for Crazy," what does that mean?

1    A.   That means like knock her, recruit her, like

2   bring her to another pimp.

3    Q.   Is it -- okay.  So to bring Silky to another --

4    A.   Pimp.

5    Q.   In this case, it's a person by the name of Crazy?

6    A.   Yeah.

7    Q.   And then "spend bread" means spend money?

8    A.   Yeah.

9    Q.   And then "pay a fee," you explained what that

10  was, but can you say it again?

11   A.   That means like I have to pay like $1,500 or

12  whatever he decides he wants me to pay to be able to

13  fuck with him on any kind of relationship level any

14  time.

15   Q.   And this would be in addition to the quota or the

16  other requirements that he had said you had to make?

17   A.   Yes.

18   Q.   If we go to the next page, please, so still on

19  the same series of messages, but if we highlight 79 and

20  80, please, Ms. Lotz.

21        You send an outgoing message at 12:08 and an

22  incoming message from the defendant's phone at 12:15.

23  You reference pills.  What did you understand was going

24  on when you sent that outgoing message?

25   A.   We had just picked Silky up from hanging out with

Tristan at some boy's house, and we went to go get some
food at like Denny's. And it was me and Jolena. And
Silky was fine getting into the car, but then like when
we got to the restaurant, she kept like nodding out,
couldn't feed herself.

So we were getting scared because like she wasn't
communicating with us, and I thought she was going to
lose consciousness. So me and Jolena are like freaking
that we have to take her to the hospital. And then she
told me that Tristan gave her some more Xanax, so I got
frustrated because this isn't the first time it happened
and like he always give her Xanax but not me.

So I text him and that's when I said to stop
giving her pills because pretty much if she like dies or
passes out, I'm going to have to try to explain why a
15-year-old girl had Xanax in her system and I'm not
giving her any.

Q. In addition to having Xanax in her system, when
you picked Silky up, was there anything else about her
appearance that you noticed?

A. Yeah. Like before she left my house, I had let
her wear this brown pullover sweatshirt with a Victoria
Secret zip-up jacket. I had just bought it, so I told
her don't lose it. When she left, she had it on.

But the jacket on the outside is like pure

fishnet.  So when she left and she came back, she wasn't
wearing the undershirt, she was just wearing the all
fishnet jacket.  And so I got mad and I asked her where
my shirt was, and she was like, "Oh, I accidentally left
it at the house.  It got too hot so I took it off."

The house meaning the house she was at with
Tristan and his friends.  And so I had my suspicions,
but I was like, "We'll just go get it later," and she
just had on my jacket.

Q.  When you left her, she had a shirt on; when you
picked her up, she didn't?

A.  Yeah.

Q.  Do you know who else was over at the house that
you picked her up at?

A.  It was V, pretty much like all the Sly gang
members, like all his homeboys.

Q.  When you say homeboys --

A.  Like Crazy, Banzo, like Isaiah Finger, like --
yeah, like all of them.

Q.  And do you know those people's relationship to
the defendant?

A.  Those are his homeboys.  Those are like his
goons, like -- do I really have to talk about that part?

Q.  The homeboys, his goons?

A.  Yeah.

1    Q.  So the next message there is an incoming message

2    from the defendant's phone.  And what does he say in

3    that message?

4    A.  Read out loud or to myself?

5    Q.  There is a mention of of a Xanny in there.

6    A.  "What I gave her a zany that they gave me last

7    night and dnt be checking me bout doing nothing."

8         What is "zany"?

9    A.  Xanax bar.

10   Q.  That's a Xanax?

11   A.  Yeah.

12   Q.  Can we go to the next page, please.  Again, if we

13   highlight line 82.  I'm sorry, like 81 and 82, Ms. Lotz.

14        So an incoming message, "Are you catching a

15   fucking cab cause it just hit my phone."  And then you

16   reply with a reference to "zans."  Is that a reply to

17   the earlier message about "zany"?

18   A.  Yes.

19   Q.  What did you say?

20   A.  Starting from "zans"?

21   Q.  Starting with "that's beside the point."

22   A.  I said, "That's beside the point.  I don't need

23   this bitch passing out in public with me.  What the

24   fuck, nigga.  U don't give me zans nun so what the fuck

25   is ya problem with her, nigga.  She younger then me and

1    yea, that's coo, stop giving her shit period."

2        Q.  So what were you trying to tell or get across to

3    the defendant in that message?

4        A.  So like stop giving her Xanax, because she's so

5    young that I was afraid she would die from them.  And I

6    just wanted to be just blunt, like what was really going

7    on with you two to where you feel like you can give her

8    Xanax bars, and you don't even engage with me on that

9    kind of level.

10       Q.  Can we go to the next two messages, please,

11   Ms. Lotz?  These would be lines 83 and 84.

12           There is another message from you.  "I don't give

13   a shit.  And if something happened u ain't gone take her

14   to the ER.  So fucking stop, okay, no argument."

15           What are you saying in that message?

16       A.  I'm pretty much saying, yeah, if she was to like

17   fall on her face and like OD, he's not going to drive

18   her to the ER, he would just have me take her to the

19   hospital.  And I just wanted it to just be done, him not

20   respond, anything to try to like discourage what I'm

21   saying.  Just stop, just don't give her anything else.

22       Q.  And just to be clear, the "her" we're talking

23   about in all of this is Silky?

24       A.  Yeah.

25       Q.  So the next message is an incoming message from

1    the defendant's phone.  It says, "Got you, but you do

2    give her shit and I do give you shit.  She was over

3    there with me.  They gave it to me.  I don't fuck with

4    them so I gave it to her.  Tf and what you doing.  If

5    you so worried about her age, then why you got her

6    around cause if something happens, then you going to

7    jail."

8         So "give her shit" and "I do give her shit," what

9    is the "shit" that's being referenced there?

10   A.   He's talking about drugs, cocaine, marijuana.

11   Q.   And then "worried about her age.  If something

12   happens, then you going to jail," what would be the

13   concern about Silky's age?

14   A.   Meaning like if what led us to court today ever

15   happened, I would be the one who would go to jail

16   because she's at my house, stuff is happening on my

17   phone, so it would just look like I'm doing something

18   terrible.

19   Q.   Okay.  If we could go to page 22, please.

20        Again, in the same series of messages, at line 90

21   and 91, can we highlight that, please.

22        So you send a message that says, "Your half our

23   age.  That's the matter."  Can you explain that message?

24   A.   Well, because when I first met him, he said that

25   he was like 20-something, so this whole time I thought

he was in our age bracket.  Around this time, we had got
like some kind of -- I called the cops or something like
that and they told me his real age, so that's when it
became weird.  Because me and my friend Jolena were just
looking at him as like nobody to be 30-something years
old hanging out with all of us.

So I brought that up, like you shouldn't even be
hanging out with us if you actually want to just like be
honest.

Q.  Your age again in October of 2018?

A.  I was 19.

Q.  That mentions you're half our age.  Did you mean
you're twice our age?

A.  Yes.

Q.  Or I'm half your age?

A.  Yeah.

Q.  But that's a reference to --

A.  His age, yeah.

Q.  And at this point, how old did you learn that he
was or think that he was?

A.  At this point, I was told he was like 33, 34.

Q.  Okay.  So the next message is an incoming
message.  "You give her everything.  I gave her one
pill.  Dnt try and make it seem like I've been giving
her shit and I'm that man.  Where you at so I can grab

1  my shit."

2      Again, referencing the drugs; is that correct?

3  A.  No, he's talking about like his clothes, like his

4  luggage.

5  Q.  When he wants his shit, it's his clothes and

6  luggage?  What did he have at your house?

7  A.  He left his duffel bag, his Jordan backpack that

8  had his PlayStation in it, like shoes, like his camera

9  equipment.

10  Q.  Okay.  And then the next line or the next section

11  is, "That's ya ho, right, cause she ain't mines.  You

12  breaking her."

13      So when it's a reference to "ya ho," your whore,

14  who is that a reference to?

15  A.  Silky.

16  Q.  And "breaking her" means what?

17  A.  Taking her money.

18  Q.  Were you taking her money?

19  A.  No.

20  Q.  Okay.  And then there is -- continue on.  "You

21  been breaking her for the last couple of days like you

22  the pimp.  LOL.  So do you wish success shorty.  I just

23  need my camera."

24      So, again, were you Silky's pimp?

25  A.  No.  I was just like a middleman.  Like dates

would happen and like Silky would hand me her half, and
then I would put my half together.  Like say she didn't
meet $500 quota, she had $200 and I had may $300, we'll
put that together and I'll just give it to Tristan.

Or sometimes she directly gave it to Tristan.  It
was never, "I'm going to take her money and keep it for
my own stuff."  It was always it went from us to him.

Whatever I managed to like stash away in my bank
account is what I put towards rent.  Or stuff I made at
the club, I really didn't -- he didn't get on me as much
about that kind of stuff.

Q.  So you were making money from two places at this
point, escorting and working at the strip club?

A.  Yeah.

Q.  Again, some portion of the escort money would be
given to the defendant?

A.  Yes.

Q.  If we can go to page 25, please.  Actually, I'm
sorry, 24.  Sorry, once again, Ms. Lotz, 25.  And
highlight the first message.

