1        UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF ALASKA

2

3  UNITED STATES OF AMERICA, )
                             )
4        Plaintiff,          )
                             )
5  vs.                       )   CASE NO. 3:19-cr-00003-RRB
                             )
6  TRISTAN GRANT,            )
                             )
7        Defendant.          )
   _____  )

8

9

       PARTIAL TRANSCRIPT OF TRIAL BY COURT, TRIAL DAY 2
10               (Testimony of Ajela Banks)
    **BEFORE THE HONORABLE RALPH R. BEISTLINE, DISTRICT JUDGE**
11               April 12, 2021; 8:37 a.m.
                    Anchorage, Alaska

12

13  **FOR THE GOVERNMENT:**
           Office of the United States Attorney
14         BY:  KYLE F. REARDON and JENNIFER L. IVERS
           222 West 7th Avenue, #9
15         Anchorage, Alaska 99513
           (907) 271-5071

16

17  **FOR THE DEFENDANT:**
           Law Offices of James Alan Wendt
18         BY:  JAMES A. WENDT
           425 G Street, Suite 610
19         Anchorage, Alaska 99501
           (907) 258-9100

20

21

22  _____

23              **SONJA L. REEVES, RMR-CRR**
               Federal Official Court Reporter
24              222 West 7th Avenue, #4
               Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:37 a.m.)

2          DEPUTY CLERK:  His Honor, the Court, the United

3   States District Court for the District of Alaska is now

4   in session, the Honorable Ralph R. Beistline presiding.

5          Please be seated.

6          Your Honor, we're back on record in *United*

7   *States of America versus Tristan Grant*, Case

8   3:19-criminal-3-RRB.

9          Counsel, please identify yourself for the

10  record.

11         MR. REARDON:  Good morning, Your Honor.

12  Kyle Reardon and Jennifer Ivers for the United States.

13         MR. WENDT:  James Wendt for Mr. Grant.

14         THE COURT:  All right.  Thank you.  Good

15  morning.

16         Good morning, ma'am.  How are you doing?

17         THE WITNESS:  I'm good.  How are you?

18         THE COURT:  You're still under oath, so we

19  won't swear you in again.  But remember you're still

20  under oath.

21         THE WITNESS:  Okay.

22         MR. REARDON:  The government has a motion it

23  would like to make beforehand.

24         We would ask to reopen our direct to show the

25  witness one exhibit and ask her to attempt to identify

```
 1   it.
 2              THE COURT:  Any objection?
 3              MR. WENDT:  No objection.
 4              THE COURT:  Very well.
 5                       DIRECT EXAMINATION
 6   BY MR. REARDON:
 7      Q.  Ms. Banks, we asked at the end of yesterday about
 8   when you were shot.  Do you recall those questions?
 9      A.  Yes.
10      Q.  Do you remember the gun that you were shot with?
11      A.  Yes.
12      Q.  Do you recall what it looked like?
13      A.  It was like a compact, chunky, black gun.
14              MR. REARDON:  May I approach, Your Honor?
15              THE COURT:  Yes.
16              (Mr. Reardon approaches the witness.)
17   BY MR. REARDON:
18      Q.  Ma'am, I am showing you what has been marked as
19   Government Exhibit 30.  Take a moment and look at that.
20          Do you recognize Government Exhibit 30?
21      A.  Yes.
22      Q.  And what is Government Exhibit 30?
23      A.  That's the gun I was shot with.
24              MR. REARDON:  I have no further questions, Your
25   Honor.
```

1          THE COURT:  Are you going to admit that or not?

2          MR. REARDON:  We are going to admit it with a

3    subsequent witness, Your Honor.

4          THE COURT:  Very good.  So just to clear up for

5    the government, we had some discussions yesterday about

6    the video.  I don't care what you do publicly, but if

7    it's contraband or if it involves juveniles, that's what

8    I want to have limited.  Clear?

9          MR. REARDON:  Yes, Your Honor.

10         THE COURT:  Other than that, you're free to do

11   what you want.

12         Okay.  Mr. Wendt, cross examination.

13         MR. WENDT:  Thank you, Your Honor.

14                    CROSS EXAMINATION

15   BY MR. WENDT:

16     Q.  Ms. Banks, how are you today?

17         I want to ask you about meeting Mr. Grant.  I

18   believe you said you -- you think you met him in July

19   of 2018.  Is that correct?

20     A.  Yes.  I said, like, yeah, around that time.

21     Q.  Around that time?

22     A.  Yeah.

23     Q.  Okay.  Now, it could have been in August of 2018?

24     A.  Well, yeah.  Like late July.  I know it was like

25   late summer.  So like, yeah, we were just conversing on,

1 like, Facebook, and then it went to other social media

2 platforms and then to phone numbers.

3     Q.  When did you meet him in person?

4     A.  Early September 2018.

5     Q.  Okay.  Now, your birthday is, if I'm not

6 mistaken, in August, is it not?

7     A.  Yes.

8     Q.  And you would have turned 19 in August of 2018?

9     A.  Yes.

10     Q.  So when you met him in person, then you were

11 certainly 19, and you either were almost 19 or may have

12 been 19 when you met him by Facebook?

13     A.  When I met him by Facebook, no.  It was like a

14 few weeks shy of turning 19.  I wasn't 19 yet.

15     Q.  Did you tell him your age?

16     A.  Yeah, through, like, Facebook, Facetime.

17     Q.  And how did that occur?

18     A.  Well, just like formal conversation, getting to

19 know each other and we were just talking.  He asked me

20 how old I was.  I said 18, but I have a birthday party

21 coming up.  And then I talked to him about pretty much

22 what I was going to do.  I had small little kickback

23 with, like, a few friends at my house.

24     Q.  But he asked you how old you were and you

25 responded that you were 18?

1    A.  Yes.

2    Q.  Now, there came a time when you introduced him to

3  JS and KC; is that right?

4    A.  Yes.

5    Q.  And when was that?

6    A.  He met, like -- I introduced him to JS via

7  Instagram Facetime, like, when he was in the hospital

8  for a shooting.  She had hit me up on Instagram Facetime

9  and was talking to me, and that's when he was talking to

10  me about taking a trip to Fairbanks with Marika Alex.

11  And I said I -- I was kind of iffy on going because I

12  didn't want to go by myself, so I asked JS if she would

13  come with me because, like, at the time, it wasn't

14  really clear what was to be done when we got there.  It

15  was just -- Marika Alex was pregnant and didn't want to

16  travel by herself on the dark roads.  So I said, okay,

17  I'll invite JS.  She said she didn't want to go.  So

18  that was his first initial meeting with JS.  He, like,

19  spoke to her, said some small words over Instagram

20  Facetime.

21    Q.  Was he in the hospital at that time?

22    A.  Yes.

23    Q.  Okay.  That would have been December of two

24  thousand --

25    A.  September.

1     Q.   September of 2018?

2     A.   Yes.

3     Q.   Okay.  And then when did you introduce him to KC?

4     A.   Well, I want to say like mid -- mid, early

5  October.  JS was staying at my apartment, and that's

6  when she told me that she had a friend that was pretty

7  much in trouble and needed somewhere to stay.  And I

8  gave her permission to come over, gave her the ground

9  rules.

10         And Tristan was on the couch at that time, but

11  when he went to the bathroom, doing something in the

12  bathroom, and when, like, KC showed up and we had our

13  conversation and everything, that's when he came out and

14  just like snatched the PlayStation from her.

15     Q.   That's when he came out and what happened?

16     A.   Snatched the PlayStation from her and said,

17  "We're not Indian givers."

18     Q.   All right.  Do you remember being interviewed

19  about that event back in -- I guess it was March

20  of 2019.  Do you remember that?

21     A.   March 2019?

22     Q.   Oh, I'm sorry.  No, January, January 25th, 2019.

23  Do you remember that interview?

24     A.   I maybe think so, maybe vaguely.

25     Q.   Okay.  Have you reviewed any of your statements

1    prior to coming here?

2        A.   It's been like a year or two.  Like, no, not

3    really.

4        Q.   All right.  Well, let me just ask you this:

5    During that time when Mr. Grant was in the bathroom and

6    KC was over there, isn't it true that you asked KC, also

7    known as Silky, how old she was?

8        A.   Yes.

9        Q.   Okay.  And isn't it true that she whispered to

10   you that she was 15?

11       A.   No.

12       Q.   It's not true that she whispered that she was 15?

13       A.   No.  There is absolutely no reason for her to

14   whisper.  We were all standing in my living room,

15   speaking at regular tone of voices, and I was talking to

16   her about everything.  And I could tell she was shaken

17   up for, like, being at a stranger's house or whatever,

18   and that's when I asked her how old she was.  And she

19   was like, I'm 15.  I was like, okay, you'll be safe

20   here.

21       Q.   And where was Mr. Grant when this happened?

22       A.   He was standing in the bathroom.  But the

23   bathroom door wasn't closed, wide open.

24       Q.   Okay.

25       A.   Within hearing distance.

1       Q.   All right.

2            MR. WENDT:  Your Honor, I'd like to try to

3    refresh the witness's testimony.  I'm not sure how to do

4    it.  Should I approach her or should I put it on the

5    overhead?

6            THE COURT:  Well, how do you want to do it?

7            MR. WENDT:  I would think --

8            THE COURT:  So what you have is a copy of her

9    prior statement?  Is that what you have?

