# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                       Plaintiff,<br><br>    vs.<br><br>TRISTAN GRANT,<br><br>                      Defendant. | 3:19-CR-00003-RRB-MMS<br><br>**18 U.S.C. § 1514(b)(1)**<br>**PROTECTIVE ORDER [DKT. 245]** |

## I. MOTION PRESENTED

Pending before this Court is the government's motion for a three-year protective order pursuant to 18 U.S.C. § 1514(b)(1). Dkt. 245 at 1-2. The government argues that Tristan Grant has "engaged in a sustained campaign to harass J.S. into recanting her trial testimony, causing her substantial emotional distress." Dkt. 393 at 1-2. This Court held evidentiary hearings in July 2021, August 2021, September 2021, October 2021, and in February 2022. Dkt. 260; Dkt. 268; Dkt. 296; Dkt. 302; Dkt. 385. The government filed its post-hearing brief in March 2022. Dkt. 393. This Court deems Grant's post-hearing brief as waived after failing to meet this Court's extended deadline. This Court has carefully reviewed the government's motion, arguments of counsel, and the pertinent portions of the records. Having done so, the government's motion for a three-year protective order is **GRANTED**.

## II. EVIDENTIARY HEARINGS

### A. Task Force Officer Leonard Torres

TFO Torres first interviewed J.S., then a minor, at a correctional youth center in January 2019. Dkt. 302 at 8. J.S. hesitated to speak with TFO Torres because she believed that TFO Torres would bring charges against her if any incriminating statements were made. *Id.* at 9-10. TFO Torres explained that the federal government could not charge a minor, that J.S. was not the subject of TFO Torres' investigation, and denied making any threats of prosecuting J.S. *Id.* at 9-10, 13. J.S. was also hesitant because she believed that Grant would retaliate against J.S. or J.S.'s family since Grant had a reputation of violence and was involved in several shootings, including the recent shooting of a codefendant. *Id.* at 12-13.

According to TFO Torres, the FBI builds trust with human trafficking victims by offering protection, resources, and allowing victims to contact the FBI agents "pretty much 24/7." *Id.* at 14. The FBI does not charge minors because it would be another "form of revictimization" to minors that have been "forced to live in a particular lifestyle where criminal acts are forced upon them." *Id.* at 13. J.S. was given TFO Torres' work phone number and J.S. would routinely call TFO Torres to request assistance with personal or legal problems. *Id.* at 14-15. TFO Torres would then help "deescalate [J.S.] and communicate with the staff where she was at to get her the help that she needed." *Id.* J.S., on numerous occasions, relayed suicidal thoughts to TFO Torres. *Id.* at 17. TFO Torres sometimes had difficulty in discerning the sincerity of J.S.'s statements because J.S. would discuss "something that's pretty serious, but she's laughing about it, even though I'm

understanding that it's serious to her … there were other times where she would be completely out of control and devastated over something[.]" [*sic*]. *Id.* at 16. TFO Torres testified that J.S. had dyslexia and that she was "delayed. Her IQ is lower than norm." *Id.* at 34.

Between May 30-31, 2021, J.S. called TFO Torres several times because Grant wanted J.S. to recant her testimony and Grant had sent Julissa Carter, an associate of Grant, to threaten J.S.'s mother. Dkt. 268 at 7. TFO Torres concluded that Grant sent Carter to threaten J.S. because Grant asked Carter to "slide over there and talk" with J.S.'s mother. *Id.* at 26. TFO Torres believed that the word "slide" was a gang-related euphemism for inflicting violence. *Id.* at 26-27. J.S. was concerned for her mother's safety and asked TFO Torres to investigate. Dkt. 268 at 8; Dkt. 302 at 16. While J.S. did not display any emotion when she asked TFO Torres to investigate, TFO Torres interpreted J.S.'s request as her being afraid. *Id.* at 35. TFO Torres followed up with J.S.'s mother, but J.S.'s mother did not cooperate, in part because she had several past run-ins with TFO Torres. Dkt. 302 at 18. TFO Torres then requested Grant's jail calls from April 24, 2021 to May 16, 2021 and found out that Grant had attempted to call J.S.'s mother on several occasions. Dkt. 268 at 9. On one occasion, Grant seemingly argued with a child because the child refused to disclose the whereabouts of J.S.'s mother and whether J.S.'s mother had received Grant's letters. *Id.* at 10, 24. TFO Torres characterized the child's demeanor as being "upset. At times, he was angry. He sounded angry." *Id.* Grant's objective in contacting J.S.'s mother was to have J.S. recant her trial testimony to secure a new trial. *Id.* at 11. On two other occasions, Grant talked to his aunt about needing "old girl" to recant "her statement to give