Ms. Banks, have you ever used the term "vogue
over hustler"?

A.  What?

Q.  Have you ever used the term "vogue over hustler"?

A.  Vogo?

1    Q.   "Vogue over hustler."  If say the word "vogue

2   over hustler," does that mean anything to you?

3    A.   No, that's my first time like ever hearing that

4   phrase.

5    Q.   Can we go back to page 23, please, and the very

6   last message.

7    A.   Oh, okay.

8    Q.   I'm worried that you didn't understand what I

9   said.  There is an outgoing message from you, "vogue

10   over hustler."

11    A.   I was like reference to like model, cutesy.

12    Q.   Okay.  So you understand what I said?

13    A.   Yeah.

14    Q.   That's a message from you, correct?

15    A.   Yeah.

16    Q.   Now, if we go to page 25 and highlight the first

17   message there on 25.

18        There is again discussion about people that have

19   been talked about before.  And then if we start midway

20   down, "All that.  I'm not mad or beefing wit you.  We

21   just dnt fit.  Thnk you for what you have done.  Your

22   special.  You gone go places.  Just stay humble.  Hit me

23   when you get out PO visit.  Pick up my camera man.

24   Vogue culd never out beat hustle.  I can hustle

25   anything, wich mean I can get money from everywhere."

1      That's a message from the defendant's phone,

2 correct?

3      A.   Yes.

4      Q.   When you hear, "I can hustle anything," what does

5 that mean to you?

6      A.   Talking about pretty much any revenue that he

7 picks to go through, he's going to financially benefit

8 from, whether it's girls, whether it's drugs, whether

9 it's fraud, whether it's robberies, he's always just

10 going to get money.

11     Q.   Is it fair to say when you look at these messages

12 that you were pretty upset with the defendant?

13     A.   Yeah.   Yeah.

14     Q.   You make a lot of accusations and statements

15 about him?

16     A.   What?

17     Q.   And you make a lot of accusations and you say a

18 lot of things about him in these messages?

19     A.   Yeah, but I wouldn't call them accusations,

20 because like accusations are most likely not real.   I

21 think I was stating like fact, like stuff that was

22 actually happening.

23     Q.   If we could go to page 28, please, and highlight

24 line 113.

25          If you look at line 113, that's an incoming

1  message, correct?

2     A.  Yeah.

3     Q.  And we'll just walk through it.  I'll read.  "And

4  I just seen all ya other messages.  What you mean you

5  want ya money and then I can leave."

6          So had you made a demand earlier for getting some

7  money from the defendant?

8     A.  Wait.  What?

9     Q.  Had you asked the defendant earlier for some

10  money?

11    A.  Yeah, because I felt like --

12    Q.  What money did you want from him?

13    A.  I wanted him -- like all the money that I turned

14  over, I felt like he should at least give me that or at

15  least give me something if it was like a relationship.

16  I was testing to see if it was really a relationship,

17  because I was still confused if it was a relationship or

18  if it's just like pimping.

19    Q.  If you look earlier in the messages, had you made

20  comments about videos that he had taken of you?

21    A.  Yeah.

22    Q.  And so when we read on, "And then I can leave and

23  you keep talking shit bruh and then videos you seen are

24  home collections.  Those are not production or

25  professional done.  We got shit for that.  LOL."

1          So you had been involved in videos that the

2     defendant had made at this point?

3          A.   I went through his phone.

4          Q.   What did you see in terms of videos?

5          A.   A bunch of videos of females.

6          Q.   And so this is a response to your comments about

7     those videos?

8          A.   Yeah.  That was on the -- I was on the phone and

9     we were arguing.

10         Q.   So then continuing, "You can't catch up.  If you

11    wanted to you gone see I ain't never pimped, bitch.  You

12    got the game fucked up.  You ain't never seen pimping

13    like this.  You confused.  Dnt know what to do.  This

14    ain't no play book.  I got my own rules.  This my

15    world."

16         So what does that message mean to you?

17         A.   Can't call like game goofy, not experienced with

18    his like -- like I said earlier, there is like the kind

19    of pimping I was used to and then like his kind of

20    pimping.  I was like blind-sided and he could tell that.

21         Q.   There is some comments about sexual acts and a

22    mention of his age.  "I'm 33."  That was the age you

23    understood him to be now?

24         A.   Yeah.

25         Q.   And then to conclude, "And bitch I like fucking.

Catch me on film.  Dnt hate.  We better off as friends and just do business together cause you know how to run a nigga away.  Get money, Pebbles.  Dnt know goofy bitch.  By this time next week I'll be all the way up.  How bout you."

"Pebbles," what does the name Pebbles mean to you?

A.  That's my family nickname.

Q.  When you say family nickname?

A.  Meaning my older brother named me that when I was a baby.

Q.  Was that a name that you some would sometimes use in ads?

A.  No.  I did like just Lady Velvet.  He just heard my mom and my sisters calling me that.

Q.  And when it says, "This time next week I'll be all the way up, how about you," what does "all the way up" mean?

A.  He'll have a lot of money.

Q.  Bring that down, please, and go to the next line.

Another incoming message, "I need my camera."  Did you know which camera he was referring to?

A.  The one that I seen at the house that he was using to make videos, like the big one that you showed me earlier.

1    Q.   The one I showed you earlier, the Exhibit 19?

2    A.   Yeah.

3    Q.   Okay.  If we go to page 29, and line 116, please.

4         So it's a message from you and there is words in

5    there I want to ask you about.  "Pimping" and "simping."

6    Pimping we have discussed.

7         What does simping mean?  What is that slang for?

8    A.   Simping is like a boyfriend pimp.  They are not

9    -- they are pretty much what Tristan does.  Like they

10   are like not very blunt or assertive.  They will play

11   like with your head and make you think that it's love

12   and like, you know, there is some pimps who you don't

13   really have intimacy.  And boyfriend pimps, which are

14   simps, they do that.

15   Q.   If we can go to the next page, please, line 121.

16   This message reads, "I take advice frm myself and you

17   right I was simping.  That's why I'm falling back cause

18   I let other shit get in the middle of my pimping and you

19   ran loose and outta control so it's no reverse.  I

20   fucked that up, but I'm back on my shit and I'm getting

21   my shit lined so when it's pimping again my shit strong

22   and no distraction so whatever.  Like I said, do you.

23   Let me get my camera."

24        So again the reference to simping is what?

25   A.   It's boyfriend pimp.

1    Q.  What did you understand that the defendant is
2  telling you in this message?
3    A.  That I was right when I called him a simp and
4  he's not ashamed of being a simp.  He doesn't care, but
5  I got like so out of hand pretty much, I let it go to my
6  head and now he goes to back out and all he wants is his
7  camera.
8    Q.  If we could go to page 32, please, one last
9  message at line 128, an incoming message from the
10  defendant's phone number.
11       "How dnt I see what's in front of me.  Just
12  because you choose me, I let you cause I seen what I
13  seen.  We just gotta stop all this dumb shit damn and
14  get an understanding.  We still playing games with each
15  other.  No trust."
16       How did you take this message?
17    A.  Pretty much that he saw that I had some potential
18  for his way of making money and so he wanted to put that
19  into me.  And I guess when he found out that I wasn't
20  trying to go that way but another way, it just -- he
21  thought it wasn't going to work and I was not on the
22  same mentality that he wants me to be.
23    Q.  The term "choose" or "choose up," are those terms
24  you've heard before?
25    A.  Yeah.

1    Q.  What does that mean?

2    A.  "Choose up," meaning like if you have had a past

3  pimp or a prior pimp or former pimp, you can leave him

4  and go to a new pimp, so like you choose up.  And

5  sometimes they make you pay a fee to do that or some

6  will let you do it for free.

7        And then like cocky pimps will say, "Oh, yeah,

8  you chose me, but I chose you too."  So even though you

9  choose a pimp, the cocky ones will say you're not good

10  enough, blah, blah, blah, like that.  Just -- it just

11  makes you question yourself, that's it.

12    Q.  And the explanations and definitions that you're

13  providing, those are things that you have learned as an

14  escort?

15    A.  Yeah.

16    Q.  If we could go to 12.13 in front of you.

17        MR. REARDON:  Your Honor, the government moves

18  to admit 12.13 into evidence.

19        MR. WENDT:  No objection.

20        THE COURT:  It will be received.

21        (Exhibit No. 12.13 admitted.)

22  BY MR. REARDON:

23    Q.  If we could publish page 2 of 1213.  It's page 39

24  on the Bates stamp.

25        These are messages from October 31st; is that

1  correct?

2     A.  Yeah.

3     Q.  If we go to line 160 and 61.  160 and 61, please,

4  Ms. Lotz.

5        Again, a reference to Silky, a message from the

6  defendant's phone number?

7     A.  Yeah.

8     Q.  And your response?

9     A.  "Silky is at home."

10     Q.  So you had described Silky leaving sometime in

11  early November.  Around Halloween, she was still at your

12  house?