10           MR. WENDT:  It's a police report.

11           THE COURT:  Do you have an extra copy for her?

12           MR. WENDT:  I do.

13           THE COURT:  I don't mind if you approach her,

14   hand it to her and let her read it.

15           MR. WENDT:  It's 15 pages long.

16           THE COURT:  Then you can focus the part of it

17   you want her to read.

18           MR. WENDT:  Okay.  All right.  I'll underline

19   it, Judge.  Hold on.

20           THE COURT:  Okay.  She can read as much of it

21   as she feels necessary to respond to your question, but

22   it's good that you focus it.

23           MR. WENDT:  Okay.

24           (Pause.)

25           MR. WENDT:  All right.  I have it here.  And

1  may I approach the witness?

2          THE COURT:  Yes.

3          (Mr. Wendt approaches witness.)

4          MR. REARDON:  Mr. Wendt, can I just confirm

5  that this is the statement that starts Bates No. 6712?

6          MR. WENDT:  Yes.

7          MR. REARDON:  Okay.  Thank you.

8          MR. WENDT:  Page 5.

9  BY MR. WENDT:

10    Q.  It's a 15-page statement, ma'am.  That's the

11  front.  This is page 5, with this highlighted section.

12  So I'll give you the whole thing there.

13    A.  You just want me to read all of it?

14    Q.  Read as much as you feel you need to.

15          Let me get back to the mic.

16          THE COURT:  You should look at the first page

17  initially to remind yourself of what it's all about.

18          THE WITNESS:  Okay.

19          THE COURT:  And then he wants to ask you about

20  page 5.  But if you feel it's necessary to read before

21  and after, that's fine as well, whatever you feel

22  comfortable.

23          (Pause.)

24    A.  Okay.  I remember it.

25          THE COURT:  Okay.

1    BY MR. WENDT:

2        Q.   Does that refresh your memory?

3        A.   Yeah.

4        Q.   Now, it's true, is it not, that KC whispered to

5    you while Mr. Grant was in the bathroom that she was 15?

6        A.   I wouldn't say that she whispered.  Like

7    honestly, I believe, like, this could have been like a

8    typo.  Maybe if there was like an audio of me saying

9    those exact words.  Because my memory is, no, she did

10   not whisper.  There was absolutely no need to whisper.

11          And time and time again, her age was brought up.

12   When she first got there, she said she's 15.  I

13   mentioned it several times.  It was constantly something

14   that was brought up.

15       Q.   Do you remember who interviewed you?

16       A.   Yeah.

17       Q.   Who was that?

18       A.   It was a detective named Jessica, and then I

19   think it was the prosecutor, Mr. Reardon.  And then

20   there was another detective.  I don't remember who she

21   was.

22       Q.   Okay.  The detective was Jessica Hais, H-a-i-s?

23       A.   Yes.

24       Q.   Okay.  You say you think the word "whispered" is

25   a typo?

1    A.  Yeah.  It might be.  Like, maybe at the time I

2  just used that to describe it.  But no, like no, she did

3  not whisper.  It was very -- how I'm speaking right now

4  is how she said it.

5        And then prior to that, before she even arrived

6  at the apartment, Tristan was sitting on the couch as JS

7  was talking to me about her friend coming to stay.  And

8  I said, how old was she, and she said 15.

9        So when the girl got there, I just asked her

10  myself again, like how old are you, and she said 15.

11  Like nobody was whispering.  This wasn't like some

12  top-secret stuff.  It was just we're talking.  Like

13  there was no bad blood or nothing like that.

14    Q.  But what you just told us, that's nowhere in this

15  statement, at least in the summary of the statement, is

16  it?

17    A.  What?  I don't understand your question.

18    Q.  You just said earlier to this portion where you

19  apparently asked Silky how old she is, even though that

20  Silky had previously said how old she was on the couch.

21  Why would you ask her how old she is if she said how old

22  she was just before?

23    A.  Because when -- she wasn't there in person to

24  tell me herself.  JS told me prior to KC's arrival,

25  because I wanted to know, like, who's coming at my

1  house.  And JS said she's 15.  So when KC arrived, it's

2  only, like, natural to ask a person about their self.

3  So I just said, you know -- got to know her a little

4  bit, like what's going on with your situation.  And I

5  said, "How old are you," and she said she was 15.  I

6  don't see like...

7     Q.  Okay.  Nonetheless, it does say here that she

8  whispered she was 15.  But you're now saying that is

9  incorrect?

10    A.  Yeah.

11    Q.  All right.  Now, you testified about how you knew

12 JS and KC.  You knew them both for some time; is that

13 true?

14    A.  I knew JS for some time.  Mid October was my

15 first time ever meeting KC.  I never knew her before

16 that.

17    Q.  Okay.  Knowing JS -- and correct me if I'm wrong.

18 I think you said you knew JS from Whaley, McLaughlin and

19 foster care?

20    A.  Yeah, and also treatment.

21    Q.  What do you mean by treatment, I may ask.

22    A.  Like, we were in North Star Behavioral Center.

23    Q.  What behavioral center?

24    A.  North Star.

25    Q.  North Star.  Okay.  What is North Star?

1    A.  It's a behavioral psychiatric institute for young

2  girls.

3    Q.  Specifically for young girls?

4    A.  Yeah.

5    Q.  Okay.  And what is Whaley?

6    A.  Whaley is like a school.  Like, it's an

7  alternative school for people who constantly have, like,

8  problems in normal schools or like people who have

9  learning disabilities or like, you know, problems.

10    Q.  Okay.  And when you say it's an alternative

11  school, but it is still a school, it's like a high

12  school?

13    A.  Yeah.

14    Q.  And McLaughlin is just a youth detention center;

15  isn't that true?

16    A.  Yeah.

17    Q.  What are the ages of people in McLaughlin?

18    A.  I mean, it can start as early as, like, just from

19  when I was there, the youngest I saw ever there was,

20  like, a 12-year-old.  And they can hold you up till like

21  19 sometimes.  I mean, it just really depends on your

22  situation.

23    Q.  Okay.  So what I'm getting at here is, you knew

24  JS from school type of situations?

25    A.  Well, no.  I wouldn't say school type because,

```
 1    like, we didn't always, like, hang out in school.  Like,
 2    it was like we'll see each other, but, like, we also
 3    had, like, our own problems.  So, like, at that time I
 4    was in between a lot of foster homes, a lot of treatment
 5    centers.  She was in between treatment centers.
 6          So we'll just occasionally hang out every once in
 7    a while.  But then we'd go on the run, so, like, nothing
 8    will last.  We spent the majority of our time in
 9    treatment centers and juvenile centers, and that's where
10    we built our foundation of our friendship.
11    Q.  Did you ever tell Mr. Grant your background with
12    JS, that is, how you knew her, where it was from?
13    A.  I said I met her at McLaughlin.
14    Q.  Did you tell her you knew her from Whaley School,
15    for instance?
16    A.  No.  I didn't see a reason to.
17    Q.  Okay.  From foster care?
18    A.  No.
19    Q.  Just from McLaughlin?
20    A.  Yeah.  I mean, yeah.
21    Q.  Okay.  And the way you and JS related to each
22    other, it was as peers, so to speak, equals?
23    A.  No, like best friends.
24    Q.  You're what?
25    A.  Best friends.
```

1    Q.  Best friends.  Okay.  But you are -- how much

2    older are you than JS?

3    A.  So I'll turn 19.  And then, like, my birthday is

4    in August and then JS's birthday is in July.  So I'll

5    turn 19, and then I'll have to wait a little bit and

6    then she's 18.  So like that.  That's like a year or

7    something.

8    Q.  A little over a year?

9    A.  Yeah.

10   Q.  All right.  So it wouldn't be unusual for anyone

11   who knew you and who knew JS, if they knew you were 19,

12   who would think that JS was 19 or 18 as well?

13   A.  No.  I mean, I can't really give, like, a firm

14   answer on that because, I mean, you would think someone

15   who is 19 would, like, have -- be in that typical age

16   range of like 17, 18, 19, like you guys are all there.

17   I have siblings that same exact age, and we hang out.

18   So I can't really narrow down a firm answer for you,

19   like a yes or no.

20   Q.  Was JS friends with KC prior to you meeting KC?

21   A.  From what she told me, yeah.  She said they met

22   in McLaughlin.

23   Q.  Now, I think you testified that you had -- prior

24   to meeting Mr. Grant, you had worked as an escort.  Is

25   that correct?

1    A.   Yeah.

2    Q.   And I think you testified that you did this in

3    California as well as Alaska.  Is that correct?

4    A.   Yeah, like multiple states.

5    Q.   More than Alaska and California?

6    A.   Yeah.

7    Q.   What other states?

8    A.   I said Colorado, Arizona, Vegas, California.

9    Q.   Okay.  How old were you when you started working

10   as an escort?

11   A.   15.

12   Q.   Okay.  And I think you mentioned, if I'm not

13   mistaken -- it caught my attention -- that in California

14   you had eight pimps.  Is that right?

15   A.   Yeah, around that number.

16   Q.   I didn't hear what you just said.

17   A.   Yeah, around that number.

18   Q.   Around that number.  Okay.

19        How did you get acquainted or get connected with

20   these pimps?

21   A.   Through foster care.  Originally started in,

22   like, Alaska.  I had a foster mom who had, like, sons

23   and stuff who were already in sex trafficking business.