3

him an opportunity for a new trial" since Grant's lawyer had moved for a new trial. *Id.* at 20.

### B. FBI Special Agent Jolene Goeden

SA Goeden oversaw Grant's case during the relevant periods of this motion. *Id.* at 43. On May 31, 2021, SA Goeden contacted J.S.'s mother to verify TFO Torres' claim that Carter went to her home. *Id.* at 45. SA Goeden characterized Carter as "being really hyped up, really pumped up, that she thought she wanted to fight, and that she repeatedly asked where JS was." [*sic*]. *Id.* at 46. J.S.'s mother relayed her worries and fears that Carter would hurt J.S. *Id.* at 47. SA Goeden then mentioned a letter sent by Grant that asked J.S.'s mother to "fix this," that is, having J.S. "change her testimony." *Id.* On June 15, 2021, SA Goeden was notified by J.S.'s mother that J.S. had fled the state because Ajela Banks, a co-defendant in Grant's case, had threatened J.S. over a video call. *Id.* at 49.

SA Goeden, during cross-examination, testified that J.S.'s mother did not perceive Grant's actions as threats. *Id.* at 53. SA Goeden also clarified that it was J.S.'s sister who notified J.S.'s mother of the threat made by Banks. *Id.* at 56.

### C. Samantha Pizzuto

Samantha Pizzuto, Grant's aunt, testified to phone conversations with Grant and testified to her limited interactions with J.S.'s mother. *Id.* at 64. Grant asked Pizzuto to contact J.S.'s mother, Pizzuto then called J.S.'s mother and asked whether she was willing to testify for Grant, and on another occasion had a three-way phone call with Carter and J.S.'s mother regarding J.S.'s testimony. *Id.* at 81. Pizzuto did not believe that there was

4

anything wrong with contacting J.S.'s mother because Grant had already been found guilty. *Id.* at 89.

### D. J.S.'s Mother

J.S.'s mother first talked about the May 31, 2021 incident with Carter, which lasted about one minute. Dkt. 315 at 9, 14. J.S.'s mother testified that Carter arrived unannounced and wanted to fight J.S. because Carter was "clamping her fist a little, like breathing hard" while asking for J.S.'s whereabouts. *Id.* at 11. At some point Carter asked, "if we could fix something and talk to somebody" [*sic*]; to which J.S.'s mother replied, "I'll talk to my daughter to see what she says." [*sic*]. *Id.* at 15. Carter left the scene after J.S.'s mother repeated a few times that J.S. was not at home and was instead detained at a correctional center. *Id.* at 12. The entire ordeal did not cause any distress for J.S.'s mother since Carter did not convey any direct threats or engage in any physical violence. *Id.* at 14, 16. After J.S. was notified of the May 31, 2021 incident, J.S. asked J.S.'s mother to not "talk to [Grant] no more." and to not "accept his calls no more." [*sic*]. *Id.* at 25. It did not appear to J.S.'s mother that J.S. was distressed after being notified of the incident as J.S.'s mother had seen J.S. fight on previous occasions to the point that J.S. had to be pulled apart from the fights. *Id.* at 25, 50.

J.S.'s mother was then asked about the letters that Grant sent but she ultimately could not remember the contents of the letters because "every letter that I've gotten, I've gaven it to my daughter. [*sic*] I think she threw it away." *Id.* at 18. According to J.S.'s mother:

> I've talked to [Grant] throughout months of him being in there, and he's always said he loved my daughter. I didn't know because my daughter's PO never told me what was ever said or what was going on. I would relay messages back and forth for them, and he's always been nice and he's always said that he has loved my daughter.