13     A.  Yeah.

14     Q.  The term "whip," what does that mean in slang?

15     A.  Whip?

16     Q.  Yeah.

17     A.  Car.

18     Q.  Can we go to the third page, please.

19        We're going to start on line 171.  It's an

20  incoming message that starts, "And you left Silky wit no

21  money, no" -- and continue onto page 42.

22        Can we bring both of those up and scroll it down,

23  please, Ms. Lotz.

24        The whole message is, "And you left Silky wit no

25  money, no phone.  She got a key at least."

 1         Where was Silky at this point?

 2     A.  She was at my apartment.

 3     Q.  Did she have a phone that you were aware of?

 4     A.  No.

 5     Q.  Had that been something that you and the

 6 defendant had talked about, getting her a phone?

 7     A.  Yeah.

 8     Q.  And why -- whose idea was it to get her a phone?

 9     A.  It was mine, because I didn't -- it was just hard

10 to channel her dates and my dates on the same phone.  It

11 was just confusing.

12     Q.  So you had posted Silky's ad?

13     A.  Yeah.

14     Q.  Were people responding to that ad?

15     A.  Yeah.

16     Q.  Were you reposting it?

17     A.  I mean like you pay for like a day or like seven

18 days, or you can pay for automatic repost.  It just

19 depends on what option you pick.  I just put automatic

20 repost, so it will regenerate her ad like every 24 hours

21 for like 30 days.

22     Q.  When you had created that ad earlier, you talked

23 about showing it to the defendant when you finalized it.

24 Why did you show it to him before you finalized it?

25     A.  To see if I like did it right, just to see if it

1    was like good enough to attract male attention.

2       Q.   So for his approval?

3       A.   Yeah.

4       Q.   Okay.  The issue of phone, so when somebody

5    wanted to set up a date with Silky, how would they get

6    in touch with her?

7       A.   I had like another tab open and I had like the

8    Gmail app, so like her account was logged in on there.

9    When I'm at home, I would just let her have my phone

10   because I had like two iPhones at the time, but they

11   have the same like cell phone number rigged to it.

12          So I would like let her use my phone.  Some she

13   responds to if she wanted to talk with guys, or then I

14   would communicate and I would tell her what they are

15   saying, like that, through Gmail.

16      Q.   Would there ever be -- would these conversations

17   ever leave Gmail and go to text messaging or anywhere

18   else?

19      A.   Yeah.  If it got too complicated to keep up with

20   Gmail, I will just ask for a phone number, and then they

21   will be texting my phone and Silky would be responding,

22   or I would be responding.  And then it would get

23   confused because I would have a date and she would have

24   a date and so you get them mixed up.

25      Q.   Why was there a need to get Silky her own phone?

1    A.  So she could better manage her dates and have

2  like contact information.

3    Q.  And how many people were contacting you or Silky

4  about her ad?

5    A.  I mean you can get like -- the least amount of

6  hits you can get is like 15.  So like on a slow day, you

7  will see 15, but we just had a lot.  It was a lot.  Some

8  we just blocked, like weirdos.  Some we responded to.

9         It was a lot.  My phone was pretty much full.  I

10  had to start deleting some.

11    Q.  Bring that down, please.

12         If we can go to 12.14.

13         MR. REARDON:  The government would move to

14  admit 12.14 into evidence.

15         MR. WENDT:  No objection.

16         THE COURT:  It will be received.

17         (Exhibit No. 12.14 admitted.)

18  BY MR. REARDON:

19    Q.  Publish page 2, please, Ms. Lotz, and highlight

20  line 202.

21         There is an outgoing message with a weight, eye

22  color and size.  Who is that in reference to?

23    A.  Silky.

24    Q.  Do you know why you were sending weight, eye

25  color and size in a text message to the defendant's

1   phone?

2      A.   See, this is what I mean.  I got -- his number

3   didn't have a contact name on it.  It was just like

4   blended in with like all the other like trick's numbers,

5   and so like that was a message that was supposed to go

6   to a former customer.

7      Q.   Okay.

8      A.   And it just got like sent to the wrong person.

9      Q.   Okay.  If we go to then page 52, line 217,

10  Ms. Lotz.  I'm sorry, line 218.

11          Sorry again, let's go to 217 and 218.

12          Looking at the two messages, 217 and 18, there is

13  an incoming message.  Looking at that message and the

14  messages immediately prior that are part of Exhibit

15  No. 12.14, do you have any recollection of what's going

16  on that day?

17     A.   I was arguing with him about something.  I think

18  this was -- I want to say it was either Silky getting

19  locked up or I found out like he was messing around with

20  JS.

21     Q.   But at the end of your message there in line 218,

22  you say, "Goodnight fucking Tristan!"  That's a message

23  for the defendant?

24     A.   Yeah.

25     Q.   If we go to the next page, and highlight the

message there on the top, please, Ms. Lotz.

This is a response, "No, not good night, but bye. I promise you I'm not coming around and you a dumb bitch who wouldn't get the bitch a phone."

So referencing not getting a phone for someone, who is that a reference to?

A.   Silky.

Q.   "So she can hit dates.  Why you working more money.  But like I said, I'm a do me and get me right cause I'm worried bout what you need and what the next bitch.  Not no more and not laid up.  I'm out in traffic as we speak."

This is a message about what?

A.   Messing with me because I didn't get Silky a phone, so I was losing out on money.

Q.   So if we go to page 54, please.  Highlight 224.

"Gingerbread Slim catch me if you can," in that incoming message.  Gingerbread Slim, does that name mean anything to you?

A.   Yeah, that's Tristan's name.

Q.   You had said earlier that his Snap name was Gingerbreadman?

A.   Yeah.

Q.   Gingerbread Slim is another nickname that you heard?

 1    A.   Yeah.

 2    Q.   If we go to 226.  One more, please, Ms. Lotz,

 3  226.

 4         Another incoming message, "I dnt chase bitches.

 5  They choose who they want over here."

 6         The reference to "choose" in that means what to

 7  you?

 8    A.   What?

 9    Q.   In that message, there is a reference to choose,

10  "They choose who they want."  What is that a reference

11  to?

12    A.   Meaning they choose their pimp, hos choose their

13  pimps.

14    Q.   We can go ahead to page 62, please.  I ask you

15  just to briefly look at the messages in the pages

16  preceding 62.  Are you and Mr. Grant having an argument

17  in those messages?

18    A.   Did you say go to the second page too or just the

19  first page?

20    Q.   Just look at the messages preceding that, and how

21  would you describe the conversation that you're having

22  with the defendant?

23    A.   Angry.

24    Q.   Arguing about something?  Do you recall what you

25  were arguing about?

 1      A.  Yeah, we're arguing because I felt like he was

 2   still messing around with Mariah, my friend, and pretty

 3   much that he wasn't saying -- he wasn't like owning up

 4   to looking like what he claimed he was, just was -- he

 5   just wanted to be a pimp, like just co-pimping himself

 6   like that.  And I told him I wanted my gun.  I don't

 7   want anything else to do with him.

 8      Q.  And the gun that you mention that you wanted, is

 9   that the gun that you described earlier from the

10   hospital?

11      A.  Yeah.

12      Q.  And who had the gun at this time?

13      A.  Tristan.

14      Q.  How do you know that?

15      A.  Because like that was the night he choked me on

16   the couch, and I grabbed my gun and tried to hit him

17   with it after Silky pulled him off of me.  And he took

18   my gun and left.  He snatched it out of my hand and took

19   it and left.

20      Q.  Can we go to page -- I apologize, Your Honor.

21         Can we go to page 62, please.  And if we

22   highlight line 256, please.  This is an outgoing message

23   to you.  What did you write to the defendant?

24      A.  I said, "Laugh my ass off.  There is a difference

25   too.  I don't need just wanted to make money wit you,

1    but you co-pimping an u ain't brought shit into my life

2    but drama yelling everything else I did so it's fair to

3    say u a punk bitch."

4        Q.   Co-pimping, what does that mean?

5        A.   Meaning I found out there was text messages

6    between him and Marika Alex where Marika was telling him

7    to pimp me.

8        Q.   So this is -- okay.  Some agreement between him

9    and another person about pimping you out?

10       A.   Yeah.

11       Q.   So then if we go to page 64 and highlight line

12   263.  There is a message, "I'm not beefing wit you or

13   nothing.  Shot fareal fareal.  I'm buying me a plane

14   ticket today or tmrw so it dnt matter.  I almost bought

15   this car today to help but for what.  I'm a wait to my

16   money right and get something real.  And you right, I

17   was co-pimping.  That's why ya shot like it is now.

18   Nowhere.  You'll see."

19            What did you interpret this message to mean?

20       A.   That what I stated that he did earlier with me

21   finding out that Marika told him to pimp me was true,

22   that he was working with Marika.

23       Q.   Bring that down, please.

24            So that message is November 3rd.  We had seen one

25   earlier from early November with a mention of Silky

being at home.  And you also have talked about Silky

getting locked up.  So what do you recall about Silky

leaving your apartment and why she didn't come back?