24   I was just never exposed to that kind of lifestyle

25   growing up with my parents.  So, like, being put into

1   foster care and being introduced to that, I was like --

2   I didn't know what it was.  Like, they would try to like

3   put me on Backpage and stuff like that, but I couldn't

4   grasp, like, doing dates or anything like that.

5          So when I ended up going out of state with my mom

6   and we got into some kind of arguments, I was approached

7   by a few guys.  And I -- we weren't raised in my family

8   to, like, correspond with other people besides our

9   family, so I had a lack of social skills completely.  So

10  he just started speaking really fast and I just became,

11  like, really scared at first.  And there was, like,

12  attempts for me to go back to my mom and, like, hide out

13  and stuff.

14         And then I met a guy who was friends with

15  Bobby Thompson, one of my foster moms', like relative,

16  family connected-wise.  And I know for some time

17  Bobby Thompson was trying to, like, get me to engage in

18  sex acts when I was in Alaska.  But I managed to get

19  away from him.

20         So from there, it just became -- I got hooked up

21  with one.  And at first it was just, oh, we're just

22  friends, we're just going to hang out.  And they didn't

23  allow me to go back to my mom.  And my mom made efforts

24  to try to find me, and then she just went back to Alaska

25  and I ended up just getting pretty much passed around.

1    Q.  Going back a little, Bobby Thompson was a foster

2  parent; is that right?

3    A.  No.  I said he was like a blood relative of a

4  former foster mom of mine.

5    Q.  That was a male, not a female?

6    A.  Yeah, female.

7    Q.  Bobby Thompson.

8    A.  No.  Bobby Thompson is a male.

9    Q.  Male.  Okay.

10    A.  His family member is a female.

11    Q.  All right.  All right.  So you started doing sex

12  work when you were 15 as a result of being in foster

13  care in Anchorage, Alaska?

14    A.  Yes.

15    Q.  Okay.  And then you went to other states and fell

16  into it in California, Las Vegas, Colorado.  Is that

17  true?

18    A.  Yeah.  Well, I wasn't really like fell into it

19  like I had a passion just want to do it.  It was like a

20  survival thing.  Like, I didn't know anything about

21  these states.  I never, like, engaged in stuff like

22  that.  So when I couldn't find my mom, it's just like I

23  found myself having to like feel that I was indebted to

24  these people or was like, I can't run away because I

25  don't know anything.  I can't go seek help anyplace,

like that.  I didn't actually just do it until I
turned 18.  From 15 to 18, I just did it as, like, oh, I
have to or, you know, I wouldn't be able to see my mom.
If I make enough money, then maybe they'll buy me a
ticket back to my mom, stuff like that.

        And then when I turned 18, I finally just managed
to, like, run away from one of my traffickers to another
state and caught police attention.  And that's when I
paid to bring myself back here.  And I wanted to leave
the lifestyle alone.  And there was, like, maybe two or
three kind of situations, but it wasn't my priority.
Like, it wasn't in my face every day like it was in the
States.

    Q.  Okay.  But you say you came back here, and there
were two or three situations when you engaged in sex
work to get money?

    A.  Yeah.  Like, yeah.  But out here, it's just like
guys looking for somebody to go on an RV trip with them
to Soldotna or something like that, so just like go with
them.

    Q.  And how would you get connected with these guys?

    A.  Well, when I came up here -- because in the
States, like, I was, like, taught to just be like a
streetwalker.  So I just worked, like, the street.  I
didn't get into the internet aspect of it until I came

to Alaska.  When I got here, I was in Plenty Of Fish,
like this dating app, hookup site, where you meet
friends or whatever, and I met this guy.  And he had
traveled from California, just was up here looking to
recruit girls.  And I was talking to him, and then I
sent him pictures thinking it was just me and him
engaging in, like, some sex thing.  And he made me an
account on the Skip The Games, and he was like, oh,
there's people hitting your phone, blah, blah, blah.

And I freaked out and I told the detective that
was, like, helping me at the time get out of the
lifestyle that this was happening.  And then, like, the
detective, like, I don't know, he didn't really do
anything about it.  So I was just like fine, one or two
numbers I'll respond to.  But I cut the guy off who
thought he was going to pimp me, and I just, like,
blocked him.

Q.   Okay.  All right.  Now, it sounds to me, having
done this from 15 until 18 or 19, you have become fairly
streetwise.  Is that fair to say?

A.   Yeah.  But there's like still, like, a lot to
learn.  Yeah.

Q.   Okay.  In addition to being streetwise, you
become more independent as well; isn't that true?

A.   Yeah.  You definitely develop a sense to want to

1    keep your independence, yeah.

2       Q.  Okay.  Because I think you mentioned that when

3    you fell into this at 15, you were kind of caught, but

4    eventually you got strong enough that you just left.

5    Isn't that right?

6       A.  Yeah.  Became, like, more -- I adapted to my

7    environment.

8       Q.  Okay.  Now, it's true, is it not, that you

9    engaged in sex work along with JS prior to meeting

10   Mr. Grant?

11      A.  No.

12      Q.  Are you saying JS didn't engage in any sex work

13   prior to meeting Mr. Grant?

14      A.  When you say "sex work," are talking about like

15   we engaged in sex work where we got paid or just like

16   sex work just for pleasure?

17      Q.  Where you got paid.

18      A.  No.  No.  She didn't even, like, really know that

19   I was even involved in that lifestyle.  Like, before I

20   even left Alaska, like no.  It wasn't something that we

21   even talked about, like no.  When I went out of Alaska,

22   like rumors spread to like some of my mutual friends and

23   it got to her, and they just started, like, talking

24   about it, "Oh, Ajela, is escorting," blah, blah, blah.

25   But no, we never engaged in anything like that.  No.

1      Q.   Now, you actually had a relationship with

2   Mr. Grant, did you not?

3      A.   That's what I thought, yeah.

4      Q.   Okay.  You say, "That's what I thought."  Did

5   there come a time when you decided that you didn't have

6   a relationship?

7      A.   Yeah.

8      Q.   When did that occur?

9      A.   I would say, like, maybe the third week of us,

10  like, actually being together; me just like starting to

11  watch him and see like he wasn't measuring up to

12  anything that he told me about himself prior to me

13  meeting him, just like the way he would just like want

14  to see other women and just like be so quick to be

15  degrading and stuff towards me and just -- no.

16         I never had a boyfriend before, so I was going

17  off, like, TV, like, okay, this is how a boyfriend is

18  supposed to be.  And then he was just, like, acting too

19  much like pimps and I was like, okay, he's, like, trying

20  to trick me and become like a simp.

21     Q.   Okay.  You say the third week.  So this would be

22  when?  October?  November?

23     A.   This would be like September, when he got shot

24  and I did that trip to Fairbanks for him.

25     Q.   Now, you have a child together, do you not?

1    A.   Yes.

2    Q.   And you don't have to give me the exact birthday.

3  But when, approximately, was the child conceived?

4    A.   I don't even know, like I said.

5    Q.   Well, when was the child born, then?

6    A.   July 24, 2019.

7    Q.   July 24, 2019.

8    A.   Uh-huh.

9    Q.   And was it a normal-term birth?

10    A.   I mean, yeah.  She was a little bit late.

11    Q.   All right.  Did you have any kind of relationship

12  with Mr. Grant, at least emotionally, at that time?

13    A.   Yeah.

14    Q.   Okay.  And how would you describe your

15  relationship emotionally with Mr. Grant at that time?

16    A.   It was one-sided.

17    Q.   One-sided meaning?

18    A.   It was all me.  I was like -- I found myself -- I

19  fell in love with him, and he just wasn't on that

20  aspect.  It was never reciprocation.  He never said

21  those words "I love you" until he ended up in jail for

22  shooting me.  That's when it really sealed the deal that

23  this was all fake.

24    Q.   Okay.  He ended up in jail for shooting you.

25  Wasn't that in December of 2018?

1     A.   Yeah.

2     Q.   All right.  So emotionally, when did you finally

3   decide, I'm cutting this guy loose, I don't want to have

4   anything to do with him anymore?  When did that occur,

5   if it has occurred?

6     A.   I mean, there was attempts for me to cut him

7   loose early on, like sent him text messages saying

8   you're not allowed to come back here, blocking his

9   number, like not allowing him access back to the

10   apartment.  But it was just always failed attempt, where

11   I'm like, okay, I should give him a chance because I

12   want somebody to give me a chance.

13        So it was just up and down, but he would always,

14   like, find some way to, like, come back into the

15   picture.  So I'm like, okay, well, I just can't

16   completely cut him off.

17        And I wouldn't say I became, like, emotionally

18   attached until, like, maybe just this past year of being

19   able to just be away from him and not be under, like,

20   any of his control, emotional, mentally.  Like, I wasn't

21   even thinking for myself.  Like, I just felt like a

22   vessel.  And after being away from him for so long, I

23   got a chance to recenter myself and go through

24   everything and process in treatment and stuff like that,

25   and it helped me.

1    Q.  So you're talking about being under his control.

2  When did that end for you emotionally?

3    A.  Just this late past year.

4    Q.  Late 2020?

5    A.  Yeah.

6    Q.  Now, you have testified about getting in fights,

7  physical fights, with Mr. Grant?

8    A.  Yeah.

9    Q.  Did you ever seek medical treatment as a result

10 of these physical fights?