[*sic*]. *Id.* at 19. J.S.'s mother further testified that TFO Torres had threatened J.S. on several occasions with prostitution charges if she did not cooperate. *Id.* at 24.

On cross-examination, J.S.'s mother blamed Grant's co-defendant, Banks, for the situation that J.S. ended up in since Grant "didn't know about my daughter's age, because he probably thought she was the same age as [Banks]" and Grant had "already suffered long enough" for the entire ordeal. *Id.* at 28, 38. J.S.'s mother testified that Banks "threatened to kill [J.S.]," J.S. fled within hours of Banks' threat, and J.S.'s mother did not know where J.S. relocated. *Id.* at 39. J.S.'s mother was pressed again on the contents of Grant's letter but could not remember what it said, but at one point seemingly nodded when asked if the letter pertained to J.S.'s minor age. *Id.* at 29-30. J.S.'s mother stood by her prior testimony that TFO Torres threatened J.S. with potential charges if she did not testify at Grant's trial. *Id.* at 32. In J.S.'s mother's eyes, TFO Torres was "very manipulative" and a "liar." *Id.* at 36, 53.

### E. FBI Special Agent Jessica Hais

SA Hais first testified to the January 3, 2019 interview with J.S. at the correctional youth center. Dkt. 302 at 45. Neither she nor TFO Torres threatened to arrest her or press charges because minor victims are not usually investigated and charged by the FBI due to the prior trauma. *Id.* at 45, 47. According to SA Hais, J.S. was concerned that Grant "would

6

Case 3:19-cr-00003-RRB-MMS   Document 398   Filed 04/05/22   Page 6 of 15

retaliate against her in a violent way [and] she would be harmed." *Id.* at 46, 48. It was hard for SA Hais to discern the sincerity of J.S.'s emotions in part because of her developmental delays. *Id.* at 48-49. J.S., however, began trusting TFO Torres and SA Hais to the point that J.S. would call for issues unrelated to Grant's pending case. SA Hais mentioned that on one occasion, J.S. did relay her concerns of retaliation against her immediate family potentially because of Grant. *Id.* at 50.

F. Tristan Grant

Grant met Carter in 2010, and met J.S. in September 2018. Dkt. 385 at 14. According to Grant, Carter and J.S. were friends since they often discussed personal matters which included helping one another with money or food. *Id.* at 15. Grant, referring to the May 31, 2021 incident, confirmed that he asked Carter to "slide" to J.S.'s mother home to discuss Grant's trial and Grant's letter. *Id.* at 17-18. Grant, however, contested TFO Torres' allegation that the word "slide" was an argot for gang violence as the word "slide" also meant to visit or stop by someone's home. *Id.* at 18. Grant asked Carter to visit the home of J.S.'s mother in part because J.S.'s mother "had told [Grant] some news … that [J.S.] had been threatened and coerced by Detective Torres [*sic*] to testify and what to testify to." *Id.* at 17.

Grant then testified to the relevance and substance of several phone calls that he made to J.S., J.S.'s mother, Banks, and Carter:

- January 5, 2019 phone call: Grant spoke with Banks regarding J.S. and Grant's case. *Id.* at 43-44.
- January 21, 2020 phone call: Carter mentioned to Grant that J.S. reached out to Carter right after J.S. was released from jail. *Id.* at 38.