     A.  I want to say it was like -- it was like the

first-ish week of like November.  I was at home

cleaning.  It was just me and Silky, because I wasn't

talking to Tristan for some reason.

          And Silky was using my phone to like talk to

somebody, text somebody, and I was just cleaning.  And

she told me that she was going to go out.  And I just

had a feeling like she shouldn't go out, so I just told

her, "No, I don't think you should go out anywhere

tonight, like you should just stay in the house, there

is nothing to do."

          She persisted, so I just said fine, whatever.

She's like it's JS, and she is with some other people.

I was like, "Well, ask her if I can come too."  She

said, "Oh, no, they said you can't come, only I can

come."

          I said, whatever, fine, and she left.  And I

didn't think to go outside and see what car she got in.

I just let her leave.  And I just got my phone.  And

then like, almost like morning, like kind of midnight

hour, Tristan came back and was like just trying to play

it off as like he didn't -- he wasn't with them.

1       But JS had already called me and told me, "Oh,

2   yeah, Silky is in jail."  And then she texted like,

3   "Where is Silky," and you just said she's in jail.  So

4   then when Silky's grandma called me and told me that

5   Silky went to jail and she was crying for me and that

6   she got caught with 80 Xanax up her vagina going to

7   Girdwood.

8       And I automatically knew it was Tristan because

9   prior to that, days before that he was trying to like

10  talk her into, "Hey, hey, you want to make some money.

11  I got this thing where we can get some for sure money.

12  All you got to do is make one little drop."

13      I told her ignore him, you don't have to tell him

14  anything.  And she snapped at him and was like she don't

15  have to listen to him.  And that's when he called her a

16  bitch and acted like he was going to hit her.  And I was

17  like he's not going to do anything, we're in a store.

18      I stopped it from happening then, but it happened

19  again when she left that night.  And I asked him about

20  it, and he's like, "It doesn't matter.  There's nothing

21  to prove.  We had nothing to do with it," and just left

22  it at that.

23  Q.  Can I ask you to look at 12.15.

24      MR. REARDON:  Your Honor, the government moves

25  12.15 into evidence.

1          MR. WENDT:  No objection.

2          THE COURT:  It will be received.

3          (Exhibit No. 12.15 admitted.)

4     BY MR. REARDON:

5        Q.  Let's go to the third page, please, message 273.

6     What's the date of this message, Ms. Banks?

7        A.  November 4, 2018.

8        Q.  At 1:20 in the morning?

9        A.  Yeah.

10       Q.  The incoming message is what?

11       A.  "Why Silky ain't wit you?"

12       Q.  Then if we go to the next page, highlight the

13    first two messages, please, Ms. Lotz.

14          So then a follow-on message from the defendant's

15    phone.  What does he say?

16       A.  He said, "what you trying to do, set me up?  Ha."

17       Q.  So that reference to set me up, what did you take

18    that to mean?

19       A.  Like he was saying I was trying to make it look

20    like -- he gave himself away too early because I didn't

21    even know Silky was in jail yet, but he thought I knew

22    and was trying to set -- make it look like he was

23    responsible for whatever happened to Silky, but I didn't

24    even know she was in jail.  I thought she was still out.

25       Q.  So the next message is your response.  What did

1   you say to him in response?

2       A.   I said, "What the fuck.  Are u serious right now.

3   And no, she want to go out and party with JS and some

4   kids so I let her.  Shit."

5       Q.   So the person mentioned in that specifically is

6   JS?

7       A.   Yeah.

8       Q.   So at least by early November, JS was back at

9   your apartment hanging out?

10      A.   Yeah.

11      Q.   Okay.  And she and Silky went out that night?

12      A.   Yeah.

13      Q.   After Silky was arrested, did she ever return to

14  stay at your apartment?

15      A.   No.  No.  Her grandma -- I told her grandma to

16  come and like get her stuff, but her grandma, we lost

17  communication.

18      Q.   But after Silky left and JS is back, did JS stay

19  at your apartment?

20      A.   Yeah, JS came back.

21      Q.   And describe JS, how often would she be there,

22  how frequently?  Do you have any recollection of that?

23      A.   She was just there on and off again, just like a

24  day or two, or maybe just a night or just like call me

25  if she wanted to drive around for a few hours, stuff

1    like that.

2        Q.   Do you know if she ever spent any time with the

3    defendant from November 4th on?

4        A.   Yeah.

5        Q.   How do you know that?

6        A.   Well, I was there on a few occasions.  And then

7    when I would go through his phone, I would see they were

8    together.

9            MR. REARDON:  If I could have just a moment,

10   Your Honor.

11           (Pause.)

12   BY MR. REARDON:

13       Q.   Do you know if after JS came back that she did

14   dates for the defendant?

15       A.   I know she did, because I was staying -- I was at

16   my friend Mariah's house hanging out, and like her and V

17   were together with Tristan and they were just calling me

18   because I had blocked his number at one point.

19           So they were calling me and like sending stupid

20   texts, but I could tell he was telling them to text me

21   and say stupid stuff.  JS, when I had picked up on her

22   call, she's like, "I'm at a hotel and I just made $300,"

23   stuff like that, and I just hung up.  I was irritated.

24       Q.   I want to switch gears a little bit.  You had

25   talked earlier about videos that you were aware of that

1    showed JS and the defendant engaged in sex acts?

2        A.   Uh-huh.

3        Q.   One of those videos I think you described as

4    taken at a drive-thru.  Can you describe that video

5    again?

6        A.   We were sitting in the car.  JS was in back.  I

7    don't think this is the day -- Tristan had got

8    frustrated because he had been driving around the same

9    complex looking for her and she couldn't give an exact

10   location where she was, so he was leaning on me to hurry

11   up and get her to get in the car.

12            He's like, "When she get in the car, knock the

13   shit out of that bitch."  So she got in the car, and she

14   brought me a teddy bear, and she had told me it was for

15   me, so I took it, and then I reached over and I told

16   her, "Just pretend, just pretend," and I just lightly

17   slapped her in the face.  And I was like, "That's

18   because you made him drive around for hours and stuff."

19            So we just drove around to another place.  And we

20   went back to my house.  And then he was like, "Oh, we

21   should go get a hotel," or something like that.  But I

22   said I was hungry, so we went to a drive-thru.  And he

23   was trying to like do one of his little games that he

24   did that pissed me off by while we're at the Popeye's

25   drive-thru, he like made a just a rude comment talking

1    about to suck his dick.

2        I was like, "No, why don't you tell your funny

3    looking bitches to do it."  So he looked at JS and he

4    was like, "Oh, record it, record it."  So I grabbed my

5    phone and recorded it and just act like it didn't hurt

6    me, it matter.

7        And she leaned over the seat and did it.  And he

8    told me to send it to his phone and I sent it to his

9    phone.

10   Q.  Do you remember when this was?

11   A.  I want to say like -- I want to say

12   November 19th, that timeframe.

13   Q.  This was you said Popeye's.  The Popeye's in

14   Anchorage?

15   A.  Uh-huh.

16       MR. REARDON:  Your Honor, at this time, I would

17   like to show the witness Exhibit No. 12.6.  I would like

18   to note for the record that this image does contain

19   contraband, approximately a 10- to 15-second video.  I

20   have turned off the outward facing monitors so the

21   gallery cannot see what's about to be played.

22       And we have turned off our monitors here at the

23   table so nobody behind us can see, so --

24       THE COURT:  Very well.

25       MR. REARDON:  Ms. Lotz, can we play Exhibit

1  No. 12.6, please.

2          (Exhibit No. 12.6 playing in open court.)

3  BY MR. REARDON:

4     Q.  So that's the video that you just described?

5     A.  Yeah.

6     Q.  And that's the video that the defendant directed

7  you to make?

8     A.  Yeah.

9     Q.  You're in the passenger seat taking the video.

10  The person in the back was whom?

11     A.  JS.

12     Q.  And the defendant is in the driver's seat?

13     A.  Yeah.

14     Q.  Do you know how old JS was at the time that this

15  video was made?

16     A.  17.

17     Q.  What did the defendant ask you to do with this

18  video after you made it?

19     A.  To text it to him, send it to him.  I sent it via

20  text message and Snapchat.

21     Q.  Sent it to his phone?

22     A.  Yeah.

23     Q.  Did you ever see that video again after you took

24  it?

25     A.  Yeah, it was posted on his Snapchat.

1    Q.  Do you know if changes or anything were made to

2   it after it was posted?

3    A.  Just the HU$H logo was added.

4    Q.  Can we play Exhibit No. 12.7, please.

5        MR. REARDON:  Your Honor, the government would

6   move 12.6 into evidence.

7        MR. WENDT:  No objection.

8        THE COURT:  It will be received.

9        (Exhibit No. 12.6 admitted.)

10       (12.7 playing in open court.)

11  BY MR. REARDON:

12   Q.  Can I have a moment, Your Honor.  So looking at

13  12.7, is this the same video, as best you can tell, with

14  the logo, the HU$H logo that you described earlier?