11   A.  I mean, no, besides getting shot.  No.  It was

12 like something I could patch up at home or have my mom

13 take care of.

14   Q.  Okay.  Now, you mentioned when you got shot there

15 was a witness there.  What was that witness's name?

16   A.  Lance Palmer.

17   Q.  Lance Palmer.

18       Now, you and I have spoken before, haven't we?

19   A.  Yeah.

20   Q.  What were the circumstances of you and I speaking

21 before?

22   A.  Wait.  I don't understand your question.

23   Q.  You and I have spoken before?

24   A.  Yes.

25   Q.  How did that come about?

A.   Well, because when I talked to Tristan's sister, because I'm thinking we should have a good relationship because my daughter may potentially be placed with her, so I wanted for us to be in good standing in case, like, for whatever reason, they feel I'm responsible for, you know, Tristan coming to terms with whatever happens to him.  So I would talk to her, and she was like, oh, yeah, Tristan said his attorney is supposed to be coming to see you, he's supposed to be coming to talk to you and question you.  It just kept coming up.

And then Tristan even went at one point, I think in a letter, and was like, uh, you know, get in touch with my lawyer, JS just called him and did an interview.  And I'm like, oh, God.  He obviously feels there's some way I could still help him, even though the evidence, everything is just clear and cut.

So I called the PO's office to, like, find out because you weren't getting in touch with me.  I didn't know who you were.  So I called the PO's office.  He told me who his old attorney was.  I called his old attorney.  Old attorney just pretty much told me, like, he's not working for Tristan anymore and here's the new information.

So I called you with the hopes and understanding to get a better understanding of just what Tristan

1  thought I could do to help him, and to just, yeah,

2  pretty much see what it was and why he just thought that

3  I would go that far to -- yeah, yeah, that's why I

4  contacted you.

5        MR. REARDON:  Your Honor, maybe we approach?

6        (Begin bench conference.)

7        MR. REARDON:  I want to inquire because at this

8  time my understanding is that Ms. Banks is represented

9  by Ms. Norris, and I'm concerned that Mr. Wendt is

10  talking about contact for a represented party, and it

11  seems to be that maybe there was some discussion about

12  her contacting him.  But I'm concerned about any

13  testimony that may have been obtained in violation of

14  her right to have her appointed attorney present because

15  I believe we're talking about a matter that Ms. Norris,

16  who is in the gallery, would have represented her on.

17        THE COURT:  What's your response?

18        MR. WENDT:  My response, I think that will all

19  be cleared up in short order.

20        THE COURT:  Are you going to do anything that

21  infringes on this other relationship?

22        MR. WENDT:  Well, these are my notes of that

23  call, and you can read the notes.

24        THE COURT:  Counsel.

25        (Pause.)

1          MR. REARDON:  Okay.

2          MR. WENDT:  Would the Court like to see?

3          THE COURT:  No.

4          Are you okay with it?

5          MR. REARDON:  I'm okay with it, yes, Your

6    Honor.

7          MR. WENDT:  There was other discussion, but I

8    made it clear.

9          MR. REARDON:  Okay.

10          (End bench conference.)

11    BY MR. WENDT:

12    Q.  Ms. Banks, when did Mr. Grant tell you to call

13    his attorney?

14    A.  It started early 2020.  Like, his sister, she

15    would pass the message for him when I would call her.

16    Q.  Okay.  Now, getting back to your call to me.

17          It's true, is it not, when you called me, the

18    first thing -- one of the first things you asked me is,

19    "What can I do to help Tristan?"

20    A.  Yes.

21    Q.  Okay.  It's true, is it not, that I was

22    relatively new to the case and I didn't know who you

23    were for a while?  Isn't that true?

24    A.  Yes.

25    Q.  Okay.  All right.  And then once you gave me your

1   full name and you described who you were, it's true that
2   I said, "I'm not able to call -- talk to you because
3   you're already represented by an attorney"?
4       A.  Yes, like some more comments to it.
5       Q.  Say it again.
6       A.  I said, yes, but there was like a little bit more
7   comments to it.  I mean, I did kind of push to still get
8   you to talk, but, I mean, eventually you relented, but
9   not so heavily to just, like, give me a full capture of
10  what -- give me a full answer of what I was hoping for.
11      Q.  Okay.  You say eventually I relented.  But you
12  had -- once I figured out who you were and I said,
13  "You're already represented," you told me you were
14  represented by Attorney Natasha Norris; is that correct?
15      A.  Yeah.
16      Q.  And you told me that you were dissatisfied with
17  her at that point in time?
18      A.  I said we were having problems, yeah.
19      Q.  And my advice to you, if you want to call it
20  advice, was just, write the judge, I can't get involved
21  in that, you write the judge, it will probably be put on
22  for some type of hearing, I can't talk to you anymore.
23  Isn't that true?
24      A.  Yeah.
25      Q.  But the purpose of your call -- and I have down

1  here it was January 5th of 2021.

2     A.  Yeah.

3     Q.  The purpose of your call was to see if you could

4  help Mr. Grant?

5     A.  Well, not really.  I mean, that's what I said.

6  It goes back to what I said earlier.  I asked you that

7  because I felt that what was being related to me from

8  Tristan's sister and from Tristan in a few letters was

9  you need to contact my attorney because there's

10  something you can do to help me.  And I just wanted to

11  know what he thought it was, so, yeah, I asked you that.

12     Q.  But you didn't ask me, what does Tristan think I

13  should be doing.  You just said, "What can I do to help

14  Tristan?"

15     A.  Yeah.

16     Q.  Okay.  So when that call ended, you called me

17  again, did you not?

18     A.  Yeah.

19     Q.  And then, actually, you called me at least two

20  times, if not three times, after that call; isn't that

21  true?

22     A.  Yeah.

23     Q.  Didn't it come to a point where I just hung up on

24  you when you would call?

25     A.  You never hung up on me.  You got just very short

1  and blunt with me.  I think that came -- the last call I
2  put in to you was when Tristan made his escape attempt.
3  And I was really eager to see, like, what's going on,
4  and I called you and you answered and you were like --
5  I'm like, are you still on the case, and you said, "Yes,
6  I'm still on the case."  And you hung up the phone then.
7      Q.  Okay.  All right.  But as far as conversations we
8  had about the case, none of these subsequent calls led
9  to anything whatsoever, right?
10     A.  It just -- let me think.
11         The only thing I learned from it was that you
12 were still going to try your best to try to push for him
13 to get a better deal, and that Tristan was absolutely
14 firm on going to trial.
15     Q.  I said that?
16     A.  Yeah.
17     Q.  All right.
18     A.  I was like, "Didn't they offer him, like, ten or
19 something like that?"  And you were like, "Oh, he
20 doesn't want to take that so I'm going to keep pushing
21 for a better deal."  And I was like, "Okay, well, maybe
22 it should just be in his best interest to, like, plead
23 out."  You were like, "Oh, I'm still trying on that, but
24 he's really set on going to trial."
25     Q.  Didn't you, on these subsequent calls -- I'm not

```
 1    trying to drive a wedge between you and your attorney.
 2    But you kept complaining to me about your attorney;
 3    isn't that true?
 4        A.   Yeah, because --
 5             MR. REARDON:  Objection; relevance.
 6             THE COURT:  Sustained.
 7    BY MR. WENDT:
 8        Q.   But I did give you, as far as your relationship
 9    with your attorney, all I told you was, write the judge.
10    Isn't that true?
11        A.   Yeah.  Yeah.
12        Q.   All right.  So I want to ask you some questions
13    now about these videos.
14             One of these videos we saw was where there was
15    almost like a very amateurish movie being made with
16    Mr. Grant and with you and JS; is that correct?
17        A.   Yeah.
18        Q.   Okay.  Who was the videographer for that?
19        A.   It alternated between me -- wait.
20             When you say "videographer," you mean like who
21    held the camera --
22        Q.   Yeah.  Who held the camera?
23        A.   -- who directed it?
24        Q.   I'm sorry.  What's the next one?
25        A.   Do you mean who held the camera or who directed
```

1 it?

2     Q.  You had a director?  Okay.  Both.

3     A.  Well, then that's like all of us, because then

4 sometimes -- the main person who held the camera was

5 Mary, and then when the camcorder died, then me and JS

6 alternated cell phones.  And then, like, Tristan was

7 like, oh, get this angle or some from over here, oh,

8 like, hold it like this.

9     Q.  So Mary was holding the camera and Tristan was

10 giving some directions?

11     A.  Yeah.

12     Q.  Who is Mary?

13     A.  Mary Rossler is like a former friend of me and

14 JS's from treatment in McLaughlin.

15     Q.  All right.  Was Ms. Rossler involved in any sex

16 work?

17     A.  Not that I know of.  I mean, no.

18     Q.  Okay.  Did Mr. Grant have any relationship with

19 Ms. Rossler?

20     A.  Not to my knowledge, no.

21     Q.  Okay.  It's true, is it not, that he didn't make

22 any attempt to have Ms. Rossler do sex work?