7

- June 20, 2020 phone call: Grant spoke with J.S. regarding his case and that TFO Torres was "bothering" J.S. *Id.* at 42.
- June 27, 2020 phone call: This was the first time that Grant spoke with J.S. after his incarceration, and according to Grant, J.S. "spoke about things in that phone call that would have helped me at trial." *Id.* at 40.
- July 5, 2020 phone call: J.S. and Carter spoke over the phone regarding Grant, specifically when Grant was going to call J.S. *Id.* at 37.
- December 2020 phone call: It appears that this was a three-way phone call with Grant, J.S., and another inmate with a separate case involving J.S. as a victim. Grant mentions that J.S. did not want to cooperate in Grant's trial because Grant "didn't do anything." *Id.* at 39.
- December 2020 or January 2021 phone calls: Grant was unsure of the month that he placed two phone calls that show Grant speaking to J.S. about J.S.'s issues and mental wellbeing. *Id.* at 41.
- January 11, 2021 phone call: It appears that this was a three-way phone call with J.S., Grant, and Grant's appointed attorney that lasted about fifteen minutes. The conversation, according to Grant, shows that J.S. did not fear or feel threatened by Grant. *Id.* at 36-37.
- March 6, 2021 phone call: J.S.'s mother mentioned to Grant that J.S. was waiting for Grant's letter because it had not been received yet, that J.S.'s mother refused to cooperate in Grant's trial, and whether Grant needed money. *Id.* at 33-34.
- April 11, 2021 phone call: Grant was not worried about J.S.'s cooperation in Grant's trial so long as J.S. told the truth. *Id.* at 34.
- April 17, 2021 phone call: This call was the day after Grant's trial concluded in a conviction. It appears that Grant wanted to know why J.S. testified the way she did but J.S.'s mother appeared to not know why. *Id.* at 34-35.
- May 5, 2021 phone call: Grant spoke with J.S.'s mother regarding the letter sent by Grant, J.S.'s mother gave Grant two additional phone numbers to contact her at, and that J.S. would speak with Grant as soon as possible. *Id.* at 31.
- May 5, 2021 phone call: While Grant did call Carter to discuss matters pertaining to his trial, he did not ask Carter to visit J.S.'s mothers home. Rather, Carter "was going over there to speak to [J.S.] herself, and you can hear [J.S.'s mother] in the background, as I'm talking to Julissa, and they're talking like amongst friends. You hear them laughing and all this other stuff." *Id.* at 32.

Grant argued that he had tried to contact J.S. through third parties such as J.S.'s mother since the government's request for the three-year protective order made it

8

impossible to contact her directly. *Id.* at 44. It appears that Grant spoke with J.S.'s mother over the phone through another inmate and the inmate mentioned the implications of this Court's temporary restraining order. *Id.* at 44. When asked whether Grant would comply with any potential protective order, he replied in the affirmative. *Id.* at 46-47.

The evidentiary hearing turned combative when Grant was cross-examined. Grant was pressed on the November 2020 call to Jacqueline, J.S.'s mother, that occurred after this Court's temporary restraining order: "They didn't order me not to speak to no one. They ordered me not to call anyone or write anyone. They didn't say I couldn't say hello." [*sic*]. *Id.* at 51. Grant conceded that the November call violated this Court's previous order but also mentioned that he would abide by any future protective order. *Id.* at 52. Grant, when asked about his pretrial communications with J.S., mentioned that they communicated several times through letters and phone calls, specifically that J.S. did not want to cooperate in Grant's trial. *Id.* at 57-58. Grant conceded that he was aware of J.S.'s affidavits:

> Q: [S]o you were talking to her all the way up to your trial and you knew that she had told police about you?
> A: I knew what I've seen in affidavits … I don't know if it specifically came out of her mouth or if this is what detectives were putting in their reports.
> …
> Q: But you knew that you were charged with several crimes that she was the victim of?
> A: Yes.
> Q: And that she was going to testify in your trial?
> A: I didn't know that she was going to testify at my trial.

*Id.* at 60-61. Grant was then asked about an April 11, 2021 phone call where J.S.'s mother told Grant that J.S. was going to testify. *Id.* at 63. Grant only knew from third-party sources that J.S. would not testify: "I've never spoken to JS, but JS spoken to my aunt, and she's spoken to [Carter]. So she told all three of them the same thing." *Id.* at 68-69. J.S.'s mother was Grant's primary way of receiving updates and relaying messages to J.S. *Id.* at 73. At one point, a May 3, 2021 phone call was repeatedly played three times because Grant was adamant that it was not him that spoke about Torres, and this Court had to intervene by stating that the "call speaks for itself." *Id.* at 76. The next call was a September 13, 2020 phone call with J.S., and in this phone call, Grant told J.S. that "I have my ways" [*sic*] when J.S. asked how Grant got her phone number. *Id.* at 81. Grant also confirmed that he called J.S. a "little bitch" and was the reason that he was in jail. *Id.* at 83. Grant, however, fell back on his theory that J.S. had been "coached" to testify against him, was therefore "tainted," and it was his duty to find out who had "threatened her. Who coerced her and forced her and who intimidated her and who violated my due process[.]" [*sic*]. *Id.* at 87-88. Grant was pressed on whether he wanted to speak with J.S. post-trial:

> If I wanted to get in contact with JS right now, I probably could. It's not hard. All I would have to do is contact [J.S.'s mother] and I can find her. But, guess what, I don't want to find JS. I don't want to talk to [J.S's mother] right now, no more. I don't want to do none of that. And I got this temporary restraining order. I'm trying to talk to my family. I've been in the whole for eight months because of this bullshit.

[*sic*] *Id.* at 110.

## III. LEGAL STANDARD

A federal court, upon a government's motion or raised *sua sponte*, must first conduct a hearing to assess whether there is a preponderance of the evidence to issue an 18 U.S.C. § 1514(b)(1) protective order. Any "adverse party named in the complaint shall have the right to present evidence and cross-examine witnesses." 18 U.S.C. § 1514(b)(3). The federal court can then issue a necessary protective order that prohibits harassment of a victim or witness in a federal criminal case or investigation. *Id.* Section 1514(b)(4) requires a federal court to specify its reasons with reasonable detail as to what act or acts are being restrained in the protective order. Harassment is defined as (1) "a serious act or course of conduct directed at a specific person that" (2) causes substantial emotional distress and (3) serves no legitimate purpose. 18 U.S.C. § 1514(d)(1)(B)(i)-(ii). A serious act is one act of "threatening, retaliatory, harassing, or violent conduct that is reasonably likely to influence the willingness of a victim or witness to testify or participate" in a federal criminal case or investigation. 18 U.S.C. § 1514(d)(1)(F). Course of conduct is specified as a series of acts spanning a time period that indicates an intent to continue such acts. 18 U.S.C. § 1514(d)(1)(A).

## IV. LEGAL ANALYSIS

Here, Grant directly and indirectly contacted J.S. over a two-year period regarding J.S.'s cooperation in his trial, his behavior escalated in the days leading up to his trial, during his trial, and immediately after he was convicted. Specifically Grant's June 2020-January 2021 phone calls indicate that Grant wanted to know about J.S.'s cooperation, with one November 2020 phone call violating this Court's temporary restraining order; in March

11
Case 3:19-cr-00003-RRB-MMS   Document 398   Filed 04/05/22   Page 11 of 15

2021-April 2021, Grant sent letters and repeatedly called J.S.'s mother and Grant's aunt to inquire whether J.S. would tell the "truth"; Grant, the day after he was convicted in mid-April 2021, called J.S.'s mother to figure out why J.S. testified the way she did; and would repeatedly call J.S.'s mother's phone throughout the rest of April 2021-May 2021, which culminated in the May 31, 2021 incident where J.S.'s mother believed that Carter wanted to fight J.S. Although Grant testified that he did not want to talk with J.S. or J.S.'s mother anymore, Grant also testified that he could "get in contact with JS right now, I probably could. It's not hard." Dkt. 385 at 110. This Court concludes, without much difficulty, that Grant's actions in attempting to directly and indirectly contact J.S. over a two-year period meet § 1514's course of conduct definition. 18 U.S.C. § 1514(d)(1)(A).

This Court now turns to whether Grant's actions caused J.S. substantial emotional distress. 18 U.S.C. §§ 1514(b)(1), (d)(1)(B)(i). The testimony of TFO Torres and SA Hais were persuasive and credible as to J.S.'s fear in January 2019 that Grant would potentially retaliate if she cooperated in Grant's case. Grant's communications with J.S. were at times vulgar and abusive, and when Grant was unable to directly contact J.S., he would resort to reaching her through third-parties. The escalation of Grant's actions in attempting to contact J.S. indirectly caused J.S. to flee the state in June 2021. Moreover, the testimony of J.S's mother shows that J.S. wanted to cease communications altogether with Grant: J.S. threw out Grant's letter, would not respond to Grant's third-party communications at times, and requested J.S.'s mother to stop speaking with Grant on several occasions. Although, because J.S. did not testify, it was impossible to directly judge the sincerity of her fears, J.S. called TFO Torres several times after meeting in January 2019, and in particular, J.S.

called TFO Torres to relay her fears that stemmed from the May 31, 2021 incident. Whether the word "slide" meant to inflict violence or not, the May 31, 2021 incident demonstrates that Grant is capable of causing substantial emotional distress to J.S. through third-parties, despite being behind bars.