15   A.  Yes.

16   Q.  That is H-U-$-H?

17   A.  Yes.

18   Q.  Where did you see this video posted?

19   A.  Snapchat.

20   Q.  Whose Snapchat account?

21   A.  Tristan's.

22   Q.  And that was the Gingerbreadman account?

23   A.  Yes.

24       MR. REARDON:  Your Honor, the government moves

25  to admit 12.7 into evidence.

```
 1            MR. WENDT:  No objection.

 2            THE COURT:  It will be received.

 3            (Exhibit No. 12.7 admitted.)

 4  BY MR. REARDON:

 5     Q.  Now, there was another instance that you

 6  described at a hotel.  Can you remind us what took place

 7  at the hotel where images of JS and the defendant were

 8  videotaped?

 9     A.  Just their part?

10     Q.  Well, let's talk about -- so do you remember when

11  this happened, the hotel incident?

12     A.  It was like right after Thanksgiving, like the

13  26th or the 27th-ish.

14     Q.  Do you remember which hotel?

15     A.  Guest House.

16     Q.  Do you remember where that was?

17     A.  Downtown Anchorage like by the soup kitchen

18  almost.

19     Q.  Right by the where?

20     A.  Like by the soup kitchen, Bean's Cafe or

21  something.

22     Q.  Do you remember who got that room or how it was

23  paid for?

24     A.  I bought it with my credit card.

25     Q.  If I could ask you to open up -- close the binder
```

we have been looking at with the text messages and open

up the other one and turn to Exhibit 20, please.

        There are two pages in that sleeve.  If you can

access them, I'm going to ask you to pull them both out.

You see those two pages?

    A.   Yeah.

    Q.   Do you recognize your signature on the credit

card receipts there on page two?

    A.   Yeah.

    Q.   And on page two, there is a photocopy of a

receipt.  It's tough to read.  Is your signature on the

bottom of that?

    A.   Yeah.

    Q.   Then looking at page one, is there a photocopy of

your ID?

    A.   Yeah.

    Q.   And there is a credit card there as well, a

photocopy of a credit card.  Does that look familiar?

    A.   Yeah.

        MR. REARDON:  Your Honor, the government moves

to admit Exhibit 20 into evidence.  I would note for the

record it is a business record that's accompanied by

business record certification at 20 cert in Mr. Wendt's

binder.

        MR. WENDT:  I have no objection.

        1              THE COURT:  It will be received.

        2              (Exhibit No. 20 admitted.)

        3   BY MR. REARDON:

        4      Q.  Can we publish page two of this, please, of

        5   Exhibit 20.

        6           Looking at Exhibit 20, this is a hotel receipt

        7   for a room you purchased, correct?

        8      A.  Yeah.

        9      Q.  Is this the receipt for the room for the hotel

       10   where the videos we have been referencing was made?

       11      A.  Yeah.

       12      Q.  And that's at the Anchorage Uptown Suites?

       13      A.  Yeah.

       14      Q.  And the date on there is November 26th and

       15   November 27th for the return receipt, correct?

       16      A.  Yeah.

       17      Q.  Bring that down.

       18           So describe what happened -- well, let's describe

       19   -- whose idea was it to go to a motel?

       20      A.  Tristan's.

       21      Q.  Did he tell you why he wanted to go to a motel?

       22      A.  It was originally just supposed to be for me like

       23   to do a video with him and like some pictures.

       24      Q.  What kind of video and what kind of pictures?

       25      A.  Like it was supposed to be like a sex video and

1  then just like modeling pictures, like lingerie.

2      Q.   Is that what ultimately happened?

3      A.   In a sense.

4      Q.   Well, tell us the rest of the sense then.

5      A.   Well, it just turned into like a drug-induced

6  threesome.

7      Q.   Between whom?

8      A.   Me, Tristan and JS.

9      Q.   Was there a video camera recording any of this

10  that you remember?

11      A.   Yeah.

12      Q.   Do you remember which camera that was?

13      A.   The one you showed me.

14      Q.   This one, Exhibit 19?

15      A.   Yes.

16      Q.   So what happened when you got to the motel?

17      A.   So when we got there and I got the room, the

18  first room we went to it smelled like death, like

19  somebody died or something, so like I went back down to

20  get a different room and she put us in another room.

21          And then like me and JS carried up my bag and her

22  bag upstairs to the hotel.  And like we just kind of

23  looked around and stuff.  And then Tristan was texting

24  saying he was going to call some more homeboys over and

25  stuff.

1       And I was like sitting on the couch, and then he

2   suggested like, oh, we need some Ecstasy.  And I was

3   like, "Oh, I know this person that I can go to to get

4   some Ecstasy."  He is like, "Yeah, yeah, go pick up

5   some."

6       So I went over there.  I drove with JS to this

7   guy's house, we picked it up, came back.  I gave it to

8   Tristan.  And I was like, "But I don't want to take any,

9   I'm just fine with this marijuana."  And he was like,

10  "Well, if I take one, then you all going to take one for

11  sure."  And so JS was already like messing around with

12  heroin and stuff, so she took it really quick, no water.

13      And I just grabbed my eyes and like just kind of

14  dropped it into my shirt, because I was like fine with

15  marijuana.  And he was like, "Did you take yours, did

16  you take yours," and I was like, "Yeah."  He was like,

17  "I know you didn't, you lied," and then he went like

18  this and the pill came out, so I just like took it,

19  whatever.

20      So then he is like, "Okay, now go get ready.

21  Stop wasting time."  Like that's when we started feeling

22  like pressure to like move and don't waste this hotel.

23  So I went and took a shower, and then JS took a shower.

24  And we started playing around with makeup and stuff.

25      He told me to go in the room, and I went in the

room.  And it started out with him taking pictures of me and JS like posing on the bed.  He gave us all this money that he had saved up and stuff and had us take pictures with it on the bed.

And then I just started getting really uncomfortable, and I just told him, "Oh, go outside in the main area, we'll call you back when we're done, when we're ready."  So he went out there, and I just told JS we're just going to lock him out there and just stay in the room, because I wasn't feeling it.  I didn't know I was pregnant, but it was symptoms of my pregnancy showing up that was making me just tired.

So he went out there, and he kept trying to come in.  So we just ended up locking the door again.  And me and JS are just taking pictures and making like little videos dancing to music to post on our Snapchats and social medias to look cool and shit.

And JS told me she got a text message from one of our old friends that we hadn't seen in like years, Mary Rotzler (phonetic).  So Mary asked to come over because she was in the area.  She came over and came upstairs, and we like were just like, "Oh, Mary can take the pictures for us."

So Mary started taking the pictures for me and JS while we were dancing and stuff.  And that's when

Tristan opened the door and was like, "Man, you ain't playing." And I'm like I'm getting too much pressure so we might as well just do it. So he came in and that's when he started like throwing out ideas on like how he wanted the video to play out.

And JS threw out an idea, and I was like no, that's stupid, let's do this. And he was like I'm just coming in and giving you money. Like we all like pitched in small parts on like what the script should be.

So that's when -- yeah.

Q. So this evolved into an attempt to make a movie with dialogue?

A. Yeah.

Q. Okay. You talked about initially the defendant was out of the room?

A. Yeah.

Q. And you and JS were on camera being filmed?

A. Yeah.

MR. REARDON: Your Honor, at this point I would like to play Exhibit 19.3. It is a non-contraband video, but it does show a minor in her underwear. We've turned off the outfacing videos as before, and it's approximately 14 seconds long. Can we play that please, 19.3.

```
 1              (19.3 playing in open court.)
 2    BY MR. REARDON:
 3       Q.   So when you talk about you and JS making videos
 4    and just trying to -- without the defendant present, is
 5    that the type of video we're talking about?
 6       A.   Yeah.
 7       Q.   And the money there in that video in that scene,
 8    who did that come from?
 9       A.   Tristan.
10       Q.   You're present in the red lingerie.  Just for the
11    record, who is the person in the nude color lingerie?
12       A.   JS.
13       Q.   Do you know if there were several videos of that
14    type that were made, several sections or segments and
15    clips?
16       A.   Yeah.  We were alternating between like the
17    camera, her cell phone, my cell phone, yeah.
18              MR. REARDON:  Your Honor, the government would
19    move to admit Exhibit 19.4 and 19.5 into evidence, and
20    19.6.
21              MR. WENDT:  No objection.
22              THE COURT:  They will be received.
23              MR. REARDON:  Can I add 19.7 on that as well?
24              MR. WENDT:  No objection.
25              THE COURT:  Very well.
```

1          (Exhibit Nos. 19.4, 19.5, 19.6 and 19.7

2   admitted.)

3   BY MR. REARDON:

4      Q.   In mentioning ideas about how this movie would

5   play out, what was the defendant's part or his role that

6   you all created for him?

7      A.   I mean he was pretty much just like going to play

8   like he was coming to collect, to pick up the money from

9   us.

10     Q.   When he came to collect, what would he find?

11     A.   Us like laying on the bed in lingerie, trying to

12  engage in like light-weight foreplay and telling him --

13  giving him the money that we made for him.

14     Q.   Can we show 19.8, please, Ms. Lotz.

15          (19.8 playing in open court.)