23     A.  No.  I think two is enough.

24     Q.  Two is enough.  Okay.

25          When you were involved with people in California,

1  Las Vegas, Colorado, would you describe that as sex
2  trafficking?
3      A.  Yeah.
4      Q.  Okay.  And people -- I think you mentioned you
5  had eight pimps?
6      A.  Close to that, yeah.
7      Q.  In California?
8      A.  Yeah, in that range.
9      Q.  And it's true, is it not, that generally
10 speaking, a pimp would have far more than two females
11 working for him?
12         MR. REARDON:  Objection, Your Honor.
13         THE COURT:  On what basis?
14         MR. REARDON:  If the question is what is her
15 experience.  But if she's being asked to give an expert
16 opinion, that would be improper.
17         MR. WENDT:  I'm just asking her about her
18 experience.
19         THE COURT:  Okay.  Based on your experience.
20         MR. WENDT:  Your experience with these
21 individuals, didn't they generally have more than two
22 people?
23         THE WITNESS:  I mean gorilla pimps would have
24 more than two people.  But an average everyday pimp
25 would just have like, the most, three girls or sometimes

1    two girls.  I've just been where it's just been me and
2    three girls.  I found myself with, like, five other
3    females, but that was like a heavyset pimp who, like,
4    dedicated his life to that.
5        Q.  Were you ever involved with a gorilla pimp?
6        A.  Yeah.
7        Q.  How many girls did that person have?
8        A.  He had like five.
9        Q.  Five.  Okay.
10           Have you ever gotten involved in sex work without
11   having a pimp?
12       A.  Yeah.
13       Q.  Okay.  When was that?
14       A.  That was, like, as soon as I turned 18 in
15   California and I went to jobs.  So like the pimp I was
16   with, he didn't know my name so, like, he couldn't find
17   out where I went.  If he did, I would have just been
18   back with him.  But he didn't know my name, so I took it
19   as a clean start.  I got out.  I had to work a little
20   bit to make some money to get back to Alaska, and then
21   came back because I made enough money to get back here.
22       Q.  And how did you get -- shall I call them dates?
23   Did you do that -- was it streetwalking?  Putting ads on
24   Craigslist?
25       A.  No.  It was streetwalking.

1    Q.  Streetwalking.

2        But you have, on occasion, put ads on social

3 media for sex work, have you not?

4    A.  Social media?

5    Q.  Well, I don't know what you call it, Craigslist

6 or Backpage or these other things.  I don't know what

7 they are.

8    A.  When I got to Alaska, yeah, skipthegames.com and

9 AdultLook.

10   Q.  I'm sorry.  You skipped games?

11   A.  Yeah.  And AdultLook.  The escorting sex sites,

12 like the new Backpage.

13   Q.  Skipped Games is a website.  Is that what you're

14 saying?

15   A.  Yeah.  Skip The Games, yeah.

16   Q.  Okay.  Skip The Games.  And the other one is

17 Outlook?

18   A.  AdultLook.

19   Q.  AdultLook.

20       So you would have put ads on those?

21   A.  Yeah.

22   Q.  For yourself?

23   A.  Well, the person that I met when I came back to

24 Alaska Plenty Of Fish, he posted me an ad and said it

25 was up there for like 30 days.  I still didn't know how

1    to like go back and put more money on it.  I just used

2    it until it didn't work anymore, until the numbers

3    stopped hitting my phone.  And that's when I picked up

4    my job at JC Penney's and the fish counter.  So I just

5    pretty much left it alone.

6        Q.   You're losing me.  You picked up what at

7    JC Penney's?

8        A.   My job.

9        Q.   Oh, you're job.  Okay.

10            It's the masks really makes is a little bit hard.

11   It's okay.

12            So you did put ads on Skip The Look [sic] and

13   AdultLook until you eventually got a job at JC Penney's

14   and you stopped doing that?

15       A.   I didn't post my own ad at that time.  I was

16   going off of the guy who tried to pimp me when I came to

17   Alaska.  He was a pimp who was out here recruiting

18   women.  I sent him sexual pictures just for him, and he

19   put them on Skip The Games with the hopes that I would

20   work for him and with his bottom bitch and go to Miami.

21   And I cut it loose.

22            But at the time, my ad was still up there.  Once

23   you're posted, you're up there for 30 days unless you

24   have the account information to deactivate.

25            From that 30-day mark, I still had numbers

hitting my phone.  When it ran out, there was a few

regulars I managed to keep, and that's it.  And I went

and got a regular job.  I didn't repost myself and

really get into educating myself about AdultLook and

Skip The Games until I met Marika Alex when we went on

our trip to Fairbanks.  And that's when she walked me

through how to do it with the card and everything like

that.  And from there, I started using it, which was

September 2019.

Q.  Okay.

A.  2018.  Yeah, 2018.

Q.  You said a few things that -- I'm just getting

old I guess.

She taught you how to use the card?

A.  When you go to make an account on those sex

sites, you need, at the time was an Apple card or an

Amazon card, and then you have to keep the receipts and

the number on the back.  So you got to type the numbers

into, like, this one little engine and then, like, build

your page.

And, yeah, I never got into all that until she

showed me how to do that.  She posted an ad when we were

in Fairbanks.

Q.  Okay.  How long have you known Marika?

A.  It was my first time ever meeting her when Grant

1    got shot and was in the hospital, and I was in there

2    with him and she came in pregnant.

3        Q.   Okay.  All right.  So she taught you how to use

4    these cards to post ads; is that right?

5        A.   Yes.

6        Q.   And you mentioned something about having a pimp

7    here before that time, who wanted you to work with his,

8    quote, "bottom bitch."  Did I hear that correctly?

9        A.   Yeah.  He wasn't my pimp.  It was just a guy that

10   I met on Plenty of Fish.  And we started talking, and he

11   told me he was from California.  He was out here, like,

12   visiting.  He never mentioned that he had another bitch.

13   I was still trying to get a feel for him.  So -- when I

14   met him at -- he paid for me to come to a hotel

15   downtown, and when I got there, he was like, no, we

16   can't go upstairs yet.  And I was like, okay, just still

17   getting to know him.

18        We went upstairs, and that's when I seen another

19   girl.  I was like, no, we're not doing this.  She gave

20   him some money and then, like, he got, like, angry at me

21   and, like, they both just decided to fight me because I

22   said I was going to leave.

23        And then I just ended up still leaving, and I

24   went to -- I was staying at a sex trafficking safehouse,

25   and I went and told the owner who was there what

happened, and she told me to tell the detective.  And I

told the detective, and then I stopped talking to the

guy.

     He was not my pimp.  He had hopes to become my

pimp.  When I found that out, I stopped talking to him.

     Q.   You say you went to a sex trafficking safehouse?

     A.   Priceless.

     Q.   This is in Fairbanks?

     A.   No.  This is in Anchorage.

     Q.   The name of this safehouse is Priceless?

     A.   Yeah.  They're an organization that helps women

from, like, sex trafficking, domestic violence.

     Q.   And you also mentioned a website called Plenty of

Fish.  Is that the same thing as Skip The Look [sic] or

AdultLook?

     A.   No.  It's a dating app.  It's supposed to be a

dating app.  Most people use it for, like, hookups.

     Q.   Okay.  All right.

     And these others, like Skip The Look [sic] and

AdultLook, are --

     A.   Those are actual -- that's the new Backpage.

     Q.   So is it your testimony, then, that you were

Mr. Grant's bottom?

     A.   Absolutely not.  No.  I would say that had to be

Marika Alex because they were together way longer, three

1  years, and then, like, she pretty much supervised

2  everything.  Like, no.  Like, she says something, then

3  he, like, carried out what she says.  Like, no.  I never

4  made it to being his bottom bitch because I didn't want

5  to -- no.  I wasn't putting myself in that lifestyle at

6  the time.  I was looking for a boyfriend, not a pimp.

7      Q.  Okay.  So you did do -- in addition to JS and KC,

8  you did do some sex work in 2019; is that correct?

9      A.  No.  I think that's at the time the feds got

10  involved and everything was all busted up and I was

11  pregnant on house arrest, yeah.

12      Q.  How about in late 2018?

13      A.  Are you talking about before I got shot?

14          MR. REARDON:  Objection, Your Honor.

15      Q.  Yes.

16          THE COURT:  Yes.

17          MR. REARDON:  Rule 413 prohibits evidence of

18  sexual activity outside of the charged range if it's not

19  relevant under either the charges or there's a

20  constitutional basis to admit evidence of a victim's

21  prior sexual history, and I would ask that any testimony

22  relating to her work after the charged period -- and in

23  this case we've talked about December 12th, but it's

24  charged until December 1st -- would be prohibited by

25  Rule 413.

```
 1              THE COURT:  Mr. Wendt?
 2              MR. WENDT:  Your Honor --
 3              (Pause.)
 4              MR. WENDT:  Your Honor, I'm just trying to
 5    establish that this person was doing sex work away from
 6    my client, and my client should not be held responsible
 7    for the sex work that she did.  That's all I'm trying to
 8    establish.
 9              THE COURT:  Okay.
10              MR. WENDT:  So I'm just asking her, did you do
11    sex work in late 2018.
12              THE COURT:  You can answer that "yes" or "no."
13              THE WITNESS:  Well, in late 2018, I was still
14    with Tristan, until December 12th.  That's when he went
15    away.  And I wasn't doing any sex work.
16              January 18th, I wasn't doing any sex work from
17    December 12th, to where he left, all the way up until
18    like January 18th of 2019.  I was still recuperating
19    from the bullet wounds.  And I still had people hitting
20    my phone, wanting dates, but I didn't have enough energy
21    to do it.  So then rent was getting closer and I got one
22    number who asked me for a date, and so I said, okay,
23    fine, I'll just go and do it.  And when I went out to do
24    it, it was the marshals who arrested me.  I attempted,
25    but it wasn't actual date.  It was a setup by the
```

1  marshals to arrest me.