The testimony of J.S.'s mother, although contrary to the evidence presented by the government, does not give this Court pause. J.S.'s mother repeatedly testified that she did not feel threatened by Grant, and in fact wanted to support him as she was not in favor of any prosecution of Grant's misconduct. Her testimony was, frankly, not credible. She was at pains to avoid saying anything adverse to Grant. She refused to pass the bar and testify from the witness stand, instead remaining in the gallery. Her demeanor was evasive, equivocal, and biased. Although J.S.'s mother testified that Carter wanted to fight J.S. on May 31, 2021, J.S.'s mother sought to minimize the dangerousness of the situation by stating that J.S. had been in fights before, and that J.S's mother was not personally threatened. J.S.'s mother is at best indifferent to the patent risk posed to her daughter by Grant and his collaborators, and at worst, J.S.'s mother is complicit with Grant's actions. This Court will not ignore the harm that is perpetrated when J.S.'s mother is willing to convey Grant's messages to J.S. at any moment's notice.

This Court does not have the benefit of J.S.'s testimony. Her whereabouts are unknown. However, the evidence amply meets the preponderance of the evidence standard, and the Court concludes that Grant's action's caused substantial distress to J.S. 18 U.S.C. § 1514(d)(1)(B)(i).

This Court now turns to whether Grant's course of conduct served no legitimate purpose. 18 U.S.C. § 1514(d)(1)(B)(ii). Here, Grant knowingly violated this Court's temporary restraining order when he contacted J.S.'s mother in November 2020, and compounded this violation by continuously trying to contact J.S. through third parties in an apparent effort to gather information regarding her plans to testify against him, or to influence or threaten her in some way. Apparently unable to accept that J.S. made inculpatory statements in affidavits and in her trial testimony, Grant continuously sought out J.S.'s mother in hopes that J.S. would recant her trial testimony. It appears to this Court that Grant exhibits a willful defiance about the force and effect of this Court's orders. If Grant's testimony is to be credited, his underlying concern was that J.S.'s testimony could have been coerced or influenced by TFO Torres. A defendant's concern as to coerced testimony is itself legitimate, but the manner in which a defendant chooses to resolve that concern speaks volumes and calls his entire course of conduct into question: his repeated attempts to contact, manipulate, and influence J.S. served no legitimate purpose. Repeatedly contacting J.S.'s mother in April 2021-May 2021 and Carter's May 31, 2021 incident served no legitimate purpose.

This Court therefore concludes by a preponderance of the evidence that Grant's actions did not serve a legitimate purpose. 18 U.S.C. § 1514(d)(1)(B)(ii).

## V. CONCLUSION

For the foregoing reasons, the government's [Dkt. 245] motion for a three-year protective order pursuant to 18 U.S.C. § 1514(b)(1) is **GRANTED**.

**IT IS HEREBY ORDERED** that Grant is prohibited from having any direct or indirect contact, which includes but is not limited to contact by phone, letter, or any other means of communication, with J.S. for a three-year period. If Grant knowingly and intentionally violates, or attempts to violate, this order, he "shall be fined under this title, imprisoned not more than 5 years, or both." 18 U.S.C. § 1514(c).

**IT IS HEREBY ORDERED** that Grant is prohibited from having any direct or indirect contact, which includes but is not limited to contact by phone, letter, or any other means of communication, with J.S.'s mother for a three-year period. If Grant knowingly and intentionally violates, or attempts to violate, this order, he "shall be fined under this title, imprisoned not more than 5 years, or both." 18 U.S.C. § 1514(c).

**IT IS SO ORDERED.**

DATED this 5th day of April, 2022 at Anchorage, Alaska

*s/ Matthew M. Scoble*
Chief United States Magistrate Judge