16          THE COURT:  Do you want this played over here?

17          MR. REARDON:  It's tilted away.

18          THE COURT:  Okay.  I don't know why you need to

19  play it over there.  You can see it on your own.

20          MR. REARDON:  I'm sorry, Your Honor.  You had a

21  question during the --

22          THE COURT:  I didn't know why you were playing

23  it up there when you each have it on your screens.

24          MR. REARDON:  We have turned our screens off so

25  as to not allow the gallery to see it.

BY MR. REARDON:

    Q.  So you and JS are in that video and the person
seen in the gray sweatshirt walking up the steps and
into the room is the defendant?

    A.  Yes.

    Q.  There is another voice.  You referred to somebody
else who is present in the room.  Is that Mary?

    A.  Yeah.

    Q.  Were there several attempts to get that scene
right, as far as you know?

    A.  Yeah.

        MR. REARDON:  Your Honor, the government would
move to admit Exhibits 19.8, 19.9, 19.10 into evidence.

        MR. WENDT:  No objection.

        THE COURT:  Very well.

        (Exhibit Nos. 19.8, 19.9 and 19.10 admitted.)

BY MR. REARDON:

    Q.  And then at some point, was the plot of the
movie, for lack of a better term, to have the defendant
join into sex acts with you and JS?

    A.  Yes.

    Q.  Can we please play Exhibit 19.11?

        THE COURT:  So clear this up for me.  I'm not
comfortable playing all of this stuff on this big
screen.

1          MR. REARDON:  We can turn that off, Your Honor.
2    That's fine.
3          THE COURT:  I'm talking about the big screen.
4    It's not necessary.  Do you have it squared away?
5          MR. REARDON:  We do, Your Honor.
6          THE COURT:  Thank you.
7          MR. REARDON:  I would note for the record that,
8    again, while we have attempted to protect the minor's
9    privacy, there was no CP in any of those videos that we
10   saw just yet.
11         THE COURT:  I appreciate that.  I can see it,
12   the defendant can see it, the witness can see it, and we
13   know what's on it.
14         MR. REARDON:  Can we play 19.11, please?
15         (Exhibit 19.11 playing in open court.)
16         MR. REARDON: I have asked this video to be
17   paused at approximately the 44 second mark.
18         We would ask that it be -- we offer it into
19   evidence.  If there is any objection --
20         MR. WENDT:  No objection.
21         THE COURT:  It will be received.
22         (Exhibit No. 19.11 admitted.)
23   BY MR. REARDON:
24     Q.  We paused it at 44 seconds.  Can you see the
25   screen, Ms. Banks?

1    A.   Yeah.

2    Q.   Did you see the defendant reach into his

3  waistband and pull anything out?

4    A.   Yeah.

5    Q.   Can you tell what that is?

6    A.   His gun.

7    Q.   You say "his gun."  Was this something that you

8  had seen him with previously?

9    A.   Yeah, that's his gun.

10    Q.   And in terms of seeing the defendant with guns,

11  was that something that you saw frequently?

12    A.   Yeah.

13    Q.   What types of guns would you see him with?

14    A.   I mean, for the most part, I only seen him with

15  that one as like his go-to, but I mean there would be

16  like people around with guns that maybe he'll either

17  pick up and take a picture with, but that wasn't like

18  what he would have on him like every day.  The one you

19  see in that video, that's his go-to.

20    Q.   Did you ever hear the defendant reference that

21  gun or call it by any particular name?

22    A.   No.

23    Q.   Like the model?  You would call your car a Ford

24  or you would call your phone an iPhone.  Did he ever

25  reference the model or type of gun?

1    A.   No, but I could tell it was like a Glock 10.

2    Q.   How can you tell that?

3    A.   Because like I had other friends who said it.

4    Q.   So after that video that we saw in 19.12, did the

5    defendant then engage in sexual acts with both you and

6    JS?

7    A.   Yeah.

8         MR. REARDON:  Your Honor, the government would

9    move to admit Exhibits 19.12 through 19.19 into

10   evidence.

11        MR. WENDT:  19.12 --

12        MR. REARDON:  19.12 through 19.19.

13        MR. WENDT:  No objection.

14        THE COURT:  They will be received.

15        (Exhibit Nos. 19.12 - 19.19 admitted.)

16   BY MR. REARDON:

17   Q.   And over the course of the evening, were you

18   videotaped performing sexual acts on JS?

19   A.   Yeah.

20   Q.   And over the course of the evening, were you --

21   did you observe JS performing sexual acts on the

22   defendant?

23   A.   Yeah.

24   Q.   At some point the camera that we have looked at a

25   couple of times, do you know if anything happened to

```
 1   that camera in terms of its ability to continue taking
 2   videos?
 3       A.   It died.
 4       Q.   What happened after it died?
 5       A.   We started using our cell phones.
 6       Q.   Did you use your cell phone to take an additional
 7   video?
 8       A.   Yeah.
 9       Q.   Do you recall what that video was of?
10       A.   JS giving Tristan like head.
11       Q.   JS performing oral sex?
12       A.   Oh, yeah, sorry.
13       Q.   JS performing oral sex on the defendant?
14       A.   Yeah.
15            MR. REARDON:  Your Honor, the government would
16   move to admit Exhibit No. 12.8 into evidence.
17            MR. WENDT:  No objection.
18            THE COURT:  It will be received.
19            (Exhibit No. 12.8 admitted.)
20            MR. REARDON:  Can I just ask, 19.3 was offered.
21   Has that been admitted into evidence yet?
22            The government would offer 19.3 into evidence
23   as well, Your Honor.
24            MR. WENDT:  No objection.
25            THE COURT:  It will be received.
```

1          (Exhibit No. 19.3 admitted.)

2   BY MR. REARDON:

3      Q.  In one of the videos we looked at there was a gun

4   that we observed that Mr. Grant pulled from his pants.

5   Do you ever recall being present with Mr. Grant when

6   there were any guns purchased or bought at gun stores?

7      A.  Yes.

8      Q.  Describe for the Court the incidents that we're

9   talking about.

10     A.  We were like driving around, me, Tristan and two

11  of his friends -- yeah, two of his friends.  They were

12  in the back.  I was the passenger.  Tristan was driving.

13  They had went to like one gun store to find a Nano mini

14  compact gun that he wanted really bad.  They didn't have

15  it at one gun store, so like we left.

16          Then we went to Granny's Guns and they had it.

17  So the girl that was with us, I think she was like 18 or

18  19, but she didn't have a record or nothing so she could

19  buy the gun, but on the way there, like, I don't know,

20  Tristan was in one of his episodes going off about

21  something and the girl started to feel uncomfortable

22  purchasing the gun because she had a fear it was going

23  to be used in a crime, so she started to like back out.

24          And the guy that was like her boyfriend at the

25  time was just like trying to calm her down.  And then

1  Tristan got mad and was like, "Why would I have you buy

2  something that's going to get me in trouble and you in

3  trouble," and went on that rant.  The girl's boyfriend

4  was like, "Oh, she's just saying that because you

5  talking about killing people."  And Tristan was like,

6  "I'm just kidding."

7       So the girl calmed down and went to the store,

8  went in with her boyfriend.  They purchased the gun, but

9  they wouldn't be able to pick it up for a day or maybe

10  three-day hold or something like that.  They eventually

11  got the gun.  It never made it in my house, but they got

12  it.

13     Q.  That was a gun you described as a Nano?

14     A.  Yeah.

15     Q.  Did you ever see that gun?

16     A.  Yeah, I saw it like one time when he was on his

17  phone like looking at the video that he took on

18  Snapchat.  He's just like looking.  I think he decided

19  he wanted to post it, but I don't know if he posted it

20  or not.  All I know is I was sitting on the couch by him

21  and he was going through Snapchat and I seen him

22  watching the video.

23     Q.  Can we pull up 13.19, please.

24         You mentioned seeing a video of Mr. Grant with

25  that gun.  I'm going to show you 13.19.

1          13.18.  I apologize, Ms. Lotz.

2              (13.18 playing in open court.)

3    BY MR. REARDON:

4        Q.  Can we play 13.19, please.

5              (13.19 playing in open court.)

6    BY MR. REARDON:

7        Q.  Do you recognize either of those two videos,

8    13.18 or 13.19?

9        A.  Yeah.

10       Q.  How do you recognize them?

11       A.  Because it was on his phone as he was going

12   through his phone.  I was on the couch.

13       Q.  Are those the videos that you referenced before?

14       A.  Yes.

15       Q.  Do you recognize the location those videos were

16   filmed in?

17       A.  Julissa's house.

18       Q.  Who is Julissa?

19       A.  His like best friend.

20       Q.  Is her name Julissa Carter?

21       A.  Yeah.

22       Q.  Does she also go by the name Red?

23       A.  Yeah.

24       Q.  The voice that you heard in those videos, do you

25   recognize that voice?

1    A.  Yeah, Tristan.

2    Q.  And the clothing or the shoes or anything else,

3  did you recognize that as being associated with the

4  defendant?