2      So from the time that he left, December 12th,

3  no, I didn't engage in any more.  I attempted one date

4  and it didn't go through.

5  BY MR. WENDT:

6  Q.  But from the time Mr. Grant got to Alaska --

7  A.  He got to Alaska early September.  Yes, I was

8  doing sex work.

9  Q.  But it's true that he himself was shot the day

10 after he got --

11 A.  Well, yeah, because that's because he had, like,

12 some stuff going on with his life.  That's nothing with

13 me.

14 Q.  Okay.  From the day that Mr. Grant got to Alaska,

15 forward to the end of the year, did you do any sex work?

16 A.  Yeah.

17 Q.  Okay.  Assuming you made some money from that,

18 what did you do with that money?

19 A.  I gave it to Tristan.  What I could smuggle, I

20 paid for expenses to keep the apartment and help take

21 care of my mom.

22 Q.  And how were you getting those dates?  It's okay.

23 I keep calling them dates.  Is that okay?

24 A.  Yeah, that's what they are.

25 Q.  Okay.  How did you get those dates?

1    A.  Online until -- yeah, online until I started

2  working at the strip club.

3    Q.  Okay.  And who put the online ad?

4    A.  At first it was Marika, and then I took over and

5  started refurbishing myself because I had a daily quota

6  to make.

7    Q.  It's true, is it not, that Mr. Grant never put

8  any ads online?

9    A.  No.

10    Q.  You say he did put ads online?

11    A.  I'm saying, no, he never put any ads online.

12    Q.  Now, you were living with him, I think you said

13  somewhat as boyfriend/girlfriend, at least for a period

14  of time?

15    A.  That's what I thought.  He was living with me.

16    Q.  I want to ask you about the video we saw at the

17  Popeye's drive-through.  Who was in the car when that

18  video was taken?

19    A.  Tristan, JS, and me.

20    Q.  Who was driving?

21    A.  Tristan.

22    Q.  Who was seated in the front passenger seat?

23    A.  Me.

24    Q.  So Tristan was driving, you were in the passenger

25  seat, and JS was in the back seat?

1      A.   Yeah.

2      Q.   And you went to -- it was Popeye's; is that

3  right?

4      A.   Yeah.

5      Q.   All right.  And you took this video yourself with

6  your phone; is that right?

7      A.   Well, yeah, because I was sitting in the

8  passenger seat and, like I said, that's when he made a

9  derogatory comment, trying to piss me off.  And I said,

10 "Have one of your funny-looking bitches suck your dick."

11 And he was like, all right, JS.  And so JS did it, and

12 he was like, "Record it, record it," and I brought out

13 my phone.

14      I was trying to act numb, like it wasn't hurting

15 me, just like whatever, go along.  If I let him know

16 that it pisses me off, then, yeah, yeah, whatever.

17     Q.   When was this video taken?

18     A.   I want to say like November 26th or, like, maybe

19 a few days before that, in that range.  Within the same

20 week that we were at the hotel.

21     Q.   Do you know where KC was at this point in time?

22     A.   Jail.

23     Q.   Okay.  So she was not available; is that right?

24     A.   Yeah.

25     Q.   Now, I think you just testified that you don't

consider yourself to have been Tristan's bottom.  Is
that correct?

    A.  Yes.

    Q.  You do consider Marika to have been his bottom?

    A.  Absolutely.

    Q.  Why do you say that?

    A.  Because, I mean, she's the one, at the end of the
day, it was -- he was like -- if I would, like, try to
make any comments toward her, that's where we would have
like the biggest physical fight, is because I made a
comment towards her.  And I'm like, are you saying you
guys aren't together, like what's going on.  She was,
like, supervising the money, and the, like, you should
just play her like this.

         And then, like, when I'm not around him, she's
like supervising me and calling and texting him and
telling him what I'm doing.  So then when I got back
with him, he wants to, like, try to hit me or something
and be like, "I know you did this or that."  It's
because she's telling him.  And that's the role that
bottom bitches take, from my experience.  They tell on
the other ones and they teach you the ropes, and then
they pretty much get a cut from everything you make and
they're telling their pimp daddy, whatever, what to do,
so.

 1          And then all his stuff, at one point he was just

 2     taking it over there, like just living over there, but

 3     having a backpack or two at my house.  Like, no.  You

 4     tell her just like -- yeah.

 5          Q.  Isn't it true that you told KC at one point in

 6     time that you didn't have to give Tristan any money?

 7          A.  No, I didn't tell her that.  I don't recall

 8     saying that.  I never even told her what I had to do

 9     with Tristan.

10          Q.  Do you still have the statement I gave you in

11     front of you?

12          A.  Yeah.

13          Q.  Okay.  Turn to page 2, if you would.  If you look

14     towards the bottom of the page, not the very bottom

15     paragraph, the one above it.  It's only three lines

16     long.  Can you read that to yourself?

17          A.  Yeah.

18          Q.  Okay.  Does that refresh your memory?

19          A.  That's not me telling her that I have to give

20     money to Tristan.  I'm telling her, yeah, even though he

21     asks you for money, you don't have to give him anything,

22     like don't feel it's your responsibility to pay him.

23     That's what I was telling her.

24          Q.  That's what I just asked you.  I thought I just

25     asked you, isn't it true --

1    A.  Okay.  Well, I didn't understand your question.

2  I apologize.

3    Q.  So isn't it true, you told KC she doesn't have to

4  give Tristan any money?

5    A.  Yes.

6    Q.  Now, it's true, is it not, that you were involved

7  in sex work for many years before meeting Mr. Grant?

8    A.  Yes.

9    Q.  And it's true that that continued for a period of

10  time after meeting Mr. Grant?

11        MR. REARDON:  Objection; asked and answered and

12  misstates her previous answer on that question.

13        THE COURT:  I think it was asked and answered.

14  Are you summarizing, or what's going on?

15        MR. WENDT:  Yeah, I'm summarizing, Judge.

16        THE COURT:  Okay.  Go ahead.

17  BY MR. WENDT:

18    Q.  Isn't it true that meeting Mr. Grant had nothing

19  to do with you performing sex work?  I mean, this is

20  something you'd been doing for a long time?

21    A.  Meeting him is what brought it back up and made

22  it like a priority because, like, before I met him, like

23  I said, all my, like, pretty much regulars, I weren't,

24  like, really talking to anymore.  I was getting into the

25  regular flow of life.  I was in school.  I was going to

the canneries.  I wasn't really on it.  But when he came

back, it's like, oh, you have to get back into it, you

have to -- I didn't have to meet quotas.  I just made

enough money to take care of my rent and take care of my

essential needs and take care of my mom.  But when he

came, I have to make money because there's some bigger

picture that has to be fulfilled.

        So that's my answer.

   Q.  Isn't it true that Mr. Grant has denied many

times, in speaking with you and texting with you, that

he was a pimp?

        MR. REARDON:  Objection; impermissible hearsay,

Your Honor.

        THE COURT:  Sustained.

        MR. WENDT:  I have no further questions.

        THE COURT:  Redirect?

        MR. WENDT:  Hold on.

        THE COURT:  Okay.

        (Pause.)

BY MR. WENDT:

   Q.  Very quickly, I did miss something on the

statement you gave on page 5.  If you could look at that

again.

        On page 5, could you look at page 5 again, that

statement I gave you?

1    A.   Yes.

2    Q.   Now, I'd asked you about the whispered portion.

3  Read the -- after "whispered 15," period, read the next

4  seven words to yourself.

5    A.   Okay.

6    Q.   Does that refresh your memory about what

7  happened?

8    A.   Yeah.  I think you're confusing the two.  I

9  already said the whispered part.  That has to be a typo

10  because I don't know why that's there.  I wouldn't

11  describe it as she whispered because that's not what she

12  did.

13       As far as to the neighborhood, I'm talking about

14  to my neighbors who are like big-time drug dealers.  I'm

15  not talking about to the people living in the apartment.

16  There is no reason to lie to us because I didn't see us

17  as a threat to her.  But I said, like, if you were to

18  meet, like, my neighbor at the time, gorilla, was just

19  so nasty, I'm like, just tell him you're like 18, 19, so

20  he won't start messing with you and trying to -- messing

21  with you and stuff like that.  So as a precaution, not

22  like -- not to anybody in the apartment, no.

23    Q.   Okay.  But you did tell KC to lie about her age?

24    A.   Yeah, to other people.

25    Q.   It doesn't say to other people, it just says you

1  told her to lie about her age?

2      A.  Well, it doesn't also say who I told her to lie

3  about her age to.

4      Q.  Isn't it true that you had denied that you were

5  required to give Mr. Grant money?

6          It's not on that statement you're looking at.

7      A.  I never denied that.  I don't recall saying

8  anything like, oh -- yeah, I don't remember saying that.

9      Q.  Okay.

10         MR. WENDT:  Your Honor, I have another report

11  here.  It's not in the possession, I don't believe, of

12  the government.  They may have it.  Can I show it to the

13  U.S. attorney?

14         THE COURT:  Show it to the government first.

15         (Pause.)