5    A.  Yeah.

6    Q.  What did you recognize?

7    A.  His pants and like his sweater.

8          MR. REARDON:  Your Honor, the government moves

9  to admit Exhibit No. 13.18 and 13.19 into evidence.

10          MR. WENDT:  No objection.

11          THE COURT:  They will be received.

12          (Exhibit Nos. 13.18 and 13.19 admitted.)

13  BY MR. REARDON:

14    Q.  Other than seeing the video, had you seen the

15  actual gun?

16    A.  No, I never seen it in person.

17    Q.  Okay.

18    A.  But I was told like it was left in the back of

19  people's cars.

20          MR. WENDT:  Objection; hearsay, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. REARDON:

23    Q.  The purchase of the gun, it was you and the

24  defendant and two other people.  The two other people

25  went into the store to buy it?

1    A.   Yeah.

2    Q.   And one of those was an 18- or 19-year-old you

3 said who didn't have a record?

4    A.   Yeah.

5    Q.   Do you know where she got the money -- do you

6 know if the other person had a record?

7    A.   Yeah, I believe so, yeah.

8    Q.   And do you know where they got the money or the

9 18- or 19-year-old got the money to buy the gun?

10    A.   Tristan.

11    Q.   How do you know that?

12    A.   Because he passed it to her as she was getting

13 out of the car.  She came back and told him the price,

14 and then he gave it to her and she went in the store and

15 bought it.

16    Q.   During the time that you were with the defendant,

17 were you familiar with a documentary that he was

18 attempting to make?

19    A.   Yeah.

20    Q.   And what was going on as it concerned a

21 documentary?

22    A.   He was just kind of like, from my understanding

23 of what he told me, like he was trying to capture his

24 life and what it's like to be the Gingerbread Man, so he

25 would have like his cameraman, Speedy, follow him around

1    and do occasional interviews with like is homeboys and

2    stuff.  Just really like glorifying his lifestyle and

3    what he chooses to do.  I want to say after he got out

4    of the hospital his cameraman asked me a few questions.

5    I didn't really know him at the time.  I was just going

6    based off of like first impressions, thoughts and stuff.

7    So I just made a comment like, "Oh, like he's really

8    smart," like that.

9        Q.  Did you ever see that documentary or any scenes

10   from it?

11       A.  No.  I know I came home and everybody was in the

12   living room with their shoes on, and I got really upset.

13   And they had all these computers going with all of these

14   keyboards and internet, but it was the shoes.  And I

15   said, "Take your shoes off or get out," and his friends

16   are like, "This is not your apartment, this is Goo's

17   apartment."

18           And Tristan got mad and looked at me like I

19   dished his friends, so his friends ended up wrapping up

20   all their stuff and then got out.

21       Q.  You didn't see what they were working on?

22       A.  It was the video.  It was his documentary, but I

23   didn't like care.  I did not think it was going to go

24   anywhere.

25       Q.  You haven't seen any sort of final product?

1    A.   No.

2    Q.   You have mentioned it several times.  I want to

3 ask you about being shot.  You were shot on

4 December 12th of 2018?

5    A.   Uh-huh.

6    Q.   You were shot by whom?

7    A.   Tristan.

8    Q.   Can you explain for the Court what happened, what

9 happened when you were shot?

10   A.   I had just got done revoking my mom's restraining

11 order on me, because she had one on me to stop me from

12 coming to my house, so I squashed hers and got another

13 one.  And my mom left for the night to my sister's

14 house.

15        I was with my friend Lance, a 16-year-old.  We

16 were at my house pretty much just like cleaning up

17 everything my mom left behind.  And Tristan was supposed

18 to pick me from the courthouse, but he never followed

19 through, so I ended up just walking home with Lance.

20        When we got home, I was in contact with some

21 detectives from Los Angeles who were going to fly me up

22 like the next day early in the morning, so I had like a

23 plane to catch.  And I was like making last-minute

24 things to pack up my stuff so I can catch the flight to

25 be a witness in another state.

And I had called Tristan and told him that I had wanted some marijuana and I couldn't get it because I'm not 21.  So he came and picked up me and Lance, and he was in the passenger seat and Rubin was in the driver seat and I was behind Tristan, and Lance was on my side, but Lance was like super scared of Tristan, because whatever he's heard.

So I had told him to like go to this dispensary.  On the way to the dispensary, they like stopped over at Wal-Mart for some reason.  And Rubin was asking about what happened to the blue truck that Tristan had brought.  And Tristan made a reference to like selling, he sold it or something.  And I was like, "You sold the truck," like shocked.

And then he got mad and like turned around, like grabbed me by my collar and like yelled at me and said I talked too much.  And he was like, "You stink," and he threw me out of the car.  And me and Lance, he like stranded us at Wal-Mart, so we ended up catching a cab from Wal-Mart.  I went back home and I cooked some food.

I felt bad because I felt like it was my fault I pissed him off.  So I texted him and was like, "I made some food, just come home and calm down.  We just doing too much."  Plus, I wasn't planning on coming back to Alaska because I felt like as long as I'm in Alaska,

1  he's always going to be around and always in control.

2      So I got him to come over.  He calmed down.  We

3  managed -- he dropped off Rubin.  He took me and Lance

4  out again, bought some weed from one of our friends

5  because the dispensaries were closed.  He was looking

6  for cars.  There was cars driving around, so he was

7  paranoid thinking they were going to shoot him, so I was

8  helping him identify, oh, is that the person.  He got

9  mad.

10     We went home, and I just seen he was in a very

11  argumentative mood.  I just didn't want to bother, so I

12  went straight into my room and slammed the door.  I

13  said, "You're sleeping on the couch or getting out."

14  Lance was on the couch still, and my cell phone was in

15  the kitchen on the counter, but my SIM card was in

16  Lance's phone.

17     So Tristan was like, "I'm not eating this fucking

18  food.  It looks disgusting," just like degrading the

19  cooking.  I'm like, "You didn't even have anything to

20  cook."  We were arguing through the door.  I said, "Stop

21  banging on my door.  I'm going to call the cops."

22     He said, "Yeah, that's if you make it this time."

23  I never heard him talk that menacing and sinister, so I

24  kind of got scared.  He left something in my room.  He

25  left a gun in there.  He left his gun, because when he

came in, he dropped it off, but he left it in there.  He
was asking for it.

So I tried to slide it under the door to give it
to him because I didn't want to confront him, but it
wouldn't fit.  So I opened the door and I handed it to
him, and I was like scared of just his presence because
he was just like really quiet looking like he was going
to choke.  He has vice-grip hands.

So I was just scared, and I was trying to walk
past him.  And I didn't even hear when he shot me.  I
just know I made it past him, I got into the hallway,
and he was like, "Yeah, that's how you shot yourself."
And I looked at him.  My friend was like in the living
room like just scared looking at me.  That's when I
looked and realized that he had shot me.  He was
standing there holding the gun looking at me.

I was like, "I'm not going to sit here and be
like, you shot me," so then he can like shoot me in the
head.  So I slid down on the floor.  That's when the
adrenaline started wearing off.  He ran and tried to
give the gun to my friend, Lance.  And my friend, Lance,
was like, "No," and he just took off running.

He left the apartment.  And my friend, I told him
to go call the ambulance.

Q.  The gun that he shot you with, do you remember

1  that gun?

2      A.  Yeah.

3      Q.  Was that the same gun that we saw in the video

4  earlier?

5      A.  Yeah.

6      Q.  When he left the apartment, how long between when

7  he shot you and ran out of the apartment?

8      A.  It was less than 60 seconds.

9      Q.  Do you know if he ran out with that gun or not?

10     A.  Yeah.  It was in his hand, because my friend

11  wouldn't take it.

12     Q.  Now, after being shot, did you ever have any

13  contact or communication with the defendant?

14     A.  Yeah.  I mean, while I was in the hospital, after

15  they brought me back to, he had Julissa calling the

16  hospital trying to see if I was dead or alive.  And my

17  sister ended up cussing her out and stuff, telling her

18  not to call and that I was alive.

19          So that's when I got my phone back from

20  detectives and he called from jail and was pretty much

21  just trying to rehash the story.  "Yeah, you

22  accidentally shot yourself," and da, da, da.

23          And that's when for the first time me and Marika

24  Alex were able to have like good communication to try to

25  help him.  So he was telling her pick me up to do this,

 1    pick me up to tell me to do a notarized statement to say

 2    I shot myself, just so many intimidating factors.  And

 3    then Julissa posted up outside the house, and it was so

 4    much.  So I ended up recanting all of my statements.

 5    And, yeah, he was calling.

 6         And then he called me when I was at the hotel and

 7    just told me like pretty much that the police aren't

 8    trying to help me and stuff like that.  And so I was

 9    just overwhelmed, and I just told the detective I don't

10    want anything else to do with it.

11    Q.   So you said that you ended up recanting all of

12    your statements.  Did you change your story?

13    A.   Yeah.

14    Q.   Why did you do that?

15    A.   Well, because that's what Tristan was telling me

16    to do via Marika, via Julissa, via his other friends,

17    like male friends.  And I felt like word was getting on

18    the street that I could potentially lose my life because

19    they feel I'm responsible for his actions.