16         MR. WENDT:  May I approach the witness?

17         THE COURT:  Do you have an extra copy there?

18         MR. WENDT:  I do not.

19         THE COURT:  So -- okay.  You're going to have

20  to share with her.  Is that what you're telling me?

21         MR. WENDT:  Apparently.

22         THE COURT:  Okay.  Go for it.

23         (Mr. Wendt approaches the witness.)

24  BY MR. WENDT:

25      Q.  All right.  I'm just going to show you this

```
 1    report.  I'm not asking you to read the whole thing, but
 2    take a look at the front page.
 3              THE COURT:  Okay.  You're not near a
 4    microphone.
 5    BY MR. WENDT:
 6        Q.  Can you identify in general what that is?
 7        A.  It's an assault call.
 8        Q.  Well, it's a police report.
 9        A.  Oh, yeah, police report.
10        Q.  All right.  If you just turn to page 2.  In the
11    middle there, you see a couple lines that are
12    underlined?
13        A.  Uh-huh.
14        Q.  Could you read those to yourself.
15        A.  Yeah.
16        Q.  Okay.  Now, I'm going to ask you again, isn't it
17    true that at least at some point in time you denied
18    having to give Mr. Grant money?
19        A.  Yeah.  From this report, yeah.
20        Q.  From what?
21        A.  From what this report says, yeah.
22        Q.  But I'm asking you whether it's true that you
23    said that.
24        A.  Well, I mean, that's how it's typed, so clearly,
25    yes, I said that, for them to punch it in like this.
```

1  But still at this time, I was still trying to protect

2  him.  So I wasn't really trying to -- yeah, I wasn't

3  really trying to get him in trouble.

4      Q.  You're admitting that you said that, but you said

5  it because you were trying to protect Mr. Grant?

6      A.  Yes.

7      Q.  Can I have it back, please?  Thank you.

8          (Mr. Wendt returns to counsel table.)

9          MR. WENDT:  I have no further questions, Your

10  Honor.

11          THE COURT:  What's the government's position?

12          MR. REARDON:  Your Honor, can I ask for a

13  ten-minute break, one to allow the witness to get some

14  water, but two to pull the report from my files that

15  Mr. Grant --

16          THE COURT:  Okay.  We'll take a 15-minute

17  recess.

18          MR. REARDON:  Thank you, Your Honor.

19          DEPUTY CLERK:  All rise.  This matter now

20  stands in recess for 15 minutes.

21          (Recessed from 9:49 a.m. to 10:08 a.m.)

22          DEPUTY CLERK:  His Honor, the Court, the United

23  States District Court is again in session.

24          Please be seated.

25          THE COURT:  Okay.  Redirect?

1          MR. REARDON:  Yes, Your Honor.  May I approach?

2          THE COURT:  Yes.

3          (Mr. Reardon approaches the witness.)

4          MR. REARDON:  Your Honor, I have provided the

5     witness a copy of the police report that was provided to

6     her by Mr. Wendt on cross examination.

7                     REDIRECT EXAMINATION

8     BY MR. REARDON:

9        Q.  And that is report 1849717, Supplement 9.

10         Do you have that there, Ms. Banks?

11       A.  Yes.

12       Q.  And can I direct your attention to the second

13    page and specifically the paragraph that Mr. Wendt asked

14    you about?  Put a Post-it Note on there to mark it.  Do

15    you see it?

16       A.  Yes.

17       Q.  Okay.  Mr. Wendt asked you about the third full

18    sentence in the second line, she denied -- "In which she

19    denied having to give Grant money."

20         Do you remember that question?

21       A.  Yes.

22       Q.  What does the rest of that sentence say?

23         MR. WENDT:  I object, Your Honor.  I think it's

24    being used to refresh her memory, not to just read

25    directly from the police report.

```
 1              THE COURT:  Very well.
 2    BY MR. REARDON:
 3       Q.  Do you remember on that day giving a statement to
 4    the police?
 5       A.  Yes.
 6       Q.  And this is the day you were shot, correct?
 7       A.  Yes.
 8       Q.  And in that statement, did you make some comment
 9    about denying that the defendant was your pimp -- I'm
10    sorry, denying that you gave him money?
11       A.  Yes.
12       Q.  Did you say anything else about things that you
13    got him or gave to him?
14       A.  Yes.
15       Q.  What did you say?
16       A.  I said that, like, I would buy him clothes or
17    like, drugs or like anything else that he asked for,
18    like cars.
19       Q.  And did you do those things?
20       A.  Yes.
21       Q.  Did you buy him drugs and clothes and cars?
22       A.  Yes.
23       Q.  Was your statement at that time complete?  Were
24    you truthful about the money part?
25       A.  I would say vaguely.  I didn't want to tell the
```

```
 1   detective a lot because I still was trying to protect
 2   him.
 3       Q.   Why were you trying to protect him?
 4       A.   Because I was still in the mindset that
 5   everything was my fault.  And then, plus, I didn't want
 6   him to find out what I was saying and then, like, pretty
 7   much come and, like, finish me off, I guess.
 8       Q.   During that statement, did you make any comments
 9   about the defendant's involvement with minors?  Do you
10   remember?
11       A.   Yes.
12       Q.   And what did you say at that time, on
13   December 12th, about the defendant's involvement with
14   minors?
15       A.   Well, I said, like, he engaged in a lot of
16   activities with minor girls.  I referenced some of my
17   friends, and then said, like, he was pimping a few of
18   them out, making sex videos with them, fraudulent IDs
19   and credit cards.
20       Q.   Do you recall if on the 12th you specifically
21   mentioned JS?
22       A.   Yes.
23       Q.   Do you recall if on the 12th you specifically
24   mentioned Silky?
25       A.   Yes.
```

1    Q.  Do you have a copy of the other statement that

2  Mr. Wendt showed you, the report of an interview from

3  January of 2019?

4    A.  Yes.

5    Q.  And specifically you were asked about whether you

6  told Silky to lie about her age, and there were seven

7  words that Mr. Wendt wanted you to look at.  Do you

8  remember that?

9    A.  Yes.

10    Q.  Was there more to that statement than what was

11  asked about, meaning, why did you tell her to lie about

12  her age?

13    A.  Because I didn't want, like, my neighbors or

14  anybody else, like, preying on her and, like, harassing

15  her if they find out she was young, because my neighbor

16  was weird.

17    Q.  But the issue of her age as it concerned the

18  defendant was something that had been openly discussed

19  prior to her arrival at your apartment?

20    A.  Yes.

21    Q.  Had you discussed it with JS prior to her

22  arrival?

23    A.  Yes.

24    Q.  And what was that conversation like?

25    A.  It was JS saying that her friend is in trouble,

she needed somewhere to stay.  And I wanted to get some

background information about who the girl was, and so I

said, like, you know, where did you know her from, how

old is she.  And she told me she's 15 and I know her

from McLaughlin, she'll only be here for a few days.  I

was like, okay, well, she can stay however long she

wants.

Q.  And was the defendant present in your apartment

during that conversation?

A.  He was on the couch, on his phone.

Q.  Can you describe your apartment, briefly?  How

big was it?

A.  I would say like -- well, like that chair to,

like, cut off of this booth, like over there.  So this

is like the living room right here.  And it's like a

narrow hallway, you guys's desk.  And there's a bathroom

and then there's my room, then theres' a closet.  So

it's kind of small.  And there's a little kitchen over

there.

Q.  One bedroom and one bath?

A.  Yeah.

Q.  So not a lot of room to find privacy if you

needed it?

A.  No, unless you go in my room and lock the door.

There's one closet.

```
 1      Q.  You had described, in response to a question from
 2   Mr. Wendt, about prior pimps that you have had.  Do you
 3   remember that question?
 4      A.  Yes.
 5      Q.  And specifically, you had made mention of
 6   previously having been involved in a pimp and you were
 7   one of five members of the family?
 8      A.  Huh?
 9      Q.  You were one of five girls who were part of that
10   family?
11      A.  Yes.
12      Q.  Describe what that pimp was like.
13      A.  I mean, he was very assertive with, like,
14   whatever he wanted.  We had to make money.  He was
15   really physically abusive.  If you didn't make a certain
16   amount of money, like, you would get hit or, like, shot
17   up with paint ball guns while you're out there.  He was
18   very derogatory with his nature about everything.  We
19   were only allowed to, like, sleep in the garage and just
20   like almost treated like cattle.
21      Q.  And how old were you then?
22      A.  I was 16.
23      Q.  Okay.  And then you also described -- well, have
24   you had other pimps that were not that way, that were
25   what you would term a finesse pimp?
```

1    A.   Before I came -- before I came back to Alaska?

2    Q.   Well, you had mentioned having a number of men

3    who had pimped you out.

4    A.   Yeah.

5    Q.   And specifically, there was one you described

6    that you were part of a group of five girls.

7    A.   Uh-huh.

8    Q.   Were there other groups of smaller numbers of

9    girls, two or three?

10   A.   Yes.

11   Q.   What were those pimps like when you were part of

12   a smaller group?

13   A.   They weren't so, like, abrasive and, like, mean,

14   but they still had the same tone of what they expected,

15   and they were big about treating their bottom bitches

16   with, like, royalty, like they don't have to work a

17   certain amount of days, but we do.  Kind of like they

18   were just -- they weren't like gorilla pimps.  They

19   weren't on you, but still refresh your memory, like you

20   need to go out and make money.

21   Q.   Okay.  Well, let me ask you about those pimps.

22   Would they set a quota for you?

23   A.   No.  They just expected you to go out and make

24   money.  You can't come in with like $200.

25   Q.   So you were expected to make a certain amount of

money?

A. Yeah, but they never said, "I want you to make this amount of money."  It was, "This isn't enough, you need to go back out."

Q. Were they pushing you to do dates?

A. Yes.

Q. Were these street dates at the time?

A. Yes.

Q. So they were pushing you to meet customers?

A. Yes.

Q. And all of the money that you made from those dates, were you expected to give most or all of it to the pimp?

A. Yeah, all of it.

Q. The defendant had an expectation for how much money you were supposed to make every day, didn't he?

A. Yes.

Q. What about pushing you to post ads?

A. Yes, he did that.

Q. What about as it concerned JS and KC, do you recall him ever pushing you to post ads for them?

A. Yes.

Q. What about the money that was earned from the dates you did?  Was there an expectation you would give some of it to the defendant?

 1    A.  Yes.

 2    Q.  What about the money that JS and KC made?  Do you

 3  know if there was an expectation to give it to the

 4  defendant?

 5    A.  Yes.

 6    Q.  Since the time that the defendant shot you, he

 7  went to jail immediately thereafter, correct?

 8    A.  Yeah, a few hours after.

 9    Q.  Has he ever contacted you from jail?

10    A.  Yes.

11    Q.  About this case?

12    A.  Yes.

13    Q.  Has he asked you to make statements in his

14  benefit about this case?

15    A.  Yes.

16    Q.  What has he asked you to do?

17    A.  To, like, tell them that I did stuff, just tell

18  them that -- since my case is resolved, just tell them

19  that I pimped out my friends and I just lied on him

20  because I was scared of the investigating detective at

21  the time, to just say that I shot myself and everything

22  was a lie and that he didn't do anything.

23    Q.  The things that he's asking you to say, are they

24  true?

25    A.  No.

1    Q.  Has he sent you letters in which he's asked you

2  to do anything on his behalf?

3    A.  Yes.

4    Q.  Have you at any point in time felt threatened?

5    A.  Yes.

6    Q.  By whom?

7    A.  Tristan and, like, his friends.

8    Q.  And what has happened that caused you to feel

9  threatened?

10    A.  Like, while I was in jail, my sister was mistaken

11  for me.  It was a friend -- friends and associates of

12  Tristan.  And so, like, nine girls jumped my sister.  I

13  had a boy shoot at my mom and little sister's house.

14    Q.  And you viewed those as threats toward you?

15    A.  Yes.  Like, they made comments and then my older

16  sister -- and my sisters and my mom are not like

17  involved in the lifestyle at all.  So there's absolutely

18  no reason for them to be, like, harassed or threatened

19  like that, or just almost, like, killed.  And they would

20  make statements like, oh, she shouldn't go and testify

21  if she knows what's good for her.

22        MR. WENDT:  I object, Your Honor.  This is all

23  hearsay.  I would like a foundation laid.

24        THE COURT:  Sustained.

25  BY MR. REARDON:

1    Q.   The question was, you view those as threats

2  toward you?

3    A.   Yes.

4    Q.   Immediately after the defendant went to jail in

5  December of 2018, did you get any phone calls or letters

6  from him in that period of time?

7    A.   Yes.

8    Q.   Did he ask you to do anything as it concerned any

9  of his property or social media accounts?

10    A.   Yeah.  He asked me to deactivate his Snapchat

11  account.

12    Q.   And did he tell you why he wanted you to do that?

13    A.   Yeah, because there was, like, a lot of stuff on

14  there that can get him in trouble.

15    Q.   Did he mention specifically what any of that

16  stuff was?

17    A.   I think he mentioned, like, there's, like, the

18  video clips, of course.  He didn't, like, go into detail

19  besides saying just, like, get all of that shit off of

20  there, clips and stuff like that.  I didn't delete the

21  actual videos.  I just deactivated the account.

22    Q.   And, again, which account was that?

23    A.   His Snapchat, Gingerbread Man account.

24    Q.   If I could have just a moment, Your Honor.

25        THE COURT:  Very well.

1          (Pause.)

2          MR. REARDON:  I have no further questions, Your

3   Honor?

4          THE COURT:  Recross?

5          MR. WENDT:  Yes, briefly, Your Honor.

6                    RECROSS EXAMINATION

7   BY MR. WENDT:

8     Q.  Ms. Banks, you say the defendant sent you letters

9   asking for your assistance in this case?

10    A.  Yes.

11    Q.  Okay.  And how many letters?

12    A.  I think he sent like, not including the ones that

13  were seized by the government before I even got a chance

14  to see them.  The ones that came to my possession, there

15  had to at least be, like, 10 to 11 letters, or maybe 12.

16    Q.  Ten to eleven letters, not including the ones

17  that were seized.  So there were 10 to 11 letters that

18  were not seized?

19    A.  Yeah.  When I went to Wildwood, he managed to be

20  able to get letters to me over there.

21    Q.  And what were the letters that were seized, the

22  ones that went to Wildwood or someplace else?

23    A.  When I was at Hiland, as soon as I got there,

24  they had a no contact order that was issued between me

25  and him.  So everything that he sent me was

1    automatically seized.  I never got a chance to see it.

2    When I got transferred to Wildwood, they didn't have

3    that order, so his letters came to me.

4        Q.  So the ones that were sent to Hiland were seized

5    and you never got a chance to see them?

6        A.  No.  I got a chance to see two, and I freaked out

7    and gave it to the social worker.  That's when she

8    brought it to the attention of, like, my attorney.

9        Q.  So two letters that were sent to Hiland did come

10   to you, and you gave them to your attorney?

11       A.  Yes.

12       Q.  And in those letters he asked for your help in

13   this case?

14       A.  Not like right off the bat.  But, I mean, he was

15   pretty much taking the victim stance, like asking me why

16   am I going to bury him for the government, they're not

17   trying to help me, just like manipulation and mind games

18   and stuff like that.  And, yeah, just saying, like,

19   everything was my fault and am I happy now, like that.

20   He didn't get more into the, oh, you need to do this,

21   this, this until I made it to Wildwood.

22       Q.  Okay.  And those letters at Wildwood, there were

23   10 to 11 letters that you received in Wildwood?

24       A.  Yes.

25       Q.  What did you do with those letters?

1    A.  Well, one, I kind of felt bad.  So, like, I

2  responded to him because I'm like, he keeps sending

3  letters and it's just rude to ignore somebody.  So I

4  just responded with the hopes that he would just like

5  think about his case and, like, see maybe he's not

6  taking the best route.  But then I just stopped

7  responding because my attorney was like, that could get

8  me in trouble even though, like, Wildwood is not

9  informed we have a no contact order.  So I just stopped

10  all communication and just started checking the letters

11  and making copies for myself and sending the originals

12  to my attorney.

13    Q.  So the majority of these letters that were sent

14  to you in Wildwood were given to your attorney?

15    A.  Yeah.  They were given to me and then I gave them

16  to my attorney.

17    Q.  They should be available somehow now?

18    A.  Yeah.  I mean, I gave a whole fat envelope away,

19  so.

20    Q.  And you mentioned phone calls as well.  When were

21  the phone calls that you received from him?

22    A.  They're not from him.  You can't call each other.

23    Q.  I know, if you're in jail.  So what were the

24  circumstances?

25    A.  We have a daughter together, so we have an OCS

1  custody battle going on right now.  So when we are both

2  on telephonic court hearings, that's when communication

3  starts where I'm directly speaking to him and he's

4  saying like -- pretty much still trying to use his charm

5  to get his way.  And then finally I just had enough of

6  it and we had a really big argument over the phone.

7  Q.  Okay.  But when you say "using his charm to get

8  his way," and he's in court and you're having a

9  conversation in court, are you saying that he's trying

10  to lie or make up stories in this case during those

11  conversations?

12  A.  Well, he's not directly saying that.  My attorney

13  is on the phone, as well my OCS attorney.  That wouldn't

14  be smart.  He's saying, like, oh, did you get my letter,

15  did you see what I said, like reference to his letter

16  that I have not responded to where he's telling me, oh,

17  call and do this and do this and that.  It's just like,

18  yeah, stuff like that.

19  Q.  Who was your OCS attorney?

20  A.  I had two I had Paul Tony, and then this new one

21  is Olivia Mackin.

22  Q.  And which one of those attorneys would be present

23  when you were having conversations with Tristan?

24  A.  They were both present.  When Paul was my

25  attorney, he was always there present, and now Olivia is

1    my attorney, so she's always present.

2        Q.  On redirect, you spoke about problems that your

3    sister had and I think problems that your mother had

4    regarding this case.  Is that right?

5        A.  Yes.

6        Q.  And you've said many times prior to this that you

7    live in a bad neighborhood; is that right?

8        A.  Well, when I was out, I was living in a bad

9    neighborhood.  But my mom and sisters don't.

10       Q.  Oh, okay.  All right.

11           MR. WENDT:  Those are the only questions I

12   have.

13           THE COURT:  All right.  Thank you very much.

14           Ma'am, you're excused.

15           (Witness excused)

16           (Requested excerpt concluded, proceedings

17   continued.)

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
    matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
    Conference of the United States.

6

        Dated this 18th day of April, 2021.

7

8

                        /s/ Sonja L. Reeves
9                       SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25