20         And so I have my mom and my sister there.  People

21    are threatening my sister, my mom.  So I just went and

22    did it, because I'm like I can't just be selfish and

23    look at it's just my life, it's my sisters' lives now.

24    And then his baby mom wouldn't stop coming to the house,

25    like in the middle of night coming to the house.  And I

1   had already seen like what he does when he wants to kill

2   people, so there wasn't any question in my mind that I'm

3   going to go and do what he says.

4       Q.   You said that you were concerned for your safety

5   back then.  Are you still concerned for your safety?

6       A.   Absolutely.

7       Q.   What about the safety of your family?

8       A.   Yeah.

9       Q.   At the time you were shot, were you pregnant?

10      A.   Yeah.

11      Q.   Who is the father of that child?

12      A.   Tristan.

13      Q.   Did he know that you were pregnant at that time?

14      A.   Yeah, because he made a bunch of comments.  When

15  like I would go off on him, he would, "Oh, what are you

16  pregnant or something."  Like he could tell, but I was

17  like so stressed out and couldn't even pay attention to

18  my own body, because of just what was going on with the

19  relationship and everything that was happening.  And it

20  was just so overwhelming.

21          So he would point it out, but I never like took

22  the time to actually look into it.  And, yeah, he

23  referenced statements and then, "Why are you walking

24  like a monkey?"  Like I didn't know that.  And then he

25  noticed that I picked up an eating habit, and so he was,

"Oh, yeah, you fat ass, you got a baby in there or
something," like comments like that that I didn't really
take too much weight to because I thought it was shit
talk, but it -- like he knew.  I feel like honestly he
knew.  That's why I was shot in the area I was shot
instead of anywhere else.

    Q.  Where were you shot?

    A.  In the stomach and the vagina.

        MR. REARDON:  Can I have just a moment, Your
Honor.

        (Pause.)

BY MR. REARDON:

    Q.  One more exhibit I would like to show you.

        MR. REARDON:  May I approach, Your Honor?

        THE COURT:  Very well.

        (Mr. Reardon approaches the witness.)

BY MR. REARDON:

    Q.  I have put up in front of you what's been marked
as Exhibit 17.  Do you recognize Exhibit 17?

    A.  Can I like touch it?

    Q.  Sure.

    A.  I can't see the back.  I can't reach it.  Can you
do it?  Is that an iPhone 4 or something?  I want to say
this is Tristan's phone.

    Q.  Just to be clear, Exhibit 17 looks like

1  defendant's phone?

2      A.   Yeah.   I just remembered it being smaller.

3          MR. REARDON:  No further questions, Your Honor.

4          THE COURT:  Okay.  You want to wait until

5  tomorrow for cross examination, or what's your thinking,

6  Mr. Wendt?

7          MR. WENDT:  We can wait until tomorrow.

8          THE COURT:  Unless you can finish up in a few

9  minutes.

10          MR. WENDT:  I cannot finish up in a few

11  minutes.

12          THE COURT:  Let's take this up tomorrow at

13  8:30.  She can go.

14          There are a few things I want to take up with

15  counsel.

16          Thank you, ma'am.  Just to be back tomorrow at

17  8:30.

18          (Witness exits courtroom.)

19          THE COURT:  So we're going to start tomorrow

20  with this witness.  What does it look like from the

21  government?

22          MR. REARDON:  Your Honor, Ms. Banks.  I think

23  we would like to do Officer McMillan still.  Then we

24  will call Silky.  And then likely an FBI witness, Lisa

25  Watson.  And then JS.  And then likely an FBI agent,

1  Daryl Allison.

2          THE COURT:  So it's a full day tomorrow?

3          MR. REARDON:  Detective Torres and Special

4  Agent Goeden.

5          THE COURT:  Let's go for it like crazy

6  tomorrow.  I have a problem -- not a problem.  I have a

7  question for the government about your jury -- about I

8  guess the jury instruction about sexual exploitation of

9  a child.

10          I looked at the one that the government gave

11  me.  They don't -- for Counts 6, 7 and 8, are you with

12  me, 6, 7 and 8, the instructions that the government

13  gave me didn't have as an element knowledge of age or

14  the fact that the person was a minor.  I think that may

15  have been an oversight.

16          But then I looked up the exploitation of a

17  child jury instruction, and it has as the element that

18  the person has to be under the age of 18.  It doesn't

19  say anything about knowingly under the age as an

20  element.

21          So I need to know what the law is with regard

22  to Counts 6, 7 and 8, and I'm confused about what has

23  been given to me.

24          MR. REARDON:  Does Your Honor want it now?

25          THE COURT:  You know right now?

1          MR. REARDON:  The law in the Ninth Circuit is

2     that the United States -- well, the law everywhere is

3     the United States does not have to prove that the victim

4     is a minor.

5          THE COURT:  Say that again. Does not?

6          MR. REARDON:  Does not have to prove.  However,

7     in the Ninth Circuit, I wouldn't characterize it as a

8     strict liability offense.  The Ninth Circuit does permit

9     a limited mistake of age defense, and that case is U.S.

10    District Court for the Central District of California,

11    it's called *Kantor*, 858 F.2d 534, a 1988 case.  It holds

12    that knowledge of a minor's age is not necessary for

13    conviction under Section 2251, but does permit a limited

14    mens rea defense.

15         What is required is the defendant to show,

16    quote, "by clear and convincing evidence that he did not

17    know and could not reasonably have learned that the

18    minor was under 18 years of age."  There is a Nevada

19    case that interprets that, *United States versus Ditirro*

20    2018 Westlaw 4934080.  It's from October 11th of 2018.

21    And it lays out additional factors.

22         There is also a *United States versus Dickerson*,

23    735 Fed.Appx. 349, a Ninth Circuit case from 2018 that's

24    unpublished.  And specifically in the Dickerson case,

25    there was a situation where the victim told others her

 1    true age.  Her true age was known to others and the

 2    defendant failed to take any steps to inquire about the

 3    victim's age.

 4            Under the *Kantor* case and its subsequent cases,

 5    the clear and convincing standard is a high one, but it

 6    is again a defense that the defendant may offer in this

 7    limited circumstance.  All of those cases and that

 8    explanation is at pages 19, 20 and 21 of the

 9    government's trial brief.

10            THE COURT:  I'm looking at the government's

11    proposed jury instruction at Docket 162.  It has two

12    elements for this crime for 6, 7 and 8.  It doesn't

13    mention that the person was a juvenile or a minor.  I

14    think it needs one more element.

15            I'm not talking about whether he knew it or

16    not.  I'm talking about whether the person -- all the

17    other counts have that as required.  I'm just trying to

18    get the proper law.

19            So if you look again at your proposed

20    instruction at Docket 162 and tell me if that's really

21    what you want the law to be in this case, or if it's

22    missing an element because it appears to be missing an

23    element.  If I go to the criminal -- to the federal

24    proposed instructions, 8-181, sexual exploitation of a

25    child.  I'm just trying to get it right.

1          MR. REARDON:  I understand, Your Honor.  The

2     only element the United States would add is that for JS,

3     the element that JS was a minor.

4          THE COURT:  Okay.  So it needs that element in

5     there.

6          MR. REARDON:  It does.

7          THE COURT:  That's not in this proposal.  I'm

8     going to fix that one.  I don't even know all the other

9     stuff you're talking -- are you telling me you want a

10    different instruction with regard to the defense or are

11    you just happy with this instruction?

12         MR. REARDON:  This is the instruction, Your

13    Honor.  This is the Ninth Circuit's instruction with the

14    additional element that the Court commented on.

15         I misunderstood the Court's question.  That is

16    the defendant's burden to show.  They can argue that

17    law.

18         THE COURT:  Okay.  As a defense they can say he

19    didn't know that this was a minor, but --

20         MR. REARDON:  Yes.

21         THE COURT:  All you have to do under your

22    theory is prove that she was a minor.  Beyond that, his

23    knowledge you don't think is relevant except under the

24    limited purpose you just discussed.

25         MR. REARDON:  Correct, Your Honor.

1          THE COURT:  I think I understand.  Okay.

2          Mr. Wendt, what do you have to add?

3          MR. WENDT:  I have nothing at this time, Your

4     Honor.

5          THE COURT:  So we're ready to start 8:30 sharp

6     tomorrow morning.  I am still working, frankly, on

7     written findings of fact and conclusions, so that's why

8     I'm interested in these details.  And I'm going to be

9     working late at night so that we can get this done at

10     the end of the trial.

11          MR. REARDON:  Thank you, Your Honor.

12          THE COURT:  Anything else?

13          DEPUTY CLERK:  All rise.  This matter stands in

14     recess until tomorrow morning at 8:30 a.m.

15          (Recessed at 4:43 p.m.)

16

17                    CERTIFICATE

18     I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19     District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20     original stenographic record in the above-entitled
     matter and that the transcript page format is in
21     conformance with the regulations of the Judicial
     Conference of the United States.

22
     Dated this 18th of April, 2021.
23

24
                         /s/ Sonja L. Reeves
25                    SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